Hon. Robert S. Lasnik

1

2

3

4

5

6

7

8

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
## AT SEATTLE

| | | |
|---|---|---|
| 9 | HENRY BARABIN and GERALDINE BARABIN, | ) ) |
| 10 | Plaintiffs, | ) ) |
| 11 | v. | ) ) |
| 12 | ASTENJOHNSON, INC. and SCAPA DRYER FABRICS, INC., | ) ) ) |
| 13 | Defendants. | ) ) |
| 14 | | ) ) |
| 15 | | ) |

No. C07-1454 RSL

PLAINTIFFS' CONSOLIDATED OPPOSITION TO DEFENDANTS' MOTIONS FOR NEW TRIAL OR REMITTITUR

**ORAL ARGUMENT REQUESTED**

NOTE ON MOTION CALENDAR: January 29, 2010

### I.  RELIEF REQUESTED

Plaintiffs respectfully request that the Court deny all the defendants' requested relief.

### II.  STATEMENT OF FACTS

On November 20, 2009, judgment was entered in this case after a jury verdict in favor of the plaintiffs.  Following entry of the judgment, the self-described "lone 'non-conforming' juror" sent a letter to the Court detailing her disappointment in the result.  On December 18, both defendants filed motions for a new trial pursuant to *Fed. R. Civ. Proc.* 59, substantially based on a declaration the defendants wrote for the disgruntled juror.

### III.  ISSUES

1.  Can an inadmissible declaration from a single disgruntled juror be used to impeach the jury's verdict?

2.  Is it proper to overturn a well-supported jury verdict simply because the jury found plaintiffs' evidence more credible than the defendants'?

3.  Should the Court reverse itself on each and every of its substantive evidentiary rulings that was objectionable to the defendants, and thereby order a new trial?

J:\WA\106995\USDC (Federal)\Post-Trial\CONSOL RSP OPP MTNS NEW TRIAL.wpd

**BRAYTON ◆ PURCELL, LLP**
111 SW Columbia Street, Suite 250
Portland, Oregon 97201
Tel: (503) 295-4931; Fax: (503) 241-2573

4.      Is a new trial warranted when the Court correctly instructed the jury on Washington law, or when the defendants did not request a damages apportionment at trial?

5.      Is a new trial warranted where a single allegedly improper statement made in closing argument was cured by a contemporaneous instruction from the Court?

6.      Is a new trial warranted where the defendants fail in their heavy burden to overcome the strong presumption of constitutionality that applies to the Legislature's preservation of the long-standing common law principle of joint and several liability for asbestos-injury cases?

7.      Is remittitur proper where the damages assessment is supported by substantial evidence?

## IV.  EVIDENCE RELIED UPON

Plaintiffs rely upon the Declaration of Cameron O. Carter in Support of Plaintiffs' Consolidated Opposition to Defendant's Motions for New Trial or Remittitur, the exhibits attached thereto, and the pleadings and papers on file herein.

## V.  ARGUMENT

There is no basis to overturn the jury's findings in this case, all of which are supported by substantial evidence.  The defendants' motions are baseless challenges to a verdict they do not like, based substantially on ill-gotten and inadmissible evidence.

Plaintiffs do not concede that any information contained within the declaration signed by the rogue juror is accurate beyond the recitation of her name, location of signing, and that she served in this case.  This juror, as the lone holdout for the defendants during deliberations, presents as the classic disgruntled juror determined to get the last word in deciding who was "right" and who was "wrong," taking pains to catalog all the areas where the other members of the jury "just didn't get it" in her un-invited letter correspondence to the court.

Notably her detailed (though error-riddled and confused) letter correspondence omits the information set forth in the subsequent declaration.  She signed a declaration clearly written by defense counsel or their representatives.

While there is no local or Ninth Circuit rule absolutely prohibiting unsupervised post-verdict juror contact, such unsupervised contacts "are not looked on favorably in this circuit." *Hard v. Burlington Northern Railroad*, 812. F.2d 482, 485 (9th Cir. 1986) (*citing Traver v. Meshriy*, 627 F.2d 934, 941 (9th Cir. 1980) (questioning jury about its internal deliberations or

2 -   PLAINTIFFS' CONSOLIDATED OPPOSITION TO DEFENDANT'S MOTIONS FOR NEW TRIAL OR REMITTITUR
J:\WA\106995\USDC (Federal)\Post-Trial\CONSOL RSP OPP MTNS NEW TRIAL.wpd

**BRAYTON ◆ PURCELL, LLP**
111 SW Columbia Street, Suite 250
Portland, Oregon 97201
Tel: (503) 295-4931; Fax: (503) 241-2573

manner in which it arrived at its verdict should be discouraged); *Smith v. Cupp*, 457 F.2d 1098, 1100 (9th Cir. 1972) (improper and unethical for lawyers to interview jurors to discover their course of deliberation), *cert. denied*, 409 U.S. 880 (1972).[1]  Notwithstanding these efforts by the defendants, even if Mrs. Lockwood's vague (intentionally or otherwise) recollections are assumed to be accurate, they are completely excluded by the rules of evidence and cannot serve as grounds for a new trial.

### A.    There is No Competent Evidence to Support the Defendants' Allegations of Juror Misconduct

*Fed. R. Evid.* 606(b) directly addresses a juror acting as a witness to impeach the validity of a verdict.[2]  The rule's proscriptions are founded in concerns for juror privacy and in insulating the manner in which the jury reached its verdict from collateral attack.  Exclusion of evidence relating to internal juror misconduct promotes the strong public interest in the finality of judicial process, a juror's ability to engage in frank discussions and to return an unpopular verdict, and the trustworthiness of the jury system.  *Tanner v. U.S.*, 483 U.S. 107 (1987).

The rule draws a dividing line between inquiry into the thought processes of the jurors and inquiry into the existence of conditions or the occurrence of events calculated to exert an improper influence on the verdict.   The purpose of the rule is to preserve the integrity of jury deliberations by confining claims of error to events or conditions that are improperly brought to the jury's attention and that involve a calculated, intentional attempt to affect the outcome.  *U.S. v. Brooks*, 677 F.2d 907, 913-914 (D.C. Cir. 1982).  This rule states in relevant part:

> Upon an inquiry into the validity of a verdict . . . *a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict . . . or concerning a juror's mental processes in connection therewith.*  But a juror may testify about (1) whether extraneous prejudicial information was improperly brought to the jury's attention, (2) whether any outside influence was improperly brought to bear upon any juror, or (3) whether there was a mistake in entering the verdict onto the verdict form.  *A juror's affidavit or evidence of any statement by the juror may not be received on a matter about which the juror would be precluded from testifying.*

*Fed. R. Evid.* 606(b) (emphasis added).

---

[1]In this regard it is worth recalling the effort the Court and attending Law Clerk took to limit even supervised post-trial contact with the jurors inside the courthouse.

[2]Surprisingly, neither defendant deigned to cite the Court to this governing authority.

**BRAYTON ◆ PURCELL, LLP**
111 SW Columbia Street, Suite 250
Portland, Oregon 97201
Tel: (503) 295-4931; Fax: (503) 241-2573

1    To obtain a new trial because of a juror's erroneous answer to *voir dire* questions, a party

2    must:  (1) demonstrate that a juror failed to answer honestly a material question on voir dire; and

3    then (2) show that a correct response would have provided a valid basis for a challenge for cause.

4    *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 556 (1984).  The defendants make

5    two allegations of juror dishonesty:  (1) a juror's alleged failure to disclose her own cancer

6    diagnosis during *voir dire*; and (2) the alleged failure of some vague number of the deliberating

7    jurors to disclose during *voir dire* their alleged bias against Asten because of Boeing's decision

8    to locate new manufacturing facilities in Asten's home state of South Carolina.  (Dkt. #396 *at* 5-

9    6).

10   To support these allegations, the defendants submitted a declaration signed by juror

11   Lockwood.  Dkt. #387 at 17; Dkt. # ).  The declaration explicitly states that the "statements"

12   supposedly recalled by Lockwood were made during the course of the jury's deliberations, and

13   exclusively concerned the "mental processes" of the jury.

14   The plain language of Rule 606(b) prohibits the Court from considering this declaration

15   in its entirety.  The declaration Lockwood signed states that the two statements upon which the

16   defendants rely were  "statements occurring during the course of the jury's deliberations"

17   (i.e.,"This was brought up during our deliberations"  Dkt. #387 *at* 18, ¶ 6.  Lockwood's

18   conjectures about the effect on the jury of Boeing's move are pure speculation about "other

19   juror's mind or emotions" and the jury's "mental processes" in rendering its verdict (i.e., "The

20   issue of Boeing moving the 787 production line to South Carolina . . . *must have been in the*

21   *jury's mind during deliberations*."  Dkt. #387 *at* 18, ¶ 7 (emphasis added).  It is precisely this

22   type of information that Rule 606(b) was intended to address.

23   For this reason, the declaration must be excluded.  Absent evidence of juror dishonesty

24   misconduct, the defendants fail to meet the first prong of the *McDonough* test.

25                    1.    There Can Be No Dishonest Response to a Question Not Asked

26   Even if the Court considers the defendants' allegations that an unidentified juror failed to

27   reveal her cancer diagnosis in *voir dire*, they again fail to pass the first prong of the *McDonough*

28   test, because there cannot be a dishonest response to a question that was not asked.

The question highlighted by the defendants in their declaration as evidence of juror

**BRAYTON ◆ PURCELL, LLP**
111 SW Columbia Street, Suite 250
Portland, Oregon 97201
Tel: (503) 295-4931; Fax: (503) 241-2573

1   dishonesty regarding cancer is in fact a grievous compounding of three questions, each

2   modifying the one that preceded it.

Q.   I need to find out, just like I talked to Ms. Maghie, is there anybody here
that has had any experience with cancer in your life?  I am not going to go
into the details about it, but a close friend, a relative, perhaps yourself, has
had an experience with cancer that you feel like, when you start hearing
about someone suffering from cancer and getting chemotherapy, and
having the symptoms and problems that go along with that, that you are
going to be so overwhelmed, feeling for the plaintiff, that you are just
going to say, I really feel like Mr. Barabin should get some money no
matter what?  Anybody have any experience like that?

8   Dkt. #396, 4:12.

9   In its entirety, this question could be logically interpreted to require disclosure only by those

10  persons:  (1) who had an "experience" of cancer in their life (personally, or through a friend or

11  relative) and (2) because of that experience will find for the plaintiff (3) no matter what.

12

13       What defense counsel intended to ask or intended to elicit from the *venire* is irrelevant.

14  "When voir dire questions can be logically interpreted to mean something else to a juror, then a

15  literal non-disclosure on another reading of the question cannot be assumed merely for failure to

16  answer the question according to its *intended* meaning.  *U.S. v. Robbins*, 500 F.2d 650, 652 (5th

17  Cir. 1974) (emphasis added).

18       The defendants bear the consequences of their imprecise questions to the *venire*.  Jurors

19  cannot be faulted for failing to disclose information when they were never asked during the

20  course of *voir dire* to make such disclosures.  *Gov't of the Virgin Islands v. Sampson*, 94

21  F.Supp.2d 639, 651 (D.V.I App. Div. 2000).  Failure to volunteer un-asked information does not

22  suffice to satisfy the first prong of the *McDonough* test.  *U.S. v. Glenn Holck, Stephen Umbrell*,

23  398 F.Supp.2d 338, 360 (E.D. Penn. 2005).

24       The facts of *Sampson* are instructive.  Following conviction, Sampson moved for a new

25  trial after his lawyer learned a juror was employed by the government as its supervising

26  enforcement officer for the Virgin Islands Department of Finance.  *See generally Sampson, infra*.

27  During *voir dire*, the *venire* was asked only two pertinent questions about their employment.

Q.   Is there anyone on the panel who has a *family member or a friend* who is
currently employed or was previously employed by the department of
Justice of the Virgin Islands or any other department concerned - of the

5 -   PLAINTIFFS' CONSOLIDATED OPPOSITION TO DEFENDANT'S MOTIONS FOR NEW TRIAL OR REMITTITUR
J:\WA\106995\USDC (Federal)\Post-Trial\CONSOL RSP OPP MTNS NEW TRIAL.wpd

**BRAYTON ❖ PURCELL, LLP**
111 SW Columbia Street, Suite 250
Portland, Oregon 97201
Tel: (503) 295-4931; Fax: (503) 241-2573

and    Government of the Virgin Islands concerned with criminal prosecution
       law enforcement?

Q.     Is there anyone on the panel who is currently employed by *any law
       enforcement agency of the federal government*, that is, the office - for
       example, such as the office of the United States Attorney, the post office
       department, the U.S. Customs and that would be - let me narrow that
       question - employed by any department that is concerned with criminal
       prosecution or law enforcement?

