1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

HENRY & GERALDINE BARABIN,

    Plaintiffs,

    v.

ASTENJOHNSON, INC., *et al.*,

    Defendants.

Case No.  C07-1454RSL

ORDER REGARDING
REASONABLENESS OF OTHER
SETTLEMENTS

      This matter comes before the Court on defendants' motions to vacate the judgment to deduct amounts plaintiffs have received in settlements with third parties.  The Court previously granted the motions, vacated the judgment, and ordered plaintiffs to provide defendants and the Court with information about all settlement monies paid and pending. The Court held a reasonableness hearing on May 21, 2010 to consider whether the amounts of the settlements were reasonable.  The hearing spanned approximately an hour and a half and included the presentation of documents and a live witness, Alan Brayton, a

partner with plaintiffs' counsel's firm Brayton Purcell.[1]

RCW 4.22.060(2) provides that if a party settles with another party, "the claim of the releasing person against other persons is reduced by the amount paid pursuant to the agreement unless the amount paid was unreasonable at the time of the agreement in which case the claim shall be reduced by an amount determined by the court to be reasonable." Based on the statute, defendants argue, and plaintiffs concede, that the judgment against defendants must be reduced by the reasonable amount of settlement monies plaintiffs received.  Plaintiffs have submitted evidence showing that they have received the following settlement amounts from third parties:

| Settling Defendants and Trusts | Settlement Date | Settlement Amount |
|---|---|---|
| Amatex | 3/26/2010 | $700.00 |
| Asbestos Claims Management Corp. | 9/18/2009 | $35,125.16 |
| C.H. Murphy/Clark-Ullman, Inc. | 8/28/2007 | $95,000.00 |
| CBS Corp. f/k/a Viacom, Inc. (f/k/a Westinghouse Electric Corp.) | 8/28/2007 | $125,000.00 |
| Celotex | 12/18/2007 | $23,049.00 |
| E.J. Bartells Company | 9/17/2007 | $10,000.00 |
| Eagle-Picher Industries, Inc. | 2/14/2008 | $9,907.00 |
| Fuller-Austin Insulation Co., Inc. | 10/5/2007 | $35,392.50 |
| Garlock Sealing Technologies, LLC | 9/4/2007 | $22,500.00 |
| General Electric Company | 5/21/2007 | $75,000.00 |
| Halliburton Energy Services, Inc. | 5/19/2008 | $44,527.14 |

---

[1] Mr. Brayton has been involved with asbestos-related litigation for over 27 years, is a partner at his firm, has tried numerous asbestos-related cases, and has negotiated "thousands of individual settlements in cases involving all types of asbestos related disease."  Declaration of Alan Brayton, (Dkt. #489) ("Brayton Decl.") at ¶ 3.

ORDER REGARDING REASONABLENESS
OF OTHER SETTLEMENTS - 2

| Ingersoll-Rand Company | 7/31/2007 | $25,000 |
|---|---|---|
| Kaiser Aluminum & Chemical Corp. | 6/9/2009 | $39,675.72 |
| Keene Corporation | 3/3/2008 | $1,375.00 |
| Owens-Illinois, Inc. | 2/15/2008 | $65,000.00 |
| Texaco, Inc. | 6/25/2007 | $76,500.00 |
| United States Gypsum Company | 7/23/2009 | $80,700.59 |
| **TOTAL:** | | **$764,452.11** |

Declaration of James Nevin, (Dkt. #479), Ex. A.[2]  In addition, plaintiffs have acknowledged that they have accepted a settlement from the Harbison-Walker Refractories Company bankruptcy trust in the amount of $71,662.50 and conceded that the verdict should be offset by the amount of that settlement because receipt of the funds is imminent.  Declaration of James Nevin, (Dkt. #501-2) at ¶ 1.  Defendants do not contest the reasonableness of that settlement.  The Court finds it to be reasonable in light of the fact that the trust offered the same amount initially and in its most recent offer, which demonstrates that plaintiffs would not be able to achieve a higher settlement.

The statute does not set forth the factors a trial court should consider in a reasonableness hearing.  The Washington Supreme Court has explained that the following factors should be considered:

> [T]he releasing person's damages; the merits of the releasing person's liability theory; the merits of the released person's defense theory; the released person's relative faults; the risks and expenses of continued litigation; the released person's ability to pay; any evidence of bad faith, collusion, or fraud; the extent of the

---

[2] Plaintiffs filed certain documents reflecting settlement amounts under seal and redacted the settlement amounts from other documents.  Although the Court permitted the filing under seal based on plaintiffs' representation that the documents reflected confidential settlements, the Court finds that the public's interest in this order outweighs that interest in confidentiality.  Therefore, it has included the information in this order and has not filed this order under seal.