*Id*. at 651 (emphasis in original).

The trial court found that "the questions, as posed, did not require the juror to disclose that he was a peace officer for the Government of the Virgin Islands," and the appellate court agreed. *Id*. The same logic applies here.

As posed, the questions cited by defense counsel did not require any juror to disclose their personal medical condition. The *venire* was asked if they had an experience with cancer that affected their impartiality. The *venire* was <u>not</u> asked if they had an experience with cancer. No fair reading of the record can reveal a dishonest answer to the cited inquiry.

The defendants cannot assert that a juror gave an incomplete or dishonest answer to a question that was never asked. Because the defendants make no showing of juror dishonesty, objective or otherwise, their arguments fail to pass the first prong of the *McDonough* test and their motions for a new trial on this ground must fail.

2.    <u>Personal Experiences Are Not "Extraneous Prejudicial Information" or "Outside Influence"</u>

Ordinarily, a verdict will not be upset on the basis of a juror's post-trial report of what occurred in the course of deliberations. *See McDonald v. Pless*, 238 U.S. 264, 267 (1915). Post-verdict affidavits submitted to show that jurors discussed their own personal experiences with issues similar to those at issue in the trial are inadmissible under *Fed.R. Evid*. 606(b) for that purpose because a juror's discussion of personal experience cannot constitute "extraneous prejudicial information."

[Extraneous prejudicial information] has been construed to cover publicity received and discussed in the jury room, consideration by the jury of evidence not admitted in court, and communications or other contact between jurors and third persons, including contacts with the trial judge outside the presence of defendant and his counsel. By contrast, evidence of discussions among jurors, intimidation or harassment of one juror by another, and other intra-jury influences on the verdict is within the rule, rather than the exception, and is not competent to impeach a verdict.

**BRAYTON ◆ PURCELL, LLP**
111 SW Columbia Street, Suite 250
Portland, Oregon 97201
Tel: (503) 295-4931; Fax: (503) 241-2573

*U.S. v. Wilson*, 534 F.2d 375, 378-79 (D.C. Cir. 1976) (quoting *Gov't of the Virgin Islands v. Gereau*, 523 F.2d 140, 149-50 (3d Cir. 1975), *cert. denied*, 424 U.S. 917, (1976))

The Ninth Circuit has repeatedly recognized, "Jurors must rely on their past personal experiences when hearing a trial and deliberating on a verdict." *Hard v. Burlington Northern Railroad*, 812 F.2d 482, 486 (9th Cir. 1987). Factual similarity, personal familiarity, and personal knowledge of issues similar to those at issue in a case generally do not qualify as exceptions to the evidentiary bar of Rule 606(b). *U.S. v. Hortensia Navarro-Garcia*, 926 F.2d 818, 821 (9th Cir. 1991) ("A juror's past personal experiences may be an appropriate part of the jury's deliberations. Inevitably, jurors must rely on their past personal experiences when hearing a trial and deliberating on a verdict.").

In *Grotemeyer v. Hickman*, 393 F. 3d 871 (9th Cir. 2004), the court found that the statements of the jury foreperson, a medical doctor, were not "extrinsic evidence," and therefore consideration of her alleged statements as grounds for a new trial was barred by Rule 606(b). The foreperson was alleged to have told the deliberating jury that she (1) "'had been through this before' and that Mr. Grotemeyer was indeed guilty of the charges; (2) referring to her medical expertise, that 'Mr. Grotemeyer was either mentally ill or retarded and that his condition caused Mr. Grotemeyer to commit the crime for which he was charged;' (3) went on to say that 'an insanity defense should have been mounted;' and (4) 'assured [the affiant] that if the jury voted to convict, Mr. Grotemeyer would receive as part of his sentence, adequate mental health care.'" *Id*. at 875.

The court disregarded statements 1 and 3 as clearly not misconduct, even if taken as true. After considering statements 2 and 4, the court held that "the mere fact that the jury foreman brought her outside experience to bear" was not misconduct, and noted that at least one study has shown that "'50% of the jurors' time [is] spent discussing personal experiences.'" *Id.* at 878-879.

In *Wilson v. Vermont Castings, Inc.*, 170 F.3d 391 (3rd Cir. 1999), a juror owned a stove identical to the stove alleged to have caused injury to the plaintiff. This juror consulted her owner's manual during the trial and informed the deliberating panel of its contents. The juror also told the panel that, like the plaintiff, she routinely left the stove door open when starting

**BRAYTON ◆ PURCELL, LLP**
111 SW Columbia Street, Suite 250
Portland, Oregon 97201
Tel: (503) 295-4931; Fax: (503) 241-2573

1    fires, and would continue to do so even if there was a warning.

2        The Third Circuit held that while the contents of the manual were "extraneous," the

3 juror's knowledge of the stove at issue and her opinions about it were not extraneous because

4 they were adduced by her own experience as a stove owner, and were "thus similar to the

5 permissible instance of a juror bringing her own life experience into a jury room." *Id*. at 395,

6 n.4. Similarly, in *Crawford v. Head*, 311 F.3d 1288 (11th Cir. 2002), the court held that a juror

7 sharing her limited experience as a 1st year nursing student in analyzing the hair and blood

8 sample evidence at issue "is consistent with jurors bringing their experiences to bear while

9 reviewing the evidence properly before them." *Id*. at 1333.

10        The Sixth Circuit has also excepted the personal experiences of jurors from the definition

11 of "extraneous prejudicial information," holding that in an action for injuries from slipping on a

12 waxed floor, comments by jurors during deliberations about their personal experience with

13 waxed floors and back injuries were statements of general experience and background by which

14 the jury tests parties' theories. *Womble v. J.C. Penney Co.*, 47 F.R.D. 350, 356, (E.D. Tenn.

15 1969), *aff'd* 431 F.2d 985 (6th Cir. 1970); *See also Gault v. Poor Sisters of St. Francis Seraph of*

16 *Perpetual Adoration, Inc.*, 375 F.2d 539, 548-551 (6th Cir. 1967).

17        In some instances personal experiences may constitute "extrinsic evidence," but only in

18 circumstances where a juror has personal knowledge regarding the parties or the issues involved

19 in the litigation that may affect the verdict. *U. S. v. Hortensia Navarro-Garcia*, 926 F.2d at 821-

20 822. For example, in *Hard* the court found that the personal experiences of a juror were

21 "extraneous prejudicial evidence" because the juror failed to disclose during *voir dire* that he and

22 his father had both been employed by the defendant, and the juror relayed his personal

23 knowledge of the defendant's legal settlement practices to the deliberating jury. *Hard* at 483,

24 485. *See also Jeffries v. Blodgett*, 5 F.3d 1180 (9th Cir. 1993) ("A juror's personal knowledge of

25 information concerning the defendant or the defendant's alleged crime constitutes impermissible

26 extrinsic evidence.")

27        **B.**     **The Jury's Verdict Was Well Supported by the Evidence**

28        It is improper to overturn a well supported jury verdict simply because the jury returned a

verdict for the Barabins. Grant of a new trial because the verdict is alleged to be against the

8 -   PLAINTIFFS' CONSOLIDATED OPPOSITION TO DEFENDANT'S MOTIONS FOR NEW TRIAL OR REMITTITUR

J:\WA\106995\USDC (Federal)\Post-Trial\CONSOL RSP OPP MTNS NEW TRIAL.wpd

**BRAYTON ◆ PURCELL, LLP**
111 SW Columbia Street, Suite 250
Portland, Oregon 97201
Tel: (503) 295-4931; Fax: (503) 241-2573

weight of the evidence can only be proper when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or "shocks the conscience." *Williamson v. Consolidated Rail Corp.*, 926 F.2d 1344, 1353  (3rd Cir. 1991). *See also Latino v. Kaizer*, 58 F.3d 310, 315 (7th Cir. 1995).  The only cry heard in this case is from the losing parties.

Determining the "weight of the evidence" is a fact specific endeavor, "and an appellate court will generally not reverse the denial of a new trial motion if there was some reasonable basis for the jury's verdict." *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007).  In this case the verdict is well supported.

"Courts are not free to re-weigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable." *Tennant v. Peoria & Pekin Union Ry.*, 321 U.S. 29, 35 (1944).  "[A] decent respect for the collective wisdom of the jury, and for the function entrusted to it in our system, certainly suggests that in most cases the judge should accept the findings of the jury." *Landes Const. Co. Inc.,v. Royal Bank of Canada*, 833 F.2d 1365, 1371 (9th Cir. 1987). Only if, after having "given full respect to the jury's findings, the judge on the entire evidence is left with the definite and firm conviction that a mistake has been committed," should a motion for a new trial be granted. *Id.* at 1371-72.

While a trial court "may weigh the evidence and the credibility the witnesses, the court is not justified in granting a new trial 'merely because it might have come to a different result from that reached by the jury.'" *Roy v. Volkswagen of America, Inc.,* 896 F.2d 1174, 1176 (9th Cir. 1990).  It is not "the courts' place to substitute our judgment for those of the jurors." *Union Oil Co. v. Terrible Herbst, Inc.*, 331 F.3d 735, 743 (9th Cir. 2003).  The record fully supports the jury's findings regarding exposure to the defendants' products, medical causation, and the Barabins' damages.

      1.    <u>Mr. Barabin Was Exposed to the Defendants' Paper Machine Clothing at the Camas Mill</u>

Mr. Barabin began his paper-making career at the Camas mill in 1968.  (10/28 56:20-21). All the paper machines were in one large building, with the exception of machines #15, #16, and

**BRAYTON ◆ PURCELL, LLP**
111 SW Columbia Street, Suite 250
Portland, Oregon 97201
Tel: (503) 295-4931; Fax: (503) 241-2573

1    # 20.  (10/28 61:1-62:18).  The main paper machine building was almost completely enclosed,

2    with only a few windows in the entire structure.  (10/28 64:4-11).  All these paper machines

3    were old, and were not well sealed or ventilated.  (10/28 63:19-64:3).

4        Mr. Barabin first worked as a pulp tester, a job that required him to travel to all areas of

5    the mill.  (10/28 65:4-16).  This required him to walk through the mill "basement," where the

6    bottom half of the paper-machine dryer sections were located.  (10/28 66:3-11).  Mr. Barabin had

7    to be in close proximity to all the paper machines to do his job as a pulp tester.  (10/28 68:24-

8    69:1).

9        Mr. Barabin later worked as a paper tester, a job that also required him to be in close

10   proximity to the dryer ends of all the paper machines.  (10/28 66:19-68:5; 69:2-15).  Mr. Barabin

11   worked all shifts on a weekly rotation, with some overtime work.  (10/28 68:6-23).

12       During his time in the technical department as a pulp tester, and later a paper tester, Mr.

13   Barabin frequently observed dryer felt changes, and was frequently in close proximity to the

14   paper machines when the old felt was removed and the new one put on.  (10/28 70:16-71:1).

15   Often he would observe felt changes in an attempt to get a piece of the used felt to use in his

16   garden.  (10/28 71:2-14).  Sometimes he was successful.  (10/28 71:6-14).

17       Mr. Barabin would cut the used felt with a paper knife, and would see visible dust

18   emitted from the dryer felt.  (10/28 71:15-72:5).  The used felts were later removed from the

19   machine area by dragging them across the shop floor by forklift to the outside scrap pile.  (10/28

20   73:4-16).  Mr. Barabin observed this at least twice a month during the time he worked as both

21   pulp and paper tester.  (10/28 73:25-74:18).  He also observed visible dust emitted when an old

22   felt was cut to release it from the paper machine, when a new felt was removed from its crate,

23   and when an old felt was pulled off the paper machine.  (10/28 74:19-75:10).  Some of this dust

24   came from inside the felt itself.  (10/28 167:22-168:1).  In order to install the new felt, the

25   workers would cut little slits all the way across the old felts, and pass rope through the slits into

26   the brass eyelets of the new felt to join the felt ends.  (10/28 96:3-12).

27       There were a lot of paper breaks on the paper machines.  (10/28 76:9-11).  Very seldom

28   was there a shift in which a paper break did not occur.  (10/28 85:1-13).  When there was a paper

break the dryer section would be shut down, the vents shut down, and the workers used poles to

1   remove the larger scraps of paper.  Compressed air was used to blow out the interior of the dryer

2   section, and the surface of the dryer felts.  (10/28 76:11-77:11).  Compressed air was also

3   exclusively used to clean the area around the dry ends of all the paper machines.  Compressed air

4   was used to clean up the paper machine and dryer end and surrounding area at the end of each

5   shift.  (10/28 85:14-18; 77:18-78:6).  The use of compressed air created a visibly dusty

6   environment.  (10/28 78:17-19).

7        Mr. Barabin moved up to working on the paper machines themselves as a "spare hand,"

8   working on all the paper machines on an ad hoc basis.  (10/28 75:11-23).  As a spare hand, Mr.