ORDER REGARDING REASONABLENESS
OF OTHER SETTLEMENTS - 3

releasing person's investigation and preparation of the case; and the interests of the parties not being released.

Glover v. Tacoma Gen. Hosp., 98 Wn.2d 708, 717 (1983).  Although courts should consider those factors, "no one factor should control."  Id. at 718.

Defendants seek an offset in the amount of $2 million.  Scapa's Clarification Regarding Relief Sought, (Dkt. #503).  It is unclear how that seemingly random amount was calculated.  The offsets set forth above total $836,114.61.  In addition, defendants seek an offset for amounts plaintiffs could receive from pending trust claims and for amounts they could have received if they had applied to other trusts.  Finally, defendants contend that plaintiffs' settlements with a few of the third parties, including Texaco, Inc., were unreasonable, so the Court should fix reasonable amounts and offset the judgment in this case by the higher amounts.  The Court addresses the settlements and defendants' arguments below.

**A.    CBS Corporation Settlement.**

Defendants do not claim that plaintiffs' settlement with the CBS Corporation is unreasonable.  In support of the reasonableness of the CBS Corporation settlement, plaintiffs have submitted a declaration from their counsel, David Donadio, a partner with Brayton Purcell.  (Dkt. #481).  Mr. Donadio states that one of his "primary jobs for the firm is to negotiate settlements on behalf of [the firm's] clients with numerous asbestos defendants."  Id. at ¶ 3 (stating that over the years, he has settled "with thousands of defendants in thousands of asbestos cases.").  Mr. Donadio states, "There existed a great risk in proceeding to trial against this defendant in light of tenuous product identification of exposure to asbestos attributable to Westinghouse Electric turbines.  Mr. Barabin was unable to identify Westinghouse Turbines in his proximity during his deposition and there was no co-worker who could identify Westinghouse turbines."  Id. at ¶ 6.  Mr. Donadio

ORDER REGARDING REASONABLENESS
OF OTHER SETTLEMENTS - 4

1    was able to settle the matter for $125,000 because of the seriousness of Mr. Barabin's

2    condition and because certain documents produced by Crown Zellerbach disclosed that

3    Westinghouse Turbines were at the paper mill.  Id. at ¶ 7.  The Court finds that the CBS

4    Corporation settlement was reasonable in light of the uncertainties of the litigation, the

5    risk in proceeding to trial, and the lack of any evidence of collusion, bad faith, or fraud.

6    **B.  Bankruptcy Trust Settlements.**

7        Plaintiffs have settled numerous claims with various bankruptcy trusts.

8    Defendants do not contend that any of the settlements received from the bankruptcy trusts

9    are unreasonable.  In support of the reasonableness of those claims, plaintiffs have

10    submitted a declaration from an associate with Brayton Purcell who supervises and heads

11    the Bankruptcy Department of the firm and has done so for over seven years.  She has

12    stated that it is her practice "to always achieve the highest possible settlement value for

13    [the firm's] clients, and the Barabins were no exception."  Declaration of Christina

14    Skubic, (Dkt. #480) ("Skubic Decl.") at ¶ 9.

15        Skubic has explained that Amatex "pays a flat claim amount based upon disease

16    and a small pool for payment.  There is no individual review option for mesothelioma

17    claims."  Skubic Decl. at ¶ 8.A.  The Court finds the Amatex settlement reasonable based

18    on the trust's procedure of paying a flat claim amount, the small pool for payment, and

19    the lack of any individual review option.

20        As for the settlement with the Asbestos Claims Management Corporation, the

21    "trust's scheduled value for mesothelioma was $45,000 and the payment percentage was

22    55.6% which would result in a payment of $25,020.  [Plaintiffs] requested Individual

23    Review and achieved a larger settlement in the amount of $35,125.16."  Skubic Decl. at

24    ¶ 8.B.  The Court finds the Amatex settlement reasonable based on the trust's scheduled

25

26    ORDER REGARDING REASONABLENESS
      OF OTHER SETTLEMENTS - 5

value, the payment percentage, and the fact that plaintiffs were able to receive a larger settlement through Individual Review.  The same factors convince the Court that the settlements with Celotex, Fuller-Austin Insulation Company, Inc., and United States Gypsum Company were reasonable.  The Celotex trust's scheduled value for mesothelioma was $130,000 and the payment percentage was 14.1% which would have resulted in a payment of $18,330.  Plaintiffs requested individual review and received a larger settlement of $23,049.  Id. at ¶ 8.C.  Similarly, the Fuller-Austin trust's scheduled value for mesothelioma was $55,000 and the payment percentage was 48.5%, which would result in the payment of $28,372.50.  Id. at ¶ 8.F.  Plaintiffs requested Individual Review and received a higher settlement of $35,392.50.  United States Gypsum Company's trust's scheduled value for mesothelioma was $155,000 and the payment percentage was 45%, which would have resulted in a payment of $69,750.  Id. at ¶ 8.J. Plaintiffs requested Individual Review and received a larger settlement of $80,700.59.