9   Barabin frequently observed felt changes, from a maximum distance of 20 feet.  (10/28 82:7-

10  83:1).  These shutdowns utilized the same work practices as described above.  (10/28 82:13-15).

11       After approximately two months of spare hand work on all the paper machines, he

12  became a "5th hand" on the progression ladder for the #7 and #8 machines.  (10/28 79:10-11;

13  79:25-80:4).  He held this job for approximately a year.  (10/28 79:23-24).  During his time as a

14  "5th hand," he was also assigned to work on the #4, #5, and #6 machines for varying lengths of

15  time.  (10/28 80:5-17).

16       As a "5th hand," Mr. Barabin participated directly in felt changes, helping to remove new

17  felts from their crates, and holding the old felts while they were stitched together with the new

18  felt so it could be installed on the paper machine.  (10/28 81:20-82:5).  This included cutting the

19  old felts with a knife.  (10/28 88:4-6).

20       Approximately every two weeks every machine would be shut down on a rotating basis

21  for routine maintenance, part of which was a "blow down" of the dryer end with compressed air,

22  with the blow down taking between one-half to one hour.  (10/28 83:2-84:25).  During his time

23  as a "5th hand," Mr. Barabin also directly participated in felt changes on the #4, #5, and #6

24  machines.  (10/28 86:7-9).  Both the old felt and the new felt were dry when they were removed

25  and installed.  (10/28 88:25-89:7).

26       Mr. Barabin became a "4th hand" on the #8 machine in approximately 1974, doing

27  essentially the same work as he had done as a "5th hand."  (10/28 90:18-20).  Approximately

28  every two weeks Mr. Barabin would work overtime assisting on a shutdown of other "wrap end"

paper machines.  (10/28 91:17-92:12).  Approximately once a month he would participate in a

11 -  PLAINTIFFS' CONSOLIDATED OPPOSITION TO DEFENDANT'S MOTIONS FOR NEW TRIAL OR REMITTITUR

BRAYTON ◆ PURCELL, LLP
111 SW Columbia Street, Suite 250
Portland, Oregon 97201
Tel: (503) 295-4931; Fax: (503) 241-2573

1   felt change on a machine other than #8.  (10/28 93:1-10).

2           After working as a "4th hand," Mr. Barabin moved up to working as a "winderman," and

3   concurrently as a relief "filterman" as needed.  (10/28 94:3-13).  The winder is located on the dry

4   end of the paper machine.  Mr. Barabin worked in this job until approximately 1977, when he

5   became a full-time "filterman."  (10/28 94:14-20; 100:20-101:3).

6           In this job he was initially assigned to machine #7, but later moved to machine #8.

7   (10/28 99:8-15).  As a 'winderman," he participated in shutdowns by blowing out the dry end of

8   the paper machine with compressed air in the same way he had in his prior jobs on the paper

9   machines, and working approximately the same amount of overtime as he had previously, on all

10  the different "wrap end" machines as needed.  (10/28 98:11-99:8; 99:23-100:17).

11          After becoming a full-time "filterman," Mr. Barabin was tasked with responsibility for

12  the filters on all the paper machines, and therefore was working on and near all the paper

13  machines once again. (10/28 103:9-19).  Although he no longer had cleanup duties, Mr. Barabin

14  was almost always present near the dry end when a paper machine was shut down. (10/28

15  103:20)

16          Asten stipulated that between 1971 through December 31, 1980, it supplied 148 asbestos-

17  containing dryer felts to the Camas Mill that were installed on paper machines that Mr. Barabin

18  worked on or around.  Ex.  696.  These felts were between 20% to 58% chrysotile asbestos.  *Id.*

19          Scapa stipulated that during the relevant time period, it supplied 229 asbestos-containing

20  dryer felts to the Camas Mill that were installed on paper machines that Mr. Barabin worked on

21  or around.  Ex.  697.  These felts were between 20% to 60% chrysotile asbestos.  *Id.*

22          As this Court has recognized, the law does not require that Mr. Barabin have a specific

23  recollection of working with a defendant's product.  *See* Dkt. # 200 *at* 7:3-5.  A plaintiff's

24  burden regarding causation in an asbestos case is no different from a plaintiff's burden in any

25  other negligence or product liability case. "Circumstantial evidence may establish the entire

26  basis for recovery under either negligence or strict products liability." *Lockwood v. AC& S*, 44

27  Wn. App. 330, 354 (citing *Ewer v. Goodyear Tire & Rubber Co*, 4 Wn. App. 152, 157 (1971),

28  *aff'd* 109 Wn. 2d 235); *See also O'Brien v. National Gypsum Co.*, 944 F.2d 69, 72 (2nd Cir.

1991); *Johnson v. Celotex Corp.*, 899 F.2d 1281, 1286-87 (2nd Cir. 1990), *cert denied*, 498 U.S.

BRAYTON ◆ PURCELL, LLP
111 SW Columbia Street, Suite 250
Portland, Oregon 97201
Tel: (503) 295-4931; Fax: (503) 241-2573

920 (1990).  It is irrelevant whether the plaintiff or a co-worker recalls Mr. Barabin working directly with an Asten or a Scapa dryer felt.  Rather, plaintiff's extensive testimony regarding his work at the mill on specific paper machines coupled with the stipulations regarding the presence of the defendants' asbestos containing dryer felts and fabrics on specific paper machines that he worked on or near is sufficient evidence of exposure to the defendants' asbestos-containing products.  *Lockwood v. AC&S, Inc.*, 109 Wn.2d 235, 245 (1987);  *See also Lockwood v. AC&S, Inc.*, 44 Wn.App 330, 354 (1987).

2.      Asten and Scapa Paper Machine Clothing Was A Substantial Factor in Causing Mr. Barabin's Disease

The defendants' arguments against exposure and causation rest on the false assertion that the law requires the plaintiffs to show that Mr. Barabin was exposed to a certain *quantity* of asbestos emitted from their products in order to be liable for his injuries.   The law does not require, as the defendants repeatedly assert, that the plaintiffs must prove exactly how much asbestos fiber from their products Mr. Barabin was exposed to.  Indeed, the evidence at trial was that such an opinion would be scientifically impossible to provide.

As this Court has recognized, "Plaintiffs need not meet some quantitative threshold in order to establish causation.  Nor must they establish that [a] defendant's product was *the* cause of plaintiff's mesothelioma or could alone have cause the disease."  *See* Dkt. #248 *at* 5:6-8.

An examination of the facts underlying both *Lockwood* appellate decisions is crucial for a full understanding of the holdings of these two important decisions.  After this examination, it is clear Mr. Barabin has made the required connection between defendants' products and his injury.

In *Lockwood*, defendant Raymark unsuccessfully moved for a directed verdict at the close of plaintiffs' case, and for a judgment notwithstanding the verdict returned in favor of the Lockwoods after jury deliberations ended.  The primary issue addressed at both the intermediate court and in the Washington Supreme Court appeal was whether the Lockwoods had presented sufficient evidence of causation.  An examination of that evidence follows.

Raymark argued that Lockwood did not personally handle asbestos products in his work, and that his primary exposure to asbestos occurred when asbestos cloth was torn from vessels

BRAYTON ◆ PURCELL, LLP
111 SW Columbia Street, Suite 250
Portland, Oregon 97201
Tel: (503) 295-4931; Fax: (503) 241-2573

during rigging.  *Id.* at 245.  There was no direct evidence that any cloth torn by riggers was asbestos cloth, or that any cloth torn was made by Raymark.  Raymark asbestos cloth was identified as cloth installed on vessels, but no evidence showed Raymark cloth was removed from any vessels Lockwood worked on.  There was also no direct evidence that Lockwood worked with or near Raymark asbestos cloth on the *George Washington*, or that Raymark cloth was torn from that vessel.  *Id.*

In reviewing the evidence against Raymark and Raymark's arguments against the evidence, the Washington Supreme Court stated: " . . . Bradley's testimony that Raymark's product was used on a large liner conversion at Puget Sound Bridge and Dredge in 1947 and 1948, and Lockwood's testimony that he had worked on the overhaul of the *George Washington* and that there was asbestos on that type of job, indicate that Raymark's product was used on a ship where Lockwood worked."  *Id.* at 247.  The Court further stated, " Thus, even if Lockwood did not work directly with Raymark's product on the *George Washington*, it is reasonable to infer that since the product was used on that ship when Lockwood worked there, Lockwood was exposed to it."  *Id.*

Lockwood also presented expert testimony about how individuals who did not work directly with asbestos, but who worked in areas where asbestos work was performed, could be exposed to asbestos as bystanders.  The expert testimony also explained how asbestos fibers, once released, spread throughout a working area over time.  The testimony established that asbestos dust released into the air could remain in the air and become diffused, so that bystanders could inhale asbestos fibers.  Expert testimony also established that asbestos diseases are cumulative dose-response diseases, i.e. all occupational exposures play a role in contributing to the ultimate disease response.  *Id.* at 243-244.

In affirming the rulings of the lower courts that the evidence presented was sufficient to affirm the jury verdict, the Washington Supreme Court considered four main evidentiary points: (1) evidence showed that the defendant's asbestos-containing product was present in an area where Mr. Lockwood worked; (2) expert testimony established that after asbestos dust was released from the defendant's product it drifted in the air and could be inhaled by bystanders who did not work directly with the product.  Therefore, it was reasonable to infer that since the

BRAYTON ◆ PURCELL, LLP
111 SW Columbia Street, Suite 250
Portland, Oregon 97201
Tel: (503) 295-4931; Fax: (503) 241-2573

1   defendant's product had been used in an area where Mr. Lockwood worked, he was exposed to

2   it; (3) the defendant could point to no evidence in the record that its product did not release

3   asbestos dust; and (4) expert testimony established that all exposure to asbestos had a cumulative

4   effect in contributing to Mr. Lockwood's asbestos-caused disease.  *Id*. at 247.  Based on this

5   evidence, the Washington Supreme Court affirmed the jury verdict against Raymark.

6                    **a.        Testimony of Dr. James Millette**

7           In this case, Dr. Millette testified regarding his knowledge of asbestos fiber release from

8   dryer felts and fabrics.  He earned his doctoral degree in Environmental Science, and focuses his

9   work in particle analysis, industrial hygiene, and the physics of small particles, specifically the

10  release of particles from different materials as those materials are cut, blown, or disrupted in

11  some manner, and the collection of those particles for analysis.  (11/5 5:3-21; 6:3-17).

12          Dr. Millette's electron microscope work formed the basis of U.S. Environmental

13  Protection Agency regulations relating to asbestos testing.  (11/5 6:18-7:13).  Dr. Millette has

14  been involved with asbestos research in his area of expertise since 1974, and has published

15  approximately 60 articles in the peer-reviewed scientific literature, over half of which deal

16  directly with asbestos.  (11/5 11:19-12:13).  Dr. Millette has written one book dealing

17  specifically with asbestos and settled dust, and a chapter addressing analytical methods of

18  asbestos analysis in another book.  (11/5 12:20-13:17).  Dr. Millette was closely involved in

19  formulating the analysis methods and standards for asbestos detection and clearance in the

20  nations schools for the U.S. Environmental Protection Agency, under the Asbestos Hazard

21  Emergency Response Act ("AHERA").  (11/5 13:23-14:8).

22          Dr. Millette is also the former Vice Chair and current Chair of the section of the

23  American Society for Testing Materials ("ASTM") that formulates the standardized methods for

24  analyzing asbestos, used by researchers throughout the world.  (11/5 14:8-15:6).  In the course of

25  his professional career, Dr. Millette has extensive experience testing asbestos-containing

26  materials, including asbestos packing and gaskets, asbestos gloves, asbestos board, various

27  asbestos textiles, talc powder, asbestos cement pipe, floor tile, acoustical plaster, fireproofing,

28  caulks and paints, and Vermiculite insulation.  (11/5 13:18-21; 59:24-60:10).  He has tested over

    10,000 different samples, and over 50 different asbestos-containing products.  (11/5 16:6-12).

15 -  PLAINTIFFS' CONSOLIDATED OPPOSITION TO DEFENDANT'S MOTIONS FOR NEW TRIAL OR REMITTITUR

J:\WA\106995\USDC (Federal)\Post-Trial\CONSOL RSP OPP MTNS NEW TRIAL.wpd

**BRAYTON ◆ PURCELL, LLP**
111 SW Columbia Street, Suite 250
Portland, Oregon 97201
Tel: (503) 295-4931; Fax: (503) 241-2573

1    Dr. Millette is the author of the only article dealing with asbestos fiber release from dryer felts

2    and fabrics in the peer-reviewed scientific literature.  (11/5 19:23-20:15; 21:9-17).