Plaintiffs received a $10,000 settlement with E.J. Bartells Company.  Skubic Decl. at ¶ 8.D.  That trust has a scheduled value of $100,000 with a maximum payment percentage of 10%, which plaintiffs received.  Given that the settlement reflected the maximum payment percentage, the settlement was reasonable.

The average settlement amount for a mesothelioma claim with Eagle-Picher Industries, Inc. was $37,244 and the payment percentage was 38%, which would have resulted in a payment of $14,152.72.  Skubic Decl. at ¶ 8.E.  That amount would have been paid in two installments, the second after two years.  Plaintiffs were offered, and accepted, an immediate one time payment of $9,907, which was 70% of the amount offered.  The settlement was reasonable in light of the amount offered, the payment percentage, and the uncertainty inherent in the installment payment offer.

ORDER REGARDING REASONABLENESS
OF OTHER SETTLEMENTS - 6

1    The Halliburton Energy Services, Inc. settlement was also reasonable because

2    plaintiffs received $44,527.14, more than double the trust's scheduled value of $21,000

3    for mesothelioma.  Skubic Decl. at ¶ 8.G.  The Kaiser Aluminum & Chemical

4    Corporation had a scheduled value for mesothelioma of $70,000 and the payment

5    percentage was 39.5%, which would have resulted in a payment of $27,650.  Id. at 8.H.

6    Plaintiffs were offered and accepted a value of $99,416, which at the 39.5% payment

7    percentage resulted in the Barabins' receipt of $39,675.72.  Id.  The Halliburton and the

8    Kaiser Aluminum settlements were reasonable because plaintiffs received more than the

9    trusts' scheduled value and payment percentage for their claims.

10    Plaintiffs also received a $1,375.00 settlement from the Keene Corporation.

11   Skubic Decl. at ¶ 8.I.  That trust's value for mesothelioma was $125,000 and the payment

12   percentage was 1.1%, which is what plaintiffs received.  The trust lacked any individual

13   review for mesothelioma claims.  The settlement was reasonable in light of the trust's

14   very low payment percentage and the lack of individual review.

15   **C.    Other Trust Claims.**

16    Defendants also argue that they are entitled to offsets for amounts that plaintiffs

17   could have, but have not, received from various trusts because they did not apply to those

18   trusts or because they rejected offers from the trusts.  Defendants note that plaintiffs'

19   discovery responses show that they have received settlement offers totaling $125,719.35

20   from six operating bankruptcy trusts that they have rejected.  Defendants are not entitled

21   to offsets for hypothetical recoveries from third parties to which plaintiffs may be (or may

22   once have been) entitled.  The Washington Court of Appeals recently held that RCW

23   4.22.060 "does not allow the court to offset a judgment by settlements not before it."

24   Coulter v. Asten Group, Inc., No. 63148-9-I, 2010 WL 60181, at *1 (Wash. Ct. App. Jan.

25

26   ORDER REGARDING REASONABLENESS
     OF OTHER SETTLEMENTS - 7

1   11, 2010).[3]  In that case, the trial court offset a judgment against Asten Group, Inc.[4] based

2   on plaintiffs' "probable recovery from future trust applications."  Id.  The Court of

3   Appeals rejected this result, explaining, "The statute excludes any consideration of claims

4   that have not yet been settled or that have not been submitted for approval."  Id. at *3.

5   Defendants contend that the Coulter decision is neither final nor a state Supreme Court

6   decision.  It is, however, persuasive authority, and it is consistent with the Washington

7   State Supreme Court's opinion in Brewer v. Fibreboard Corp., 127 Wn.2d 512 (1995).  In

8   Brewer, the plaintiffs had settled with the Manville Trust for $175,000.00, an amount the

9   court determined was reasonable.  127 Wn.2d at 532.  However, because $21,000.00 was

10  all that plaintiffs had received, or were likely to receive, the court determined this smaller

11  amount was the correct offset.  Id. ("We believe the better and fairer result would be

12  achieved by valuing the settlement for set-off purposes at $21,000.00, the amount actually

13  received by the Brewers under the $175,000.00 settlement agreement.").  The court's

14  holding makes it unlikely that a Washington court would permit defendants to receive

15  offsets for potential settlements that plaintiffs have either not sought or not accepted.  The

16  decision also supports the conclusion that under RCW 4.22.060, defendants should not

17  receive an offset for monies that plaintiffs have not actually been awarded.  Therefore, in

18  this case, defendants are not entitled to offsets for claims that have not yet settled.