3         In his testing of various dryer felts and fabrics, Dr. Millette found the asbestos content

4    ranged from 20% to 60% .  (11/5 23:16-24:3).  Asten admitted that its asbestos-containing dryer

5    felts ranged from 20% to 58% chrysotile asbestos.  Ex. 696.  Similarly, Scapa admitted that the

6    asbestos content of its felts ranged from 20% to 60%.  Ex. 697.

7         As a part of his testing, Dr. Millette engaged in a simple and common-sense application

8    of a Post-it note to the tested felt samples.  If asbestos fibers adhere to the lightly adhesive

9    surface of the note, it demonstrates that those fibers are capable of being released in a variety of

10   other situations.  (11/5 38:20-39:9).  Dr. Millette also conducted a similar test using a wet

11   fingertip.  (11/5 39:13-40:4).

12        Despite the varying ages and conditions of the dryer felt samples used in Dr. Millette's

13   testing, all of the samples, except for the non-asbestos sample, released asbestos fibers, including

14   those samples from dryer felts made by Asten and Scapa.  (11/5 40:5-25).  Dr. Millette's analysis

15   found that for those dryer felts and fabrics that initially had a resin coating, the coating

16   deteriorated to such an extent that it did not prevent fiber release in any significant way, and

17   there was not a significant difference in fiber release between newer dryer felts and older dryer

18   felts.  (11/5 24:14-24; 23:4-9).  Wet or dry, used or unused, tightly woven or loose weave,

19   asbestos fibers were released in significant quantities in all cases.  (11/5 85:24-86:3).

20                    **b.    Testimony of Kenneth Cohen**

21        Mr. Cohen testified regarding asbestos fiber release and the physical properties and

22   behavior of asbestos fibers.  Mr. Cohen has worked in the industrial hygiene field since the mid-

23   1960s.  (10/29 22:11-13).  Asbestos and its related issues have been a substantial component of

24   Mr. Cohen's professional practice since the early 1970s.  (10/29 22:23-23:4).  From 1976-1978,

25   he was employed by the U.S. Civil Service as a civilian Industrial Hygienist for the U.S. Navy,

26   and co-authored the Navy's manual on asbestos handling in shore-based facilities, published in

27   1980.  (10/29 22:16-18; 23:4-7).  Mr. Cohen has taught industrial toxicology courses at the

28   University of California-San Diego Medical School.  (10/29 23:9-13).

          Mr. Cohen voluntarily retired from California OSHA as a safety inspector in the High

J:\WA\106995\USDC (Federal)\Post-Trial\CONSOL RSP OPP MTNS NEW TRIAL.wpd

**BRAYTON ◆ PURCELL, LLP**
111 SW Columbia Street, Suite 250
Portland, Oregon 97201
Tel: (503) 295-4931; Fax: (503) 241-2573

1   Hazard Unit, after working for that agency as a registered professional safety engineer and

2   Certified Industrial Hygienist for a number of years.  (10/29 18:19-19:23; 20:8-17).  Before

3   retirement, Mr. Cohen was an active member of the American Board of Industrial Hygiene, the

4   American Conference of Governmental Industrial Hygienists, and the American Industrial

5   Hygiene Association. (10/29 23:14-23).

6       Mr. Cohen is trained and educated on asbestos sampling techniques and practices, both

7   bulk sampling and air sampling, and for many years operated his own laboratory for that

8   purpose, analyzing several thousand samples in a single project for the U.S. Navy.  (10/29 24:2-

9   25:10).  Mr. Cohen was a certified AHERA inspector.  (10/29 25:13-22).  Mr. Cohen has

10  conducted asbestos-related testing at thousands of different sites over his 40-year industrial

11  hygiene career. (10/29 34:23-35:1).

12      Mr. Cohen has also conducted extensive testing on various types of asbestos textile

13  products.  (10/29 48:13-49:23).  Mr. Cohen has concomitant experience testing encapsulated

14  asbestos products.  (10/29 47:4-48:12).  His previous testing experience revealed that

15  encapsulation prevented asbestos fiber release in very few of these products.  *Id.*  This is

16  particularly true as these products are used, and the deterioration of the encapsulating material

17  depends on their exposure to friction, abrasion, temperature and length of use, among other

18  things.  (10/29 49:24-51:6).

19      Specific to this case, Mr. Cohen had visited three working paper mills in his professional

20  capacity.  (10/29 61:12-62:2; 113:7-114:4).  Mr. Cohen is familiar with the work setting and

21  practices of the paper mill environment.  (10/29 66:8-15).  Mr. Cohen had previously tested used

22  asbestos-containing dryer felt material obtained from a retired paper worker.  (10/29 62:6-14).

23  Mr. Cohen had undertaken a review of the available literature relating to asbestos-containing

24  dryer felts, and was familiar with the use and purpose of dryer felts in a paper mill.  (10/29

25  62:15-63:25).  Mr. Cohen's prior testing of dryer felts revealed an asbestos-content between 20-

26  40% chrysotile asbestos.

27      Mr. Cohen is well educated and familiar with the chemical and molecular qualities of

28  asbestos, and how they contribute to the aerodynamic qualities of asbestos fibers.  (10/29 37:25-

39:9; 51:7-18).  Once released, asbestos fibers can remain airborne, and therefore are available to

17 -  PLAINTIFFS' CONSOLIDATED OPPOSITION TO DEFENDANT'S MOTIONS FOR NEW TRIAL OR REMITTITUR
J:\WA\106995\USDC (Federal)\Post-Trial\CONSOL RSP OPP MTNS NEW TRIAL.wpd

**BRAYTON ◆ PURCELL, LLP**
111 SW Columbia Street, Suite 250
Portland, Oregon 97201
Tel: (503) 295-4931; Fax: (503) 241-2573

1   be breathed, for extremely long periods of time.  (10/29 51:19-23).  The use of compressed air

2   has the tendency to break apart asbestos fiber bundles and re-distribute the asbestos fibers into

3   the air, where they are again available to be inhaled.  (10/29 54:3-6).

4       Mr. Cohen testified that Mr. Barabin's cutting of the dryer felts would be a physical

5   manipulation of the material that would allow asbestos fibers to be released into his breathing

6   zone, and would constitute a direct exposure to asbestos.  (10/29 76:15-82:10).  Mr. Barabin's

7   proximity to others doing this activity, Mr. Barabin's proximity to disposal of used dryer felts,

8   and his presence in the paper machine areas where compressed air was used to "blow down"

9   asbestos-containing dryer felts and in the operating areas where the dryer felts were in use all

10  constituted components of Mr. Barabin's overall exposure to asbestos.  *Id.*

11                    **c.      Testimony of Dr. Carl Brodkin**

12      Dr. Brodkin is a physician board certified in internal medicine and occupational and

13  environmental medicine, with extensive experience in the diagnosis and treatment of

14  occupational injuries.  (11/3 5:5-15:16).  Dr. Brodkin has published approximately a dozen

15  articles in the peer-reviewed medical literature relating directly to asbestos exposure, and has

16  authored or co-authored five medical textbook chapters relating to asbestos disease.  (11/3 9:24-

17  10:7; 9:6-23).  He has studied over 4,000 asbestos-exposed workers, including paper mill

18  workers, and also including 40 mesothelioma patients, as part of the CARET study funded by the

19  National Cancer Institute.  (11/3 8:12-10:6).  In his clinical practice, he has treated over 1,500

20  patients with asbestos-related disease during his 20 years of focusing on asbestos.  (11/3 10:17-

21  20; 13:8-14:12).

22      By necessity, an occupational medicine physician must be familiar with the ways in

23  which harmful substances can enter an individual's body.  Over the course of his long career in

24  occupational and environmental medicine, Dr. Brodkin is familiar with the properties of

25  asbestos-containing textiles, and the manner in which the physical manipulation of those textiles

26  can cause asbestos fibers to be released.  (11/3 51:10-25).

27      Dr. Brodkin testified that particulate matter, including asbestos fibers, enter the lungs and

28  pass through its defenses, and is transported out of the lungs to the pleura through the body's

immune system.  (11/3 19:22-22:17).  Once at the target site, the fibers cause cellular injury

18 -  PLAINTIFFS' CONSOLIDATED OPPOSITION TO DEFENDANT'S MOTIONS FOR NEW TRIAL OR REMITTITUR

J:\WA\106995\USDC (Federal)\Post-Trial\CONSOL RSP OPP MTNS NEW TRIAL.wpd

**BRAYTON ◆ PURCELL, LLP**
111 SW Columbia Street, Suite 200
Portland, Oregon 97201
Tel: (503) 295-4931; Fax: (503) 241-2573

1  which ultimately manifests as mesothelioma, leading to the death of the exposed person.  (11/3

2  27:17-28:16).  All types of asbestos fiber can cause mesothelioma, specifically including

3  chrysotile asbestos.  (11/3 70:4-72:23).

4      Mesothelioma is a total dose response disease.  It is the aggregate dose of asbestos that

5  one encounters over a lifetime that causes mesothelioma.  Given sufficient minimum latency, it

6  is not biologically possible to separate or segregate a dose of asbestos that came from one source

7  versus a dose of asbestos that came from another source.  (11/3 67:14-68:5; 69:5-15; 73:20-

8  74:10).

9      Dr. Brodkin discussed how he had reviewed and considered Mr. Barabin's deposition

10  testimony regarding his actual activities and opportunities for exposure at the Camas mill.  (11/3

11  38:5-39:23).  He testified regarding the various studies he had reviewed on asbestos dust levels

12  in paper mills, his review of documents produced by each of the defendants, and his review of

13  studies of various asbestos textiles similar to dryer fabrics.  (11/3 46:4-50:13).  He also testified

14  that he had reviewed Mr. Cohen's testimony regarding asbestos release from dryer fabrics, as

15  well as Dr. Millette's peer reviewed published study on the subject.  (11/3 52:6-17).  Dr. Brodkin

16  testified to his opinion based on several epidemiological studies that paper mill workers have a

17  significantly increased risk of mesothelioma due to their occupational exposures in the paper

18  mill environment.  (11/3 34:7-36:8).

19      He further opined that based on all the studies he reviewed, the exposure in the paper

20  machine areas of paper mills, including asbestos from dryer fabrics, would be in the range of 7

21  f/cc.  (11/3 54:22-55:6).  He opined that asbestos from dryer felts would be an important

22  component of the cumulative exposure to asbestos a paper machine worker would encounter

23  around a paper machine.  (11/3 56:1-4).  Dr. Brodkin compared ambient air (500,000 to 5 million

24  sugar cubes of air before one would hit the first fiber of asbestos) to levels of 7 f/cc around a

25  paper machine, including from dryer felts (7 fibers in each sugar cube of air) - a level of asbestos

26  exposure up to 35 million times higher than ambient - that overwhelms the body's defense

27  mechanisms and contributes to cause mesothelioma.  (11/3 56:6-25).

28      Dr. Brodkin opined that all of Mr. Barabin's exposures from his paper machine work,

including from dryer fabrics, were strong identifiable exposures to asbestos that added to his

BRAYTON ◆ PURCELL, LLP
111 SW Columbia Street, Suite 250
Portland, Oregon 97201
Tel: (503) 295-4931; Fax: (503) 241-2573

1   cumulative exposure to asbestos and were substantial contributing factors in his development of

2   mesothelioma.  (11/3 63:10-21).  Dr. Brodkin opined that Mr. Barabin was exposed to asbestos

3   from dryer felts via both direct and background exposure, and that both were significant in the

4   causation of his mesothelioma.  (11/3 57:24-59:4).  He opined that none of these exposures could

5   be excluded as part of the cumulative exposure, substantially contributing to cause Mr. Barabin's

6   mesothelioma regardless of fiber type.  (11/3 64:11-16; 66:2-68:3; 69:2-12; 72:15-23).  The

7   exposures to dryer felts described by Mr. Barabin, whether direct exposure or bystander

8   exposure, all contributed to his cumulative dose of asbestos that ultimately caused his

9   mesothelioma.  (11/3 69:16-70:3).

10          Contrary to the mis-statement in the defense motions, Dr. Brodkin's testimony on

11  exposure and causation was more than sufficient for the jury to find in favor of the Barabins.

12  The emptiness of the defendants' argument is illustrated by their focus on argument that has

13  nothing to do with this case - "every fiber, or a single fiber, can cause disease."  The defendants

14  have set up the "single fiber" strawman in order to knock him down.  Neither Dr. Brodkin, nor

15  any other expert on either side in this case, offered such testimony.[3]  Regardless, Dr. Brodkin

16  actually testified that to be a cause of mesothelioma an exposure to asbestos fibers must be

17  sufficient to overwhelm the body's defense mechanisms.