19      In addition to the lack of legal support for applying off-sets for unconsummated

20  settlements, the facts in this case do not support doing so.  After the reasonableness

21

22      [3] The court's opinion in *Coulter* was originally designated as "unpublished."
23  However, on March 23, 2010, the court granted a motion to publish the opinion.

24      [4] Asten Group, Inc. is the same party as AstenJohnson, Inc., currently before this
25  Court.  See Coulter, 2010 WL 60181 at *1 n.1.

26  ORDER REGARDING REASONABLENESS
    OF OTHER SETTLEMENTS - 8

1   hearing, Scapa submitted a report from an expert who contends that plaintiffs could have

2   recovered a minimum of $365,00 and as much as $1,538,000 from bankruptcy claims that

3   plaintiffs delayed filing, or in four cases, have not yet filed at all.  Declaration of Marc

4   Scarcella, (Dkt. #496-2).  The Court has not considered the report because it was filed a

5   month after the reasonableness hearing, which deprived plaintiffs of any chance to cross

6   examine its author.  In contrast, plaintiffs' witness, Mr. Brayton, testified during the

7   reasonableness hearing.  There is no reason why defendants could not have done the same

8   and they have offered no explanation for their failure to present the evidence sooner.

9   Moreover, at the conclusion of the reasonableness hearing, the Court invited the parties to

10  submit additional information "such as the timing of when these things may have become

11  available, or if any new money comes in in the next 30 days, for you to update your

12  numbers, Mr. Nevin, I would accept it in that area." Transcript of Reasonableness

13  Hearing at p. 111.  The Court did not invite the parties to submit new expert reports, nor

14  did defendants request to do so.  Therefore, the Court did not consider the belatedly filed

15  Scarcella declaration and plaintiffs' request to strike the same is granted.[5]

16          Even if the Court had considered it, Mr. Scarcella's declaration would not support

17  defendants' assertions.  Instead, the report highlights the reason why courts do not apply

18  offsets for unconsummated settlements: Mr. Scarcella notes that the total amount of

19  projected recoveries varies by over a million dollars.  As his opinion shows, valuing the

20  unconsummated settlements would necessarily involve speculation and result in an

21

22          [5] Similarly, plaintiffs have submitted a Statement of Recent Decision noting a high
    verdict amount in a recent Georgia state court case against Scapa and Union Carbide
23  Corporation.  Because these cases are so fact specific, that verdict does not shed light on
    the issue of whether the other settlements in this case are reasonable or whether the jury's
24  verdict was excessive.  Accordingly, defendants' request to strike the Statement of Recent
    Decision is granted and the Court did not consider it.
25

26  ORDER REGARDING REASONABLENESS
    OF OTHER SETTLEMENTS - 9

1    inaccurate offset as admonished against in *Coulter* and *Brewer*.

2         The Court also considers defendants' argument that plaintiffs have gamed the

3    system by delaying filing various claims to receive a double recovery.[6]  Certainly, that

4    risk is inherent in the "dual compensation environment that exists between the tort and

5    Trust systems."  Scarcella Decl. at p. 7.  To the extent that the risk is inherent in the

6    system, that issue is for the legislature and not for this Court to resolve.  Mr. Scarcella

7    notes that he found it "surprising" that plaintiffs' counsel delayed so long in filing some

8    of the claims, particularly in light of the fact that many trusts offer an Exigent Health

9    Claims status for "living mesothelioma cases" and because plaintiffs possessed the

10   necessary medical and exposure claims by December 2006.  Scarcella Decl. at pp. 5-6.