18                         **d.      Testimony of Dr. Arnold Brody**

19          Dr. Brody testified about the cellular impacts of asbestos exposure.  Dr. Brody is an

20  expert on cell biology and asbestos-related pathogenesis.  (10/27 97:6-11).  Like Dr. Brodkin and

21  defense pathologist Dr. Samuel Hammar, he opined that all types of asbestos fibers, chrysotile

22  and the amphiboles, cause cancer in the mesothelial cells surrounding the lung, heart and

23  peritoneal cavity.  (10/27 99:18-23; 126:1-8).  Chrysotile fibers tend to accumulate preferentially

24  in the pleura.  (10/27 125:9-19).  On a cellular level, each exposure to asbestos contributes to the

25  cellular errors that cause cancer.  (10/27 142:20-143:5).

26

27          [3]It is worth nothing that defendants' cite as authority a law review article written by Mark Behrens.

28  Defendants fail to mention that Mr. Behrens is a lawyer with the notorious asbestos and tobacco defense firm of
    Shook Hardy & Bacon, and that his job is to lobby for "tort reform" across the country.  *See*
    http://www.shb.com/attorney_detail.aspx?id=13 (last visited Jan. 20, 2010)

**BRAYTON ◆ PURCELL, LLP**
111 SW Columbia Street, Suite 250
Portland, Oregon 97201
Tel: (503) 295-4931; Fax: (503) 241-2573

1

        **e.**       **Application of *Lockwood***

2

      The facts present in this case are closely analogous to those presented in *Lockwood*.

3 (1) Exhibits 696 and 697 show that the defendants' asbestos-containing dryer felts were

4 installed on paper machines Mr. Barabin worked on and near during his long career at the Camas

5 Mill; (2) the Barabins presented expert testimony that established that asbestos-containing dryer

6 felts release respirable asbestos fibers. These fibers, once released, hang in the air and become

7 diffused across large areas. Bystanders who do not work directly with the dryer felt can be

8 exposed to respirable fibers released from the dryer felts during their installation, use,

9 manipulation, and removal. Therefore, as the *Lockwood* court concluded, it is reasonable to infer

10 that because the defendants' asbestos-containing dryer felts were used in the areas where Mr.

11 Barabin worked, he was exposed to respirable asbestos from Asten and Scapa dryer felts; (3)

12 even in their highly controlled study, the defendants were unable to show that asbestos-

13 containing dryer felts do not release respirable asbestos fibers; (4) the Barabins presented expert

14 medical evidence that all of Mr. Barabin's occupational exposures to asbestos, including his

15 exposure to respirable asbestos fibers from Asten and Scapa dryer felts, were a substantial factor

16 in contributing to his asbestos-caused disease. On this point, Scapa's expert witness Dr. Samuel

17 P. Hammar agrees.

18

      The Barabins have amply demonstrated that the defendants' products were in Mr.

19 Barabin's work environment at the Camas Mill when the injurious exposure occurred, and that

20 all his exposures to respirable asbestos, including those from the defendants' dryer felts, played

21 an indivisible role in causing his disease.  Taken as a whole, the evidence clearly shows that Mr.

22 Barabin was exposed to respirable asbestos fibers from Asten and Scapa products, and that these

23 exposures, together with his other significant occupational exposures to respirable asbestos

24 fibers, were a substantial factor in causing his mesothelioma.  Considering the sufficiency of the

25 evidence presented, the defense motions must fail.

26

    **C.**      **The Court's Rulings on Evidence Were Not Erroneous**

27

      In considering a motion for a new trial, the Court must adhere to the harmless error rule

28 of *Fed. R. Civ. Proc.* 61, which provides "that no error in any ruling or order by the court is

ground for a new trial or otherwise disturbing a judgment unless refusal to do so is inconsistent

21 -  PLAINTIFFS' CONSOLIDATED OPPOSITION TO DEFENDANT'S MOTIONS FOR NEW TRIAL OR REMITTITUR

J:\WA\106995\USDC (Federal)\Post-Trial\CONSOL RSP OPP MTNS NEW TRIAL.wpd

**BRAYTON ◆ PURCELL, LLP**
111 SW Columbia Street, Suite 250
Portland, Oregon 97201
Tel: (503) 295-4931; Fax: (503) 241-2573

1    with substantial justice." *Bunch v. United States*, 680 F.2d 1271, 1283 (9th Cir. 1982).  For a new

2    trial to be warranted, the erroneous evidentiary ruling must have "substantially prejudiced" a

3    party.  *Ruvalcaba v. City of Los Angeles*, 64 F.3d, 1323, 1328 (9th Cir. 1995).

4         *Fed. R. Evid.* 702 governs the admissibility of expert testimony.  This rule states that "if

5    scientific, technical, or other specialized knowledge will assist the trier of fact to understand the

6    evidence or to determine a fact issue" an expert "may testify thereto."  Once a court makes a

7    preliminary determination under *Fed. R. Evid.* 104(a) that a witness qualifies as an expert, the

8    court's focus turns to the offered testimony.  *Henricksen v. ConocoPhillips Co.,* 605 F. Supp.2d

9    1142, 1153 (E.D. Wa. 2009).  "Far from requiring trial judges to mechanically apply the *Daubert*

10   factors . . . judges are entitled to broad discretion when discharging their gatekeeping function."

11   *Id.* at 1153 (citing *U.S. v. Hankey*, 203 F.3d 1160, 1168 (9th Cir. 2000); *See also Kumho Tire Co.*

12   *v. Carmichael*, 526 U.S. 137, 150-152.

13        1.     Mr. Cohen's Testimony Was Properly Allowed

14        More ink has been spilled addressing Mr. Cohen's testimony than any other issue in this

15   case.  In this instance, the defendants are simply asking the Court to join them in re-hashing old

16   arguments that have been extensively briefed by the parties, and already considered by the Court.

17   At this point, the defendants "must show more than a disagreement with the Court's decision,

18   and recapitulation of the cases and arguments considered by the Court before rendering its

19   original decision fails to carry the moving party's burden."  *U.S. v. Westlands Water District*,

20   134 F. Supp.2d 1111,1131 (E.D. Cal 2001).

21        The trial record reflects the testimony given by Mr. Cohen in this case, and his

22   background and experience.  *See infra* § V(B)(2)(b).  It serves no purpose to repeat it here.  The

23   Court listened carefully to the questions asked of Mr. Cohen and scrutinized his responses.  The

24   defendants' repeated objections to Mr. Cohen's foundation were heard and considered by the

25   Court.  The Court placed the limitations on Mr. Cohen's testimony that it deemed appropriate,

26   and Mr. Cohen did not exceed those limitations.  The defendants cite no new facts or law in

27

28

**BRAYTON ◆ PURCELL, LLP**
111 SW Columbia Street, Suite 250
Portland, Oregon 97201
Tel: (503) 295-4931; Fax: (503) 241-2573

1   support of a position that has been repeatedly rejected by this Court.[4]

2       The linchpin of the defense argument is that a paper mill is *so* different from any other

3   industrial environment that a Certified Industrial Hygienist of 40-years experience in evaluating

4   harmful exposures in industrial settings cannot render any opinions relating to the paper mill

5   environment.  Likewise with their paper machine clothing.  Defendants contend that their dryer

6   felts and fabrics are *so* different from any other asbestos textile that only the mythical[5] "Certified

7   Dryer Felt Specialist" can render any opinions relating to these textiles.

8       The flaw in these contentions is that the defendants failed to present *any* evidence that

9   supported this theme.  Mr. Cohen and Dr. Millette indicated dryer felts are no different than any

10  other asbestos textiles they have sampled and tested throughout their professional careers.  The

11  defendants attempt to overcome their lack of evidence on this crucial point through sheer weight

12  of repetition.  This was unconvincing to the Court and to the jury, and remains so now.

13      In this case, Mr. Cohen provided substantial trial testimony, with extensive foundation,

14  regarding direct exposure, bystander exposure, and relatively contemporaneous re-entrainment

15  exposure through the work practices described by Mr. Barabin.  Both defendants had ample

16  opportunity to cross-examine Mr. Cohen on his opinions, and both did so vigorously.  The

17  Court's evidentiary rulings regarding Mr. Cohen were not erroneous, and therefore a new trial

18  based on Mr. Cohen's testimony is not warranted or proper.

19              2.      Dr. Millette's Limited Testimony Was Properly Allowed

20      In complaining about the admission of microscopist Dr. James Millette's testimony, the

21  defendants repeat themselves yet again.  More than repetition is required.  *Westlands Water*

22  *District at* 1131.  Although Asten and Scapa cloak their arguments against Dr. Millette as

23  relating to allegedly unsound methodologies, these remain poorly disguised attacks on Dr.

24  Millette's conclusions.  The defendants have submitted nothing to support their unfounded

25  argument that Dr. Millette's testimony violates Rule 702 or related rules of evidence.  Nothing

---

27      [4]The case cited by the defendants in support of their position is entirely distinguishable.  *See generally*
28  *Andrews v. Foster Wheeler Corp.* 138 Cal App. 4th 96 (2006).  In *Andrews*, the court rejected the scanty foundation
    set forth in a poorly written declaration opposing a summary judgment motion in a case where the only identifiable
    asbestos exposure was via re-entrainment, and only many decades after initial fiber release.

    [5]In the manner of the Unicorn and Gryphon

**BRAYTON ◆ PURCELL, LLP**
111 SW Columbia Street, Suite 250
Portland, Oregon 97201
Tel: (503) 295-4931; Fax: (503) 241-2573

1    about Dr. Millette's testing, publication or opinions runs afoul of Rule 702.[6]

2    The defendants boldly assert that Dr. Millette's "methodology and findings are not

3 generally accepted in the scientific community." This would be comical if the subject were not

4 so serious. The defendants willfully ignore that (1) he authored the testing methodology for

5 asbestos used by the EPA and the ASTM; that (2) he chairs the ASTM committee on asbestos

6 testing methodology; that (3) he has authored multiple peer-reviewed publications on asbestos

7 testing methodology; that (4) he has tested and produced more reports on asbestos dryer fabrics

8 than anyone else; and (5) has authored the only peer-reviewed study of asbestos fiber release

9 from dryer felts extant in the published scientific literature.

10    Defendants' argument that Dr. Millette's testimony must be excluded based on "general

11 acceptance" are not well taken. Nothing in the text of Rule 702 establishes "'general

12 acceptance' as an absolute pre-requisite to admissibility . . . and a rigid 'general acceptance'

13 requirement would be at odds with the 'liberal thrust' of the federal rules and 'their general

14 approach of relaxing the traditional barriers to 'opinion' testimony . . . that austere standard,

15 absent from, and incompatible with, the Federal Rules of Evidence, should not be employed in

16 federal trials." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 588-589 (1993).

17    Dr. Millette is a recognized expert in his field. *See Caruolo v. John Crane, Inc.*, 226 F.3d

18 46, 54-55 (2nd Cir. 2000) (upholding district court's admission of expert's testimony regarding

19 his reliance on and reference to Dr. Millette's study of asbestos fiber release from packing

20 material as a peer reviewed and authoritative publication in the relevant field of study). It is

21 perfectly appropriate for him to testify regarding his published and peer-reviewed dryer felt

22 studies, and for others to rely on that work. "The fact of publication (or lack thereof) in a peer

23 reviewed journal will be a relevant, though not dispositive, consideration in assessing the

24 scientific validity of a particular technique or methodology on which an opinion is premised."

25 *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 594 (1993).

26    Here, as with Mr. Cohen, the appropriate standard is not whether his foundational

27 experience exactly replicates conditions in a paper mill. But even if it were the standard, Dr.

28

---

[6]Tellingly, Asten and Scapa have cited no decision of any court in the United States in which Dr. Millette's testimony has been excluded, despite the fact that they have confronted this very same testimony in numerous trials.

24 - PLAINTIFFS' CONSOLIDATED OPPOSITION TO DEFENDANT'S MOTIONS FOR NEW TRIAL OR REMITTITUR

J:\WA\106995\USDC (Federal)\Post-Trial\CONSOL RSP OPP MTNS NEW TRIAL.wpd

1  Millette's foundational testimony tracks the uncontradicted evidence adduced from Mr. Barabin

2  regarding the conditions at the Camas mill.  *See infra* §V(B)(2)(a).  It is in fact the foundation of

3  the defense experts that bares no resemblance to the actual evidence of the conditions at the

4  Camas Mill.[7]

5  　　　　Defendants make much of the fact that the conditions of Millette's test did not exactly

6  replicate the conditions at the Camas Mill.  However, such things as water content, angle of

7  airflow across the felt, and ventilation go to the weight the jury could accord the evidence, not its

8  admissibility.  "Vigorous cross-examination, presentation of contrary evidence, and careful

9  instruction on the burden of proof" are the traditional means of attacking this sort of evidence.

10  *Daubert* at 596.  Defendants' arguments go to weight of the evidence offered by Dr. Millette, not

11  to its admissibility.  The admission of Dr. Millette's testimony was not erroneous, and cannot be

12  ground for a new trial.