11   Ms. Skubic has filed a declaration in response.  She states that although Mr. Scarcella

12   opines that plaintiffs should have submitted claims to four additional trusts, three of those

13   entities – A.P. Green, Pittsburgh Corning, and United States Mineral – are not yet

14   operating trusts, so no claims can be made to them at this time.  Declaration of Christina

15   Skubic, (Dkt. #501-2) at ¶ 4.  In addition, the delay in filing some claims does not

16   necessarily reflect strategic behavior, particularly because plaintiffs filed nearly all of

17   their claims before trial and have already accepted settlements on the majority of the

18   available claims.  In fact, the anticipated settlements for the three belatedly filed

19   claims–ACandS, Inc., J.T Thorpe Company Trust–Texas, and Raymark Industries, are

20

21        [6] Defendants also argue that plaintiffs delayed filing the ACandS, Inc., J.T Thorpe
22   Company Trust–Texas, and Raymark Industries claims so their statements in the claim
     forms could not be used against them during the trial in this case.  That argument will be
23   addressed by separate order regarding defendants' motions for a new trial and/or
     discovery because if defendants are correct that plaintiffs delayed *for that reason*, the
24   remedies defendants seek in their other motions are more appropriate than applying set
     offs for unconsummated settlements.
25

26   ORDER REGARDING REASONABLENESS
     OF OTHER SETTLEMENTS - 10

1   $8,670, $57,000, and $2,500, respectively, low to average settlement amounts that do not

2   suggest strategic withholding of high value claims.  Nevin Decl., Ex. A.

3        Furthermore, during the reasonableness hearing, Mr. Brayton testified that there is

4   no incentive for his firm or for plaintiffs to settle claims for low amounts.  That testimony

5   was logical and credible.  Mr. Brayton also explained that each of the settlements was

6   negotiated individually on behalf of the plaintiffs.  Plaintiffs' claims were never

7   negotiated as part of a "package" settlement involving other claimants, so there was no

8   motive to accept a lower settlement for plaintiffs in furtherance of any other goal.  Mr.

9   Brayton also testified during the reasonableness hearing that his firm has tried to get

10  plaintiffs funds as quickly as possible while Mr. Barabin is still alive.  He also explained

11  that the firm generally files claims earlier that have higher potential values and/or earlier

12  cut-off dates.  He explained that it is not always possible to file all claims at the same

13  time, and his firm does not "hold claims."  That testimony further demonstrates the lack

14  of any strategic behavior.  Therefore, the Court will not offset the judgment in this case

15  based on hypothetical and uncertain amounts plaintiffs could receive.

16  **D.     The Ingersoll-Rand Company Settlement.**

17        Plaintiffs received a settlement of $25,000 from the Ingersoll-Rand Company.

18  Defendants do not dispute the reasonableness of that settlement.  Plaintiffs' counsel have

19  filed a declaration stating that the settlement amount reflects the substantial risk of

20  proceeding to trial against that entity, which was the result of the following factors: (1)

21  although plaintiffs had evidence that Ingersoll-Rand had equipment at the Camas Mill,

22  Mr. Barabin had no recollection of ever working on that equipment or being around

23  others who did so; there were no co-workers who could so testify; and (2) Washington

24  Supreme Court authority suggested that even if plaintiff worked on or around others

25

26  ORDER REGARDING REASONABLENESS
    OF OTHER SETTLEMENTS - 11

1  working on Ingersoll-Rand equipment, he would also have to prove that any internal parts

2  were original, which he was unable to do.  Declaration of Zachary Herschensohn, (Dkt.

3  #490) at ¶ 5.  In light of those difficulties, the settlement was based primarily on the fact

4  that Ingersoll-Rand's equipment was present at the mill and the seriousness of Mr.

5  Barabin's injury and disease.  Id.  Counsel states, "Because of the lack of product

6  identification or exposure to asbestos attributable to Ingersoll-Rand, there was a

7  significant risk of loss at summary judgment or trial."  Id. at ¶ 6.  In light of those factors,

8  the risk of proceeding to trial, and the evidentiary problems, the settlement was

9  reasonable.

10  **E.    The C.H. Murphy/Clark-Ullman Settlement.**

11       Plaintiffs settled with C.H. Murphy/Clark-Ullman for $95,000.  Brayton Decl. at

12  ¶ 10.A.  Mr. Brayton states that there was a "great risk" in proceeding to trial against C.H.

13  Murphy because of product identification and exposure issues.  Id. at ¶ 10.A.  Although

14  the firm obtained information indicating that C.H. Murphy's products were present at

15  Crown Zellerbach while plaintiff worked there, plaintiff was unable to identify or

16  remember any person working near him using those products.  Id.  "Additionally, no co-

17  worker could be found that could testify and identify exposures to asbestos-containing

18  products for which C.H. Murphy was responsible."  Id.  Mr. Brayton notes that the

19  settlement was consistent with other cases his firm settled on behalf of similarly situated

20  plaintiffs.  The Court finds that the settlement was reasonable in light of those facts, the

21  risk and uncertainty of proceeding to trial, the evidentiary problems, and increased

22  expenses of continuing litigation.