13  　　　　　　3.　　　Evidence of the Barabins Medical Insurance Was Properly Excluded

14  　　　　On its face, Mrs. Barabin's very general testimony about her concerns as she faces a

15  challenging future with a sick and dying husband did not "open the door" such that the

16  defendants should have been allowed to introduce evidence of the Barabin's health insurance.

17  Moreover, the defendants did not object or move to strike at the time the testimony was offered,

18  and thereby waived their objection to this testimony.

19  　　　　It is a fundamental rule of evidence that an objection not timely made is waived.  *U.S. v.*

20  *Jamerson*, 549 F.2d 1263, 1266-67 (9th Cir. 1977).  "Error may not be predicated upon a ruling

21  which admits or excludes evidence unless a substantial right of the party is affected and . . . a

22  timely objection or motion to strike appears of record . . ."  *Fed. R. Evid.* 103(a)(1).  If testimony,

23  even though improper, is introduced into evidence without objection, it becomes part of the

24  record and is available to be considered for its probative value by the trier of fact.  *U.S. v.*

25  *Carney*, 468 F.2d 354, 357 (8th Cir. 1972).  "No objection having been made to the evidence

26  *when given and no motion to strike having been made*, the evidence complained of was properly

27  before the jury."  *Anthony v. U.S.*, 256 F.2d 50, 53-54 (9th Cir. 1958).  The defendants cannot fail

28

---

[7]Mr. Carlson's testimony regarding the dryer section of paper machine # 8 is irrelevant, as Mr. Carlson had
no knowledge of what these conditions were when Mr. Barabin worked on this machine.

25 -  PLAINTIFFS' CONSOLIDATED OPPOSITION TO DEFENDANT'S MOTIONS FOR NEW TRIAL OR REMITTITUR
J:\WA\106995\USDC (Federal)\Post-Trial\CONSOL RSP OPP MTNS NEW TRIAL.wpd

**BRAYTON ◆ PURCELL, LLP**
111 SW Columbia Street, Suite 250
Portland, Oregon 97201
Tel: (503) 295-4931; Fax: (503) 241-2573

1    to object and then use their dilatory behavior as an excuse to introduce inadmissible collateral

2    source evidence.

3         Washington law is clear that medical insurance is a collateral source.  The premise of the

4    rule barring evidence of collateral source payments is that injured parties should be able to

5    recover compensatory damages from tortfeasors without regard to payments received from other

6    sources.  *See e.g. Johnson v Weyerhaeuser Co.*, 134 Wn. 2d 795, 798 (1998).  Because of the

7    danger that the jury might use evidence of the plaintiffs' receipt of insurance proceeds for an

8    improper purpose, such evidence is inadmissible at trial.  *Cox v. Spangler*, 141 Wn.2d 431, 440

9    (2000).

10        While the defendants cite foreign cases in support of their arguments, the two

11   Washington cases they cite are factually distinguishable from the facts at issue in this case.  In

12   *Johnson*, the court found the plaintiff had opened the door to collateral source evidence by

13   specifically stating his income had been reduced.  The defendants' reliance on *Marler v.*

14   *Department of Retirement Systems*, 100 Wn.App. 494 (2000) is likewise misplaced.  In *Marler*,

15   the plaintiff repeatedly testified to receiving an L&I pension during his direct testimony,

16   obviously opening the door to the defendant referring to his pension as well.

17        In contrast, Mrs. Barabin preceded the testimony cited by the defendants by telling the

18   jury she had retired from her job in 2002.  Mrs. Barabin's subsequent testimony that in looking

19   toward the future she hoped to "keep my health and be able to take care of him" and "pay for

20   necessary medications and stuff," was simply her attempt to summarize some of the many

21   concerns she has as she faces the future with her beloved, terminally ill spouse (and is factually

22   accurate because they do in fact make substantial insurance co-payments).

23        Because Mrs. Barabin had already informed the jury that she was retired, the jury clearly

24   cannot infer that she needed to keep her health in order to keep working to pay for her husband's

25   medical treatment – a conclusion the defendants appear to be arguing as the grounds for

26   "opening the door" to evidence of Mr. Barabin's health insurance benefits.  Rather, it is more

27   reasonable to conclude that the jury understood from Mrs. Barabin's very general testimony

28   regarding this subject, that, as would be normal under her circumstances as her husband's

**BRAYTON ◆ PURCELL, LLP**
111 SW Columbia Street, Suite 250
Portland, Oregon 97201
Tel: (503) 295-4931; Fax: (503) 241-2573

primary care-giver, she has an overall fear of the future having already faced great uncertainty and hardship.

The defendants complain that somehow this relates to the issue of plaintiffs recovering "substantial settlements from others."  They forget that under Washington law, they are entitled to an offset for these past settlements.  The defendants next erroneously contend that somehow Mrs. Barabin's testimony led to an a somehow excessive loss of consortium assessment.  The defendants' speculation is belied by the fact that the medical damages assessed by the jury is exactly consistent with the testimony from Dr. Brodkin on medical damages.

If Mrs. Barabin's state-of-mind testimony regarding her fears for the future rises to the level of opening the door to admission of  collateral source evidence, the entire collateral source rule would be rendered meaningless in virtually all cases.  In the context of the overwhelming and uncontroverted evidence about the Barabins general and special damages, Mrs. Barabin's cited testimony cannot be said to have had a prejudicial effect on the damages verdict, and the defendants attempt to use it as a vehicle to introduce evidence of otherwise inadmissible collateral source insurance payments to counter the plaintiffs' medical damages testimony is barred.

        4.      <u>The Court's Admission of a Limited Number of  the Defendants' Corporate Documents and Asbestos Textile Institute Documents Was Not Unfairly Prejudicial or Needlessly Cumulative </u>

Asten admitted it was a member of the Asbestos Textile Institute ("ATI").  ATI documents are routinely admitted into evidence in cases involving members of the ATI.  *See Lockwood v. AC&S, Inc., et al.*, 109 Wn. 2d 235, 264 (1987).  Asten has cited no instance in which the ATI documents have been excluded from use as evidence against a member of the organization.

Plaintiffs only used the ATI documents in relation to their negligence claim against Asten.  In a negligence claim against a product manufacturer, the manufacturer's knowledge of the product, its dangerousness, and the hazards involved in reasonably foreseeable uses of the product are all relevant to determining its culpability.  The Court informed the jury that the ATI

**BRAYTON ◆ PURCELL, LLP**
111 SW Columbia Street, Suite 250
Portland, Oregon 97201
Tel: (503) 295-4931; Fax: (503) 241-2573

1    evidence was only to be considered in relation to Asten, and could not be considered in relation

2    to plaintiffs' allegations against Scapa.  This limiting instruction was sufficient.

3           The admitted ATI documents related directly to Asten's participation in (and often the

4    directing of) the ATI's efforts related to asbestos and disease for a number of years.  The ATI

5    documents clearly demonstrate that members of the ATI, and in particular the members of the

6    Air Hygiene Committee (chaired by Asten's representative for a significant period of years),

7    were aware of the dangers of asbestos .

8           The Court reviewed each and every proposed ATI exhibit over several days, and

9    excluded the vast majority of those offered.  The Court only admitted redacted versions of a few

10   ATI documents which demonstrated Asten's knowledge of the hazards of asbestos dust.  The

11   Court took great effort to ensure the admitted documents were not needlessly cumulative or

12   unfairly prejudicial.

13          Asten also argues that its own internal documents relating to plant conditions were not

14   relevant to show it should have known of the dangers its products presented to end users.

15   However, information indicating that exposure to asbestos is likely to harm one group of

16   workers "is at least suggestive of the fact that other groups of workers who are also exposed to

17   asbestos fibers face similar dangers."  *See Lockwood*  at 252-253 (citing *Jackson v. Johns-*

18   *Manville Sales Corp*., 750 F.2d 1314 (5th Cir. 1985), *cert. denied*, 478 U.S. 1022 (1986).  Any

19   distinction between exposures to different types of workers goes to the weight of the evidence,

20   not to its admissibility.  *Id*.  Admission of the these documents was neither cumulative nor

21   unfairly prejudicial, and therefore not erroneous.

22

23          5.    The Jury Was Correctly Instructed on the Law Using Pattern
                   Instructions

24

25                 a.    It was Not Error to Refuse the Defendants' Request For An
                         "Exposure" Question on the Verdict Form

26

27          After three weeks of evidence, argument, and instructions on the law, it is hard to

28   imagine that the jury could have misunderstood that Mr. Barabin must have been "exposed" to

the defendants' products before they could be found liable for his injuries.  It is axiomatic that

**BRAYTON ◆ PURCELL, LLP**
111 SW Columbia Street, Suite 250
Portland, Oregon 97201
Tel: (503) 295-4931; Fax: (503) 241-2573

1    without exposure there cannot be liability.[8]  Contention questions such as the issue of "exposure"

2    are subsumed within the questions regarding cause that were presented to the jury.

3           The jury instructions given were sufficient if they permitted the defendants to argue their

4    theory of the case.  *Brewer v. City of Napa*, 210 F.3d 1093, 1097 (9th Cir. 2000).  Here, the

5    defendants were free to argue their theories of exposure and its relation to liability based in the

6    instructions given.  Simply because it was the defendants' position that there was no exposure to

7    their products does not mean the jury could not disagree with them on that issue.   The jury's

8    disagreement with the defendants on whether liability should be imposed does not mean the jury

9    misunderstand the predicate concept of exposure in determining liability.

10          Following the defendants' arguments to their logical conclusion, there are any number of

11   predicate concepts the jury must have understood before it could have assessed liability against

12   the defendants (i.e., Did Mr. Barabin work at the Camas Mill?  Was Mr. Barabin alive when he

13   worked at the Camas Mill?  Is  inhaled asbestos capable of causing injury?).  Refusing the

14   defendants' request for a separate "exposure" question on the verdict form, or any other question

15   regarding the existence of predicate facts, was not error.

16                      **b.     The Pattern Instruction on Cause Was Not
                               Incorrect**

17

18          The language the defendants complain of was taken verbatim from the most recent

19   edition of the Washington Pattern Jury Instructions (WPI 15.02 2009 Supp.)  The Washington

20   Supreme Court has never directly addressed the application of the substantial factor causation

21   standard to an asbestos injury case. However, that Court has addressed the application of the

22   substantial factor causation standard in a pesticide damage case, which is closely analogous.

23

24          In *Hue, et al., v. Farmboy Spray Co., Inc., et al.*, 127 Wn.2d 67 (1995) the court analyzed

25   a challenged jury instruction regarding causation in a claim for damages arising from "off-

26   target" pesticide "drift" after its aerial application.  The Washington Supreme Court affirmed the

27   trial court's ruling that "plaintiffs did not have to prove or apportion individual causal

28

---

[8]This allegation of error demonstrates either the defendants' contempt for the fact-finder or an extremely
low regard for their ability to communicate basic and fundamental concepts to the jury.

29 -   PLAINTIFFS' CONSOLIDATED OPPOSITION TO DEFENDANT'S MOTIONS FOR NEW TRIAL OR REMITTITUR
J:\WA\106995\USDC (Federal)\Post-Trial\CONSOL RSP OPP MTNS NEW TRIAL.wpd

BRAYTON ◆ PURCELL, LLP
111 SW Columbia Street, Suite 250
Portland, Oregon 97201
Tel: (503) 295-4931; Fax: (503) 241-2573

responsibility." *Id.* at 91.

The Washington Supreme Court held that it was enough that plaintiffs show that the defendant's pesticide was contained in a mixture of pesticides that was applied by the crop-dusting planes, and was therefore "part of a cloud" of pesticides "that then was the proximate cause of damage." *Id.* The *Hue* court specifically rejected the contention that the plaintiffs had to show that an individual defendant's contribution to the pesticide cloud would have been sufficient to cause the injury on its own. *Mavroudis v. Pittsburgh Corning Corp.*, 86 Wn. App. 22 ,30.

In rejecting the contention that plaintiffs had to show that an individual defendant's contribution to the pesticide cloud would have been sufficient to cause the injury on its own, the court cited a series of its prior cases with consistent reasoning and rulings, including *Martin v. Abbott Laboratories*, 102 Wn.2d 581 (1984) (eliminating individual causal responsibility in DES [diethylstilbestrol] cases); *Lockwood v. AC & S*, 109 Wn.2d 235, 245 (1987) (cited for the proposition that plaintiff need establish only that defendant's asbestos products were among those in the plaintiff's work environment); and *Benton City v. Adrian*, 50 Wn.App. 330, 342, (1988) (recognizing that where plaintiff suffers indivisible damage caused by the combined flow of defendants' excess irrigation waters, it is error to dismiss action on ground that damages are not "sufficiently individualized and traceable to each defendant."). *Hue* at 92.