23  **F.    The Garlock Sealing Technologies, LLC Settlement.**

24       Plaintiffs settled with Garlock for $22,500.00.  During the reasonableness hearing,

25

26  ORDER REGARDING REASONABLENESS
    OF OTHER SETTLEMENTS - 12

1  defense counsel argued that the amount was unreasonable because there were crocidolite

2  gaskets present when plaintiff worked there, Garlock manufactured crocidolite-containing

3  gaskets, and plaintiff recalled assisting with the removal of gaskets.  However, plaintiff

4  could not recall the brand or manufacturer of any of those parts.  No co-worker could be

5  located to supply that information.  Brayton Decl. at ¶ 10.B.  Mr. Brayton explained that

6  there was "significant risk in proceeding to trial against this defendant in light of product

7  identification and exposure issues."  Id.  Mr. Brayton opined that the settlement was

8  reasonable in relation to others obtained for similarly situated plaintiffs whose cases had

9  evidentiary problems.  "It was also reasonable in that the increased expense of continuing

10  litigation against this defendant would have been outweighed, due to the paucity of

11  evidence, by the risk of loss at summary judgment or at trial."  Id.  In light of those

12  factors, the Court finds that the settlement was reasonable.

13  **G.  The General Electric Company Settlement.**

14        Defendants argued during the reasonableness hearing that plaintiffs' settlement

15  with GE was unreasonably low because GE asbestos-containing turbines were used at the

16  Camas mill.  Although plaintiff worked around workers who performed maintenance

17  duties on them, he never worked on the turbines himself.  Brayton Decl. at ¶ 10.C.  Mr.

18  Brayton explained during the reasonableness hearing that the asbestos was in the internal

19  components of the turbines, which makes it more difficult to prove exposure than against

20  a defendant whose product contains external asbestos.  Also, plaintiff could not recall

21  what duties his co-workers actually performed on the turbines, so it was unclear whether

22  their activities disturbed asbestos-containing components, releasing respirable asbestos

23  fibers that would be associated with GE, or that GE was responsible for the turbine

24  insulation even if plaintiffs could show that it had been disturbed.  Id.  Based on those

25

26  ORDER REGARDING REASONABLENESS
OF OTHER SETTLEMENTS - 13

factors, there was a "significant risk" with proceeding to trial.  Mr. Brayton opined that

the settlement was reasonable in relation to those obtained for other similarly situated

plaintiffs whose cases had evidentiary problems, and reasonable in light of the paucity of

evidence and increased expense of continuing to trial.  Id.  In light of those factors, the

Court finds that the settlement was reasonable.

**H.      The Owens-Illinois, Inc. Settlement.**

Plaintiffs settled with Owens-Illinois, Inc. for $65,000.  There was evidence that

the company's product, asbestos-containing Kaylo thermal pipe insulation, was used at

the Texaco refinery where plaintiff worked.  Plaintiff could not identify working around

or seeing others working with Kaylo insulation or any other Owens-Illinois product.

Plaintiffs' counsel states that for that reason, "there was a substantial risk in proceeding to

trial against this defendant in light of product identification and exposure issues.  The lack

of specificity and identification of exposure to an [Owens-Illinois] asbestos-containing

product at this facility, would have presented great difficulty in proof at trial."  Brayton

Decl. at ¶ 10.E.  The Court finds that the settlement was reasonable in light of those

factors and the risks of proceeding to trial.

**I.      The Texaco Settlement.**

Plaintiffs settled with Texaco for $76,500.  As with plaintiffs' other settlements,

there is no evidence that the settlement was the result of fraud or collusion.

Plaintiff worked for C.A. Turner Construction Company at the Texaco refinery for

three or four years until 1968.  Mr. Barabin's Trial Testimony, 10/28/09 at pp. 5-6;

Brayton Decl. at ¶ 10.D.  Plaintiff spent his first 4-6 months at the refinery working

outside on the "yard crew," cutting grass and doing general cleanup work.  "Although he

did clean up trash and debris left behind by pipefitters, bricklayers and other tradesmen, it

ORDER REGARDING REASONABLENESS
OF OTHER SETTLEMENTS - 14

1  was not possible for Mr. Barabin to state that any of the materials he cleaned up contained

2  asbestos." Brayton Decl. at ¶ 10.D. Plaintiff could not specifically recall cleaning up

3  insulation debris although he was "sure" that some of it was insulation. Mr. Barabin's

4  Trial Testimony, 10/28/09 at p. 7. His job was to sweep debris into areas where someone

5  else would come pick it up and dispose of it. Id. at pp. 82-83. Plaintiff estimated that he

6  was never closer than 30 to 40 yards from the area where the tradespeople were working.