As the court stated in *Mavroudis,* the simplest articulation of the "substantial factor" standard comes from eminent legal scholar W. Page Keeton:

> When the conduct of two or more actors is so related to an event that their combined conduct, viewed as a whole, is a but-for cause of the event, and the application of the but-for rule to them individually would absolve all of them, the conduct of each is a cause in fact of the event.

*Mavroudis* at 30 (citing W. Page Keeton, et al, *Prosser & Keeton on Torts* § 41, at 268 (5th ed. 1984).

After analyzing the holdings and reasoning of the *Lockwood* and *Hue* decisions, the *Mavroudis* court stated:

> By citing *Lockwood* in conjunction with *Martin v. Abbott Laboratories*, the case eliminating the need to show individual causal responsibility in DES cases, the

**BRAYTON ◆ PURCELL, LLP**
111 SW Columbia Street, Suite 250
Portland, Oregon 97201
Tel: (503) 295-4931; Fax: (503) 241-2573

*Hue* court certainly implied that asbestos-injury plaintiffs need not prove or apportion individual causal responsibility but need only show that the defendant's asbestos products were among those in the plaintiff's work environment when the injurious exposure occurred.

*Id.* at 30.

Despite the defendants' disagreement with existing law, it was not error for the Court to instruct the jury using the pattern instruction published for that purpose.

### c.    The Continuing Duty to Warn Instruction Was Correct

The uncontradicted evidence in this case was that injuries caused by asbestos are cumulative dose-response diseases.  If a person's susceptibility to the danger caused by a product continues after that person's direct exposure to the product has ended, the manufacturer still has a duty after exposure to exercise reasonable care to warn the person of known dangers, if the warning could help to prevent or lessen the harm.  *Lockwood* at 109 Wn.2d 235, 259-260 (1987). Without a warning, Mr. Barabin was given no opportunity to reduce his cumulative exposure to the defendants' products or any other asbestos-containing products.  The continuing duty to warn is well-established in Washington law, and was properly given in this instance.[9]

The defendants' arguments against this instruction are fatally flawed another reason. Both defendants admitted that they never warned about their products at any time.  This admission, coupled with the fact that the continuing duty to warn instruction was an alternative instruction on negligence, means the jury could have found the defendants liable for negligence on one of two alternative grounds.  Any error in giving the continuing duty to warn instructions was harmless.  *Fed. R. Civ. Proc.* 61.

### d.    The Brief Statement Made in Closing Argument Was Cured by the Court

To warrant reversal of the jury's verdict on grounds of attorney misconduct, "the flavor of misconduct must sufficiently permeate an entire proceeding to provide conviction that the jury was influenced by passion and prejudice in reaching its verdict."  *Kehr v. Smith Barney, Harris Upham & Co., Inc.*, 736 F.2d 1283, 1286 (9th Cir. 1984).  The conduct complained of must have

---

[9]The continuing duty to warn is codified, reflecting the legislature's recognition of this important consumer safety principle.  *See* RCW 7.72.030(1)(c)

J:\WA\106995\USDC (Federal)\Post-Trial\CONSOL RSP OPP MTNS NEW TRIAL.wpd

**BRAYTON ◆ PURCELL, LLP**
111 SW Columbia Street, Suite 250
Portland, Oregon 97201
Tel: (503) 295-4931; Fax: (503) 241-2573

1    "prevented the losing party from fully and fairly presenting his case or defense." *Wharf v.*

2    *Burlington Northern R. Co.*, 60 F.3d 631, 637 (9th Cir. 1995).

3         Here, the statement complained of was made in closing argument.  It was made in

4    response to the testimony of Asten's industrial hygienist that he had consulted on hundreds of

5    dryer felt cases involving allegations of asbestos injury caused by exposure to dryer felts.  Scapa

6    immediately objected and moved to strike, and the Court instructed the jury to disregard

7    counsel's argument.  (11/18 62:23-63-7)

8         Any alleged prejudice caused by this statement was sufficiently cured by the Court's

9    instruction to the jury at the time the objection was made.  Such an isolated statement standing

10   alone at the end of a three week trial cannot be said to have "permeated the entire proceeding" or

11   to have prevented the defendants from fully and fairly presenting their defense.  The statement

12   complained about by the defendants does not warrant a new trial.

13        **D.    Joint and Several Liability Does Not Violate the U.S. Constitution**

14        It is undisputed that joint and several liability applies to Asten and Scapa as asbestos-

15   injury tortfeasors.  *Coulter v. Asten Group*, Inc. 135 Wn. App. 613, (Div. 1 2006); *Brewer v.*

16   *Fibreboard Corp*, 127 Wn.2d 512, 535-536 (1995).  The defendants challenge that portion of

17   Washington law that provides for joint and several liability of asbestos-injury tortfeasors as

18   violative of their right to equal protection and due process under the U.S. Constitution.

19        The defendants never challenged this application of the law to them at trial.  Dkt # 248 at

20   2:15-16.  In that regard, the defendants never requested any jury instructions relating to

21   apportionment of damages, and never requested a related question in the special verdict form.

22   By failing to so act, the defendants have waived these arguments.  However, even if the Court

23   finds that the defendants have not waived this argument, because the defendants have made no

24   showing to overcome the strong presumption of constitutionality that applies to legislative

25   enactments, their arguments fail.

26        1.    The Legislature's Preservation of Joint and Several Liability for Asbestos-
                Injury Tortfeasors Was Rational.

J:\WA\106995\USDC (Federal)\Post-Trial\CONSOL RSP OPP MTNS NEW TRIAL.wpd

**BRAYTON ❖ PURCELL, LLP**
111 SW Columbia Street, Suite 250
Portland, Oregon 97201
Tel: (503) 295-4931; Fax: (503) 241-2573

1
2
3
4

In order to be violative of the equal protection clause of the Fourteenth Amendment, a state law must be shown to be without any rational basis and to be purely arbitrary. *Morey v. Doud*, 354 U.S. 457, 463 (1957). The burden of showing the essential arbitrary nature of the challenged law is on the party assailing the classification. *Id.*[10]

5
6
7
8
9

When no suspect classification or fundamental right is implicated, the "rational basis" test is applied to allegations of an equal protection violation. *Tigner v. Cockrell*, 264 F.3d 521, 526 (5th Cir. 2001). Under rational basis review, the defendants' claims must be rejected as long as "there is any reasonably conceivable state of facts that could provide a rational basis" for the challenged law. *FCC v. Beach Communications*, 507 U.S. 307, 313 (1993).

10
11
12
13
14
15
16
17
18
19
20

"The authority of the States to enact such laws as reasonably are deemed to be necessary to promote the health, safety, and general welfare of their people, carries with it a wide range of judgment and discretion as to what matters are of sufficiently general importance to be subjected to state regulation and administration." *Lawton v. Steele*, 152 U.S. 133, 136 (1894). It is undisputed that the legislature may prescribe rules of procedure and evidence, create legal presumptions, allocate burdens of proof, and the like. It is likewise undisputable that the legislative branch may make rules concerning the type of damages recoverable, the way in which damages are paid, and the way a jury determines factual issues. *See, e.g. New York Central Ry. Co. v. White*, 243 U.S. 188 (1917) (upholding workers compensation law). Just as certainly, the legislature may abolish a common law right of action and, if it desires, replace it with a compensation scheme. *Mountain Timber Co. v. Washington*, 243 U. S. 219 (1917).

21
22
23
24
25

The Constitution does not forbid the creation of new rights, or the abolition of old ones recognized by the common law, to attain a permissible legislative object. *Silver v. Silver*, 280 U.S. 117, 122 (1929). Accordingly, it follows that the Constitution does not forbid the preservation of existing rights, even as it creates new rights in a similar area of law.

26
27
28

---

[10]Once again the defendants have failed to cite to the Court the applicable level of judicial scrutiny they believe applies to their claims. In this instance they have conceded that the "rational basis" test is the appropriate level of judicial scrutiny. (Dkt. # 396 at 37:1; Dkt. # 386 at 9:15). This is particularly true given that they have failed to make any showing that the right they claim to an apportionment of damages is a "fundamental right" deserving of a higher level of judicial scrutiny, or that they belong to a traditionally protected class.

**BRAYTON ◆ PURCELL, LLP**
111 SW Columbia Street, Suite 250
Portland, Oregon 97201
Tel: (503) 295-4931; Fax: (503) 241-2573

As part of the 1986 Tort Reform Act, the Washington Legislature created a regime of proportionate damages for most causes of action.  In doing so, the legislature preserved the existing and long-standing traditional common law principle of joint and several liability imposed on multiple tortfeasors when they caused a plaintiff indivisible injury.  *Kottler v. State*, 136 Wn.2d 437, 442 (1998).  Traditional common law joint and several liability was preserved for the categories of actions specifically set forth in RCW 4.22.070(3), including "any cause of action relating to hazardous . . . substances.  *Coulter v. Asten Group, Inc.*, 135 Wn. App. 613, 619.

In analyzing the application of RCW 4.22.070(3) to an asbestos-injury case, the Washington Supreme Court found that the both the plain language of the statute and its legislative history showed the legislature intended a broader application of RCW 4.22.070(3)(a) than just "environmental pollution" cases, and that the statute applied to asbestos-injury cases. *Sofie v. Fibreboard*, 122 Wn.2d 636, 668 (1989).  A review of the legislative history of the challenged section of the statute clearly evidences a concern for asbestos victims.  *See, e.g.* Senate Journal, 49th Legislature (1986) *at* 1483.

As Scapa points out, for those categories of actions to which the traditional common-law joint and several liability was not preserved, tortfeasors are entitled to an apportionitur of damages, event if their co-tortfeasors are insolvent or otherwise immune to liability.  Dkt. # 386 *at* 8:19-21; RCW 4.22.070(1).  In operation, if a plaintiff cannot be made whole because other parties who contributed to cause his injuries are insolvent or otherwise immune to liability, "then so be it."[11]  Dkt. # 386 at 8:21-25.

It is perfectly rational for the Legislature to determine that some tort victims should be relieved of the risk that they will not be made whole due to the insolvency or other legal immunity of some joint tortfeasors.  In Washington, victims are relieved of this risk where their harm stems from hazardous wastes or substances; where they have been harmed by the tortious interference with their contracts or business relations; or where their harms stems from the manufacture or marketing of a fungible product in a generic form which contains no clearly

---

[11]Scapa's evident disregard for those harmed by the wrongs of others is chilling.

**BRAYTON ❖ PURCELL, LLP**
111 SW Columbia Street, Suite 250
Portland, Oregon 97201
Tel: (503) 295-4931; Fax: (503) 241-2573

identifiable shape, color, or marking.  *See* RCW 4.22.070(3).  Victims are also relieved of this risk where do not share any fault for their harm.  *See* RCW 4.22.070(1)(b).

There is nothing arbitrary about the Legislature minimizing the risk that asbestos-injury victims will not be made whole.  This is a rational policy decision to protect victims of toxic exposures, uniquely within the province of the legislative branch to make.  Absent a contrary showing, the defendants' arguments must fail.

2.    The Defendants' Due Process Challenge Is Premature

As an initial matter, it is plaintiffs' contention that the due process challenges set forth in the defendants' briefing are to vague to respond to in a meaningful manner.  It is manifestly unclear whether the defendants are advancing a procedural due process argument, a substantive due process argument, or both.  As the Court is well aware, there are different standards of review and analysis that apply to each.  The Court and the plaintiffs should not have to guess at what the defendants mean.  Because of the incoherent nature of these allegations, the defendants (purported) due process claims must fail.

As best as can be made out, the defendants claim that the application to them of joint and several liability deprives them of their property without due process of law.  However as a common sense matter, whatever property right the defendants' claim in an apportionment of damages is "inchoate and affords no definite or enforceable property right until reduced to final judgment." *Austin v. City of Bisbee*, 855 F.2d 1429, 1435 (9th Cir. 1988).  Because there has been no final judgment entered, no party can be said to have been deprived of any property.

However even if the Court disagrees with this proposition, the defendants' due process arguments fail in the same manner as their equal protection claims.  It is well-established that legislative acts adjusting the burdens and benefits of economic life come with a presumption of constitutionality, and that the burden is on the party complaining of the due process violation to establish that the legislature has acted in an arbitrary or irrational way.  *Ferguson v. Skurpa*, 372 U.S. 726 (1963); *Williamson v. Lee Optical Co.*, 348 U.S. 483, 487-488 (1955).  The party complaining of a due process violation must establish that the legislature has acted in an arbitrary or irrational way.  *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 15 (1976).  Here, for the same reasons as set forth in response to the defendants' equal protections claims, their

BRAYTON ◆ PURCELL, LLP
111 SW Columbia Street, Suite 250
Portland, Oregon 97201
Tel: (503) 295-4931; Fax: (503) 241-2573

1   due process claims likewise fail because the government action they complain of is neither

2   arbitrary or irrational.