7  Id. at p. 7. He recalled occasionally cleaning up trash or debris left behind by pipefitters

8  and the work did generate some dust. However, the dust's composition was unclear. Id.

9  at pp. 84-85. Similarly, although he occasionally cleaned up some scrap materials left

10  behind by bricklayers, it was unclear what the scrap materials were or whether any

11  contained asbestos. Id. at pp. 86-87.

12  Thereafter, plaintiff worked on the loading dock for 6-8 months loading cases of

13  motor oil into boxcars. During that time, he never saw anyone working with insulation or

14  other asbestos-containing products. Brayton Decl. at ¶ 10.D; Mr. Barabin's Trial

15  Testimony, 10/28/09 at pp. 7, 8.

16  For the remainder of his employment at the refinery, plaintiff worked in the

17  "grease plant" helping to make outboard motor oil. Brayton Decl. at ¶ 10.D. During that

18  time, he never saw anyone working with insulation, transite pipe, or other asbestos-

19  containing products. Id.; Mr. Barabin's Trial Testimony, 10/28/09 at p. 8. Mr. Brayton

20  opined, "The lack of specificity and identification of exposure to asbestos at this facility,

21  over a limited period of time, would have been problematic at trial. Due to the paucity of

22  evidence, the risk and expense of proceeding to trial against Texaco, and/or avoiding

23  summary judgment, were far outweighed by the certainty of this reasonable settlement."

24  Brayton Decl. at ¶ 10.D. Mr. Brayton also stated that the settlement the Barabins

25

26  ORDER REGARDING REASONABLENESS
   OF OTHER SETTLEMENTS - 15

1 received from Texaco was the largest he had ever secured for a client from the company,

2 dating back to 1991. Id.

3      Defendants argue that the Texaco settlement is not reasonable. "'It is incumbent

4 upon a party having a significant interest in seeing that the settlement is found to be

5 unreasonable to present some evidence to controvert the settling parties' evidence.'"

6 Brewer, 127 Wn.2d at 526 (1995) (quoting Pickett v. Stephens-Nelsen, Inc., 43 Wn. App.

7 326, 332 (1986)). Specifically, defendants argue that in the forms plaintiff belatedly

8 submitted to the ACandS, Inc. and J.T Thorpe Company Trust–Texas trusts,[7] plaintiff

9 alleged that he was exposed "on a regular basis" to asbestos fibers at the Texaco refinery.

10 Plaintiffs' Supplemental Filing (Dkt. #521). Plaintiff checked boxes indicating that while

11 he worked at the Texaco refinery, he "altered, repaired or otherwise worked with an

12 asbestos-containing product such that the claimant was exposed on a regular basis to

13 asbestos fibers" and "Claimant was employed in an industry or occupation such that the

14 claimant worked on a regular basis in close proximity to workers who did one or more of

15 the above three activities." Id. at Ex. A, § 7. Plaintiff also added the following statement:

> 16 Claimant boxed up bottles of motor oil, and loaded the boxes onto freight cars.
> 17 Claimant worked in proximity to insulators and pipefitters tearing insulation off of
> vessels, tanks, cat towers, and boilers throughout the refinery. Claimant swept up
> and gathered insulation debris after it was torn off of equipment and pipe lines.
> 18 Claimant worked in proximity to brick layers re-bricking boilers. Claimant picked
> up old brick, mortar, and insulation left behind by the brick layers. Claimant
> 19 worked in proximity to welders.

20

---

21     [7] Defendants further contend that plaintiffs' delayed filing of the ACandS, J.T.
Thorpe Company Trust–Texas, and Raymark Industries claims forms reflects strategic
22 behavior, impaired their ability to cross examine plaintiff at trial, and violated the
discovery rules because the AcandS claim was submitted during trial, but plaintiffs failed
23 to supplement their discovery responses with the submitted form. Even if the delay were
improper in one or more of those ways, it would not necessarily mean that the Texaco
24 settlement was unreasonable. Rather, those issues will be addressed by separate order
related to defendants' pending motions for a new trial and for discovery.
25

26 ORDER REGARDING REASONABLENESS
OF OTHER SETTLEMENTS - 16

1    Id.; see also id. at Ex. B, Part 4 (plaintiff checked boxes agreeing that while he worked at

2    the Texaco refinery, he "[f]abricated asbestos-containing products so that [he] in the

3    fabrication process was exposed on a regular basis to raw asbestos fibers" and that he

4    "[a]ltered, repaired, or otherwise worked with an asbestos-containing product such that

5    [he] was exposed on a regular basis to asbestos fibers."). Defendants contend that the