3       Plaintiffs vigorously disagree that the defendants are in any way foreclosed from seeking

4   contribution.   RCW 4.22.050.  It is perfectly within the defendants' power to join those other

5   parties they believe are needed for a just adjudication.  *Fed. R. Civ. Proc.* 14.  When the

6   defendants fail to take this action to protect their interests, they cannot complain their due

7   process rights have been violated.  For these reasons their due process arguments also fail.

8       **E.      Remittitur Is Not Proper Given the Uncontroverted Damages Evidence**

9       It is important to note at the outset that the defendants do not challenge the sufficiency of

10  the evidence regarding the damages suffered by the Barabins.  Dkt # 386 *at* 17:21-19:18; Dkt #

11  396 *at* 39:8-43:1.  In this case all damage assessments made by the jury were well supported by

12  the evidence adduced at trial.

13      Each case is within the sound discretion of the jury.  *Morrissey v. Welsh Co.*, 821 F.2d

14  1294, 1301 (8th Cir. 1987).  Each case is evaluated by a different, randomly selected group of

15  individual jurors.  *Id.*  The defendants only dispute with the verdict is that it is too high.

16          "*We must expect substantial disparities among juries as to what constitutes
            adequate compensation for certain types of pain and suffering.*  This is a litigious

17          fact of life of which counsel, clients and insurance carriers are fully aware.  *Once
            they place their fate in the hands of a jury, then they should be prepared for the*

18          *result* . . . They cannot expect the Court to extricate them in all cases where the
            award is higher or lower than hoped for or anticipated.

19  *Taken Alive v. Litzau*, 551F.2d 196 (8th Cir. 1977) *citing Mainelli v. Haberstroh*, 237 F.Supp

20  190, 194 (M.D. Pa. 1964), *aff'd* 344 F.2d 965 (3rd Cir. 1965) (emphasis added).

21      Generally, a jury's award of damages is entitled to great deference, and should be upheld

22  unless it is clearly not supported by the evidence or only based in speculation or guesswork.  *In*

23  *re First Alliance Mortgage Co.*, 471 F.3d 977, 1001 (9th Cir. 2006).  In reviewing the damages

24  award, the court must consider the evidence in the light most favorable to the prevailing party.

25  *Fenner v. Dependable Trucking Co.*, 716 F.2d 598, 603 (9th Cir. 1983).  If a court does decide to

26  remit a judgment, it must sustain the award at the maximum amount sustainable by the evidence.

27  *D & S Redi-Mix v. Sierra Redi-Mix & Contracting*, 692 F.2d 1245, 1249 (9th Cir. 1982).

28      In the Ninth Circuit, in reviewing a jury's damages award, the district court must uphold

    the jury's "finding of the amount of damages unless the amount is 'grossly excessive or

J:\WA\106995\USDC (Federal)\Post-Trial\CONSOL RSP OPP MTNS NEW TRIAL.wpd        **BRAYTON ◆ PURCELL, LLP**
                                                                111 SW Columbia Street, Suite 250
                                                                Portland, Oregon 97201
                                                                Tel: (503) 295-4931; Fax: (503) 241-2573

1   monstrous,' clearly not supported by the evidence, or 'only based on speculation or guesswork.'"

2   *Handgards, Inc., v. Ethicon, Inc.*, 743 F.2d 1282, 1297 (9th Cir. 1984); *Lambert v. Ackerley*, 180

3   F.3d 997, 1011 (9th Cir. 1999) (en banc), *cert denied*, 528 U.S. 1116 (2000).  Appellate courts are

4   extremely hesitant to overturn jury verdicts which include awards for non-economic damages.

5   *Dabney v. Montgomery Ward & Co.*, 761 F.2d 494, 501 (8th Cir.) *cert denied* 474 U.S. 904

6   (1985)

7         Objective evidence to support emotional distress awards required by other Circuits is not

8   the law of the Ninth Circuit, which holds that damages for emotional distress are subjective, may

9   be based on testimony alone, appropriate inference from the circumstances, or by reference to an

10   injured party's conduct and the observations of others.  *Zhang v. Am. Gem. Seafoods, Inc.*, 339

11   F.3d 1020, 1040 (9th Cir. 2003).  Indeed, evidence of emotional distress may be based solely on a

12   plaintiff's own testimony.  *Id.*

13         As in the case of awards for loss of consortium, awards for pain and suffering are highly

14   subjective.  Depending on the fact situation, the range between an inadequate award for pain and

15   suffering and an excessive award can be enormous.  *Morrissey v. Welsh Co. at* 1301

16         In this case, Dr. Ben-Zion offered substantial testimony regarding the Barabins' non-

17   medical economic losses attributable to Mr. Barabin's mesothelioma, arriving at a figure of

18   $500,200.  *See* 15:2-37:19.  The defendants offered no evidence to refute Dr. Ben-Zion's

19   calculations.

20         Dr. Brodkin testified as the reasonable value of Mr. Barabin's past medical losses, and to

21   the value of his future medical losses, arriving at a combined figure of $ 271,000.  81:6-82:13;

22   82:14-83:21.  This evidence was also uncontradicted by the defendants.  The jury ultimately

23   calculated the Barabins' economic losses to be $ 700,000, a figure less than that calculated by

24   plaintiffs' experts, but well within the range given by Dr. Ben-Zion.

25         Dr. Brodkin and Dr. Hammar both described in detail the brutal course mesothelioma

26   takes, from initial symptoms, diagnosis, treatment, to inevitable death.  Henry Barabin testified

27   to the effects his mesothelioma has had on his life, discussing the pain and discomfort of the

28   various surgical procedures he has undergone, the impact of multiple rounds of chemotherapy,

    and daily pain and discomfort he suffers, the drastic reduction in the activities he is able to

37 -   PLAINTIFFS' CONSOLIDATED OPPOSITION TO DEFENDANT'S MOTIONS FOR NEW TRIAL OR REMITTITUR

J:\WA\106995\USDC (Federal)\Post-Trial\CONSOL RSP OPP MTNS NEW TRIAL.wpd

**BRAYTON ◆ PURCELL, LLP**
111 SW Columbia Street, Suite 250
Portland, Oregon 97201
Tel: (503) 295-4931; Fax: (503) 241-2573

1  perform, and the impact on himself, his wife, and his children of knowing his death will be

2  premature and certain. 111:4-125:15.  "Well, that's a heck of a sentence when they tell you

3  you've got cancer and there is no cure." 116:9-11.  The defendants did not cross-examine Mr.

4  Barabin on these points, and adduced no evidence of their own to controvert Mr. Barabin's

5  testimony.

6          The defendants claim that the verdict was excessive in comparison to the small pool of

7  previous Washington asbestos cases.  While of dubious utility in comparing something that is

8  determined by each unique jury, a brief survey of other jurisdictions within and without the

9  Ninth Circuit shows the jury's award of non-economic damages in this case is consistent with

10  those from around the country.[12]  There is nothing shocking or untoward about the jury's

11  determination of damages in this case.

12

13          [12]*See e.g., Treggett v. Garlock Sealing Tech., et al*, No. BC307058, 2004 WL 3828256 (Calif.
14  Super. Ct. Los Angeles County Oct. 2004) (jury awarded $36.6 million to a former nuclear submarine
    worker suffering from lung cancer caused by asbestos exposure, $18 million non-economic damages, and
15  $688,496 in economic damages); *Silvestro v. Kelly-Moore Paint Co., et al*, No. BC253974, 2006 WL
    5721924 (Calif. Super. Ct. Los Angeles County Sep. 2006) (jury awarded $15.25 million to family of
16  mesothelioma victim; $15 million in non-economic damages and $250,000 in economic damages); *Davis
    v. American Standard, et al*, No. BC367464, 2007 WL 4878046 (Calif. Super. Ct. Los Angeles County
17  Oct. 2007) (jury awarded $35 million in non-economic damages and $100,000 in economic damages to
    plaintiff dying from mesothelioma); *Shahabi v. A.W. Chesterton, et al*, No. BC379085, 2008 WL
18  3892284 (Calif. Super. Ct. Los Angeles County Aug. 2008) (jury awarded $13.2 million in non-economic
    damages and $1.676 in economic damages to plaintiff dying from mesothelioma);  *Woodard v. Alfa Laval
19  Inc., et al*, No. BC387774, 2009 WL 330252 (Calif. Super. Ct. Los Angeles County Feb. 2009) (jury
    awarded $15 million non-economic damages and $1.925 million in economic damages to plaintiff dying
20  from mesothelioma).
            The following cases come from the Circuit Court for Baltimore City, MD:  In the cases of *Milton
21  Cichy* and *Reginald Puller*, Consolidated Case No. 24X03000356 ( 2004), the jury awarded $4,000,000 in
    non-economic damages to the Estate of Mr. Cichy, $2,000,000 for non-economic damages to Mr. Cichy's
22  wife for loss of consortium; $1,000,000 to Mr. Cichy's wife for wrongful death damages, and $500,000 to
    Mr. Cichy's daughter for wrongful death damages.  In the *Puller* case, the jury awarded $6,500,000 in
23  non-economic survival damages, $2,000,000 to Mr. Puller's wife for loss of consortium, $1,000,000 to
    Mr. Puller's wife for wrongful death damages, and $500,000 to Mr. Puller's son for wrongful death
24  damages.
            In 2003, a jury awarded damages in two mesothelioma cases tried before the Honorable Thomas
25  Noel.  In the *Walter Cooper* case, the jury returned a verdict of $5,000,000 in non-economic survival
    damages, $3,000,000 for loss of consortium, $1,000,000 in wrongful death damages to the wife and
26  $200,000 for each of three surviving children.  The case of *Charles Bildstein* was tried at the same time.
    The jury awarded a total of $10,403,666.00 in the *Bildstein* case.  A $15,057,329.00 award (including
27  $57,329 in special damages) was returned for Diane Lester, a living mesothelioma victim whose case was
    tried before the Judge Quarles in November, 2001.  At the time of trial, Ms. Lester was 50 years old.
28  $8,025,949 (including $25,949 in special damages) was awarded to Antonio Colella in the same trial;
    after a 2008 trial before the Honorable Carol Smith, a verdict was returned in the *George Linkus*
    mesothelioma case, Case No. 24X05000315.  The award included noneconomic damages of
    $15,000,000.00, past medical expenses of $335,274.00.

**BRAYTON ◆ PURCELL, LLP**
111 SW Columbia Street, Suite 250
Portland, Oregon 97201
Tel: (503) 295-4931; Fax: (503) 241-2573

Mrs. Barabin also testified with great effect to the impact of her husband's illness on her after their long and happy marriage together. 7:15-17:16. The defendants' declined to cross-examine Mrs. Barabin, and adduced no other evidence of their own relating to Mrs. Barabin's loss of consortium claim.[13]

The evidence of the damages sustained by the Barabins was uncontested. With regard to the non-economic damages, the jury was instructed to exercise their judgment, and they did so. After failing to provide the jury with any evidence or information with which to evaluate the plaintiffs' evidence, the defendants cannot claim the verdict was too high. The evidence of Mr. Barabin's terminal illness overwhelmingly supports the jury's findings regarding damages, and this evidence was un-controverted. There is nothing excessive, "monstrous" or "shocking to the conscience" about the amount of the verdict, and it must be sustained.

## VI. CONCLUSION

For all the foregoing reasons, the defendants motions must be denied.

DATED this 25th day of January, 2010.

BRAYTON ❖ PURCELL, LLP

/s/ Cameron O. Carter

_____
Cameron O. Carter, WSBA #33326
Attorneys for Plaintiffs Henry Barabin and
Geraldine Barabin

---

[13]In addition to the loss of consortium verdicts set forth above, it may be helpful to consider the following cases involving children, an area where the relationship between parent and child is less formed than that of a long-term marriage: *Reben v. Ely*, 705 P.2d 1360 (1985) ($1,000,000 award for loss of consortium to parents of brain-damaged child uphold; *May v. City of Grosse Pointe Park*, 332 N.W. 2d 411 (1982) ($1,145,000 wrongful death award to estate of 13-year old boy; amount awarded was solely for loss of society and companionship); *Brownsville Medical Cntr. v. Garcia*, 704 S.W.2d 462 (1986) ($500,000 award for loss of deceased child's consortium upheld); Gulf States Utilities v. Reed 659 S.W.2d 849 (1983) ($500,000 award for loss of consortium to mother of child upheld as not excessive).

BRAYTON ❖ PURCELL, LLP
111 SW Columbia Street, Suite 250
Portland, Oregon 97201
Tel: (503) 295-4931; Fax: (503) 241-2573