6    forms show that plaintiff's exposure at Texaco's facility was actually much larger than

7    plaintiff testified, so the settlement is unreasonable. Although defendants argue that

8    plaintiff's statements in the forms are inconsistent with his trial testimony, the record

9    shows that he testified that for a period of time, he spent about half of his time cleaning

10   up insulation after pipe fitters or insulators. Mr. Barabin's Trial Testimony, 10/28/09 at

11   p. 53. Plaintiff testified that he was "sure" that some of what he cleaned up was

12   insulation. Id. at p. 7. Defendants have not cited any of plaintiff's testimony that directly

13   contradicted his statements in the forms that he was exposed to asbestos "on a regular

14   basis." Furthermore, the forms do not ask about potential evidentiary problems such as

15   the ones counsel identified; rather, they reflect plaintiff's allegations. Because plaintiff's

16   trial testimony was consistent with his statements in the forms, the forms do not support

17   applying a higher offset for the Texaco settlement.

18        Defendants also argue that the Texaco settlement was unreasonable in light of the

19   expert testimony during trial that early exposure to asbestos is the most causative of

20   disease later. That testimony, however, begs the question of whether plaintiff could

21   actually prove that Texaco was responsible for plaintiff's asbestos exposure as the

22   facility. During the reasonableness hearing, Mr. Brayton described the difference

23   between claims against product makers or suppliers and "premises" defendants like

24   Texaco: "Premise defendants create a whole new set of problems [in proving liability]

25

26   ORDER REGARDING REASONABLENESS
     OF OTHER SETTLEMENTS - 17

1  because it is not just enough to show that there is asbestos at the facility." Transcript of

2  Reasonableness Hearing, 5/21/10 at p. 78.  Rather, a plaintiff generally has to show that

3  the premises defendant had control over the dangerous product and make a "liability

4  link."  Id.  Based on that unrebutted testimony, defendants' comparison between

5  themselves and Texaco is flawed.

6  Defendants also fail to present evidence about the amount of an allegedly

7  reasonable settlement with Texaco.  Without citing anything in support, defendants argue

8  that the Texaco settlement "should have been at least $500,000."  Scapa's Supplemental

9  Brief, (Dkt. #496) at p. 2.  That unsupported assertion is not evidence of

10  unreasonableness.  They also contend that the settlement is unreasonable because of the

11  disparity between the settlement amount and the $1 million settlement demand that

12  plaintiffs made to Asten and Scapa in March 2007.  The settlement demand is

13  inadmissible under Federal Rule of Evidence 408.  Even it were admissible, it does not

14  support a finding that the settlement was unreasonable in light of the differences between

15  Texaco and defendants, as set forth above.  Moreover, the function of a reasonableness

16  hearing "is not to apportion fault to each of the parties causing the injury or determine the

17  liability of such parties, but rather to determine whether, given the facts and law known to

18  the hearing judge, the proposed settlement amount is reasonable."  Price v. Kitsap Transit,

19  125 Wn.2d 456, 467 (1994); see also Glover, 98 Wn.2d at 717.  In light of those cases,

20  the Court cannot conclude that the Texaco settlement was unreasonable simply because of

21  the large verdict in this case.

22  Defendants also contend, "It is obvious from both the timing and the amount of the

23  settlement with Texaco that Plaintiffs failed to properly investigate and work up their

24  claim against Texaco, resulting in their settling the claim for an unreasonably low value."

25

26  ORDER REGARDING REASONABLENESS
OF OTHER SETTLEMENTS - 18

1  Asten's Supplemental Brief, (Dkt. #492) at p. 5.  Other than arguing that the settlement is

2  too low, defendants have not shown that plaintiffs' counsel failed to properly investigate

3  the claim against Texaco.

4           For all of the foregoing reasons, the Court finds that the amount of the

5  consummated settlements is reasonable.  The judgment in this matter will be offset by a

6  total of $836,114.61.  The Clerk of the Court is directed to enter judgment in favor of

7  plaintiffs and against defendants in the amount of $9,373,152.12, which reflects the $10.2

8  million verdict, less the offset amount, plus $9,266.73 that has been awarded in costs.

9  The judgment shall be entered *nunc pro tunc* as of November 20, 2009, the date of the

10 initial judgment, for purposes of calculating interest thereon.

11

12         DATED this 13th day of September, 2010.

13

14

15                                                    Mat S Casnik

16                                                    Robert S. Lasnik
                                                      United States District Judge

17

18

19

20

21

22

23

24

25

26 ORDER REGARDING REASONABLENESS
   OF OTHER SETTLEMENTS - 19