1

2

3

4

5

6

7

8

9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10

GERALDINE BARABIN,

CASE NO. C07-1454JLR

11

Plaintiff,

12

v.

ORDER ON MOTIONS TO
EXCLUDE

13

SCAPA DRYER FABRICS, INC.,

14

Defendant.

15

## I.    INTRODUCTION

16    Before the court are two motions to exclude filed by Defendant Scapa Dryer

17 Fabrics, Inc. ("Scapa"):  (1) a motion to exclude two expert witness testimonies on the

18 subject of exposure to asbestos fibers (Exposure Mot. (Dkt. # 681)); and (2) a motion to

19 exclude four expert witness testimonies on the subject of causation (Causation Mot. (Dkt.

20 # 683)).  Plaintiff Geraldine Barabin opposes both motions.  (*See* Exposure Mot. Resp.

21 (Dkt. # 690); Causation Mot. Resp. (Dkt. # 689).)  The court has reviewed the parties'

22 filings in support of and in opposition to the motions, the relevant portions of the record,

and the applicable law. The court also heard oral argument from the parties at a *Daubert* hearing on February 6, 2018. (*See* 2/6/18 Min. Entry (Dkt. # 695).) Being fully advised, the court GRANTS in part and DENIES in part both of Scapa's motions for the reasons discussed below.

## II. BACKGROUND

This matter began on December 18, 2006, when Plaintiffs Henry and Geraldine Barabin (collectively, "the Barabins") filed suit against various defendants for relief based on Mr. Barabin's alleged exposure to asbestos through his employment. (*See* Not. of Removal (Dkt. # 1) ¶¶ 2-4.) Between 1968 and 2001, Mr. Barabin worked at the Crown-Zellerbach Pulp and Paper Mill in Camas, Washington (the "Camas paper mill" or "paper mill"). (*See* Causation MacKenzie Decl. (Dkt. # 684) ¶ 2, Ex. 1 ("Brodkin Rep.") at 12-15.)[1] While there, he worked a variety of jobs, some of which required him to manipulate dryer felts allegedly manufactured by Scapa and original-defendant AstenJohnson, Inc. ("AstenJohnson").[2] (*See id.* at 12-14; Not. of Removal ¶¶ 3-5.) For instance, he changed dryer felts, cut the felt off pins and rollers, moved felts throughout the mill, and cleaned the paper machines with high pressure hoses. (Brodkin Rep. at 29.) Mr. Barabin retired in 2001. (*Id.* at 15.)

//

//

---

[1] When referring to exhibits in the record, the court cites to the page numbers generated by the CM-ECF filing system that appear on the upper right hand of the document.

[2] Ms. Barabin and AstenJohnson recently reached settlement. (*See* Not. of Settlement (Dkt. # 694).)

In late October and November of 2006, Mr. Barabin was diagnosed with malignant mesothelioma and subsequently underwent multiple courses of chemotherapy. (*Id.* at 16, 29.) Mr. Barabin passed away on March 30, 2012, due to mesothelioma. (*See id.* at 5.) An autopsy on March 31, 2012, revealed malignant pleural mesothelioma in the right cavity of the chest. (*Id.*)

This case originally went to trial in November of 2009, and a jury returned a verdict in favor of the Barabins. (*See* Judgment (Dkt. # 355).) Scapa and AstenJohnson both appealed. (*See* AstenJohnson Not. of Appeal (Dkt. # 554); Scapa Not. of Appeal (Dkt. # 565).) The Ninth Circuit held that the district court failed to make the appropriate determinations under *Daubert* and Federal Rule of Evidence 702 in allowing certain expert testimony. *See Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 464 (9th Cir. 2014) (en banc). Accordingly, the Ninth Circuit remanded the matter for a new trial. *Id.* at 467.

With the retrial approaching, Scapa filed the motions-at-issue to exclude various expert testimonies offered by Ms. Barabin pursuant to *Daubert* and Federal Rule of Evidence 702. These testimonies fall into one of two categories: (1) witnesses offered to show that Mr. Barabin was exposed to asbestos from Scapa's dryer felts (*see* Exposure Mot.); and (2) witnesses offered to show that Mr. Barabin's occupational exposure to asbestos was a substantial factor in causing his mesothelioma (*see* Causation Mot.).

A.      **Exposure Expert Testimonies**

Scapa challenges two of Ms. Barabin's expert witnesses who will testify to exposure: Mr. Christopher DePasquale and Dr. Steven Compton. (Exposure Mot. at 1.)

//

1                1.  Mr. Christopher DePasquale

2       Mr. DePasquale is a Senior Industrial Hygienist who conducts industrial hygiene

3   and indoor air quality investigations.  (Exposure MacKenzie Decl. (Dkt. # 682) ¶ 2, Ex. 1

4   ("DePasquale Rep.") at 11.)  In the field of asbestos management and control, he has

5   conducted asbestos sampling in numerous settings and performed monitoring on facilities

6   to evaluate potential for exposure.  (*Id.*)  For his testimony here, he reviewed deposition

7   testimonies of both parties, various interrogatory responses, and trial testimonies of Mr.

8   Barabin and previous expert witnesses.  (*Id.* at 15.)

9       Mr. DePasquale summarizes Mr. Barabin's occupational history at the Camas

10  paper mill, noting Mr. Barabin's various roles at the paper mill that required interaction

11  with dryer felts.  (*Id.* at 16-19.)  He then opines that Mr. Barabin "would have had

12  significant exposures to asbestos . . . when he personally cut dryer felts, assisted in the

13  change-out of dryer felts, and when he or others used compressed air to clean off dryer

14  felts."  (*Id.* at 20.)  Overall, Mr. DePasquale concludes that Mr. Barabin's "exposures

15  would have likely been in the range of 0.1 to 5 [fibers/cubic centimeter][3] during the full

16  change out process," with "peak exposures possibly above this range during certain

17  activities, such as the cutting and folding of used dryer felts and/or clean up of debris

18  from these activities using compressed air."  (*Id.* at 22.)  When Mr. Barabin was involved

19  with the blowing of dryer felts, Mr. DePasquale concludes that "his exposures would

20  have likely been 0.1 fibers/cc or greater."  (*Id.*)

21  _____

22      [3] Fibers per cubic centimeter ("f/cc") is a measure of fiber count used in asbestos-fiber exposure studies.

1    Mr. DePasquale based this exposure range on various studies that analyzed

2    asbestos fiber release from dryer felts. First, he relies on a study by J.D. Wendlick

3    analyzing samples collected on April 16, 1973, at a paper mill during a dry end felt

4    change ("the Wendlick study"). (*Id.* at 20.) The samples indicated that exposures during

5    this one task "ranged from 0.02 to 0.10 f/cc." (*Id.*) Mr. DePasquale then cites Dr. James

6    R. Millette's studies, who analyzed the release of asbestos fibers from dryer felts when

7    blown with compressed air and found concentrations "exceeding 30 f/cc." (*Id.* at 20-21.)

8    Another study conducted by Dr. Millette found concentrations of asbestos at 51.4 f/cc.

9    (*Id.* at 21.) Mr. DePasquale also relies on a study conducted by Materials Analytic

10   Services ("MAS") that discovered asbestos exposure of 12.4 f/cc for a person cleaning

11   dryer felts by blowing it with compressed air, 13.7 to 14.4 f/cc for the assistant of the

12   task, and area samples ranging from 6.6 to 8.0 f/cc. (*Id.*) Lastly, Mr. DePasquale

13   reviews the study by the RJ Lee Group ("the RJ Lee study"), which blew compressed air

14   on Scapa dryer felts using a model paper machine and found exposure for the worker

15   ranged from 0.02 to 1.79 f/cc, with an average sample result of 0.4 f/cc. (*Id.* at 21-22.)

16          2.  Dr. Steven Compton

17          Dr. Compton is a physicist and microscopist with experience in testing

18   "asbestos-containing products for fiber release." (Exposure MacKenzie Decl. ¶ 4, Ex. 3

19   ("Compton Rep.") at 2.)  He reviewed Mr. Barabin's trial testimony, various

20   interrogatory responses, Mr. Barabin's occupational history, and other expert testimonies

21   presented in this case. (*Id.*)

22   //

Additionally, Dr. Compton conducted microscopic examinations and fiber release testing on a variety of textiles, including "used and unused, as well as coated and uncoated" dryer felts manufactured by Scapa. (*Id.*) Dr. Compton examined these felts with polarized light microscopy ("PLM") and analyzed the debris released through contact with these felts with scanning electron microscopy ("SEM"). (*Id.*) He performed various tests to analyze the debris released through manipulation of dryer felts. First, he conducted compressed air tests in a "closed glove box chamber," where air hoses with 60 psi compressed air were directed at two dryer felt pieces for five minutes. (*Id.*) The released particles were then collected. (*Id.* at 3.) Second, he collected air samples after cutting dryer felt material in a closed glove box. (*Id.*) Dr. Compton employed various methods to analyze the collected air samples, including the National Institute of Occupational Safety and Health ("NIOSH") Method 7400, the NIOSH 7402 procedure, the International Standards Organization ("ISO") Standard Method 10312, and the Asbestos Hazard Emergency Response Act ("AHERA") Method. (*Id.*) These tests revealed that "asbestos dryer felts will release asbestos fibers when handled, regardless of manufacturer or condition" and that "asbestos fibers can readily be released into the air, especially when blown with compressed air or when cut." (*Id.*)

Dr. Compton concedes that these studies were "not intended to replicate or represent actual plant conditions where paper was being made." (Exposure MacKenzie Decl. ¶ 5, Ex. 4 ("Compton Dep.") at 57.) In fact, he has never been to the paper mill (*id.* at 25), and he has no knowledge about the conditions there, such as the amount of water used, the level of ventilation, or the humidity (*id.* at 53-54). However, he notes that Mr.

Barabin describes "the frequent installation and removal of dryer felts" at the paper mill, which involved cutting the felt and using compressed air "on a daily basis" for cleaning purposes. (Compton Rep. at 2.) Moreover, Mr. Barabin recounts how he "personally handled, cleaned with compressed air, and cut dryer felts in connection with his work." (*Id.*) Thus, despite not having examined the specific felts used by Mr. Barabin, Dr. Compton concludes that "the handling of asbestos-containing dryer felts, cleaning with compressed air, and cutting of dryer felts performed by Mr. [Barabin] . . . would have released asbestos fibers into the air." (*Id.* at 3-4.)

**B.  Causation Expert Testimonies**

Scapa additionally challenges four of Ms. Barabin's expert witnesses who will testify to causation:  Dr. Carl Brodkin, Dr. Allan Smith, Dr. David Tarin, and Dr. Richard Cohen. (Causation Mot. at 1.)

1.  Dr. Carl Brodkin

Dr. Brodkin practices occupational and environmental medicine. (Brodkin Rep. at 56.) He holds an M.D. from University of Colorado Medical School and an M.P.H. from the University of Washington, School of Public Health. (*Id.* at 54.) For his reports, Dr. Brodkin interviewed Mr. Barabin, performed a medical examination on him, and reviewed his medical records and interrogatory responses, including his autopsy and post-mortem pathologic reports. (*Id.* at 2, 10.) He additionally interviewed Mr. Barabin's treating physicians, reviewed various expert reports, and considered interrogatory responses from Scapa. (*See id.* at 46, 50.) Lastly, Dr. Brodkin considered the literature on occupational exposure to asbestos. (*See id.* at 41-45.)

1    In his initial report on February 26, 2007, Dr. Brodkin concluded that Mr.

2    Barabin's "most prominent exposure" to asbestos came during his time as a paper mill

3    worker. (*Id.* at 31.) Mr. Barabin participated in various tasks that resulted in "prominent

4    direct exposure to asbestos," including his "regular manipulation of wet and dry felts . . .

5    with tugging, pulling, and cantilevering of dry felts during fitting procedures." (*Id.*)

6    Analyzing Mr. Barabin's symptoms and the literature around asbestos-related malignant

7    mesothelioma, Dr. Brodkin concludes that "Mr. Barabin's malignant pleural

8    mesothelioma was caused by his occupational exposure to asbestos as a career paper

9    machine worker and laborer, with prior exposure to asbestos as a refinery laborer." (*Id.*

10   at 39 (internal parentheticals omitted).) Specifically, Dr. Brodkin states that "Mr.

11   Barabin's cumulative exposures to asbestos-containing materials placed him at

12   significant risk for development of mesothelioma, with a well-demonstrated

13   dose-response associated with increasing asbestos exposure." (*Id.* at 33.)

14       On March 24, 2009, Dr. Brodkin submitted an updated report based on additional

15   clinical data and exposure-related reports, including his review of information indicating

16   that Scapa-produced dryer felts contained chrysotile asbestos. (*Id.* at 46, 50.) This

17   additional information, Dr. Brodkin concluded, "is fully consistent" with his previous

18   opinion that Mr. Barabin's mesothelioma is "causally associated with occupational

19   exposure to asbestos as a career paper machine worker and laborer." (*Id.* at 51.) Dr.

20   Brodkin stated that the additional exposure-related documents confirm "that dryer felts

21   represent an historically important source of respirable asbestos exposure in pulp and

22   paper mill settings . . . [D]ryer felt material represents a component part of Mr. Barabin's

cumulative career asbestos exposure." (*Id.* at 52.) Dr. Brodkin reiterates his conclusion that Mr. Barabin's exposure to asbestos fibers through the dryer felts "is a substantial contributing factor in his development of malignant mesothelioma." (*Id.*)

At his deposition, Dr. Brodkin was asked to clarify whether he believed that "every exposure to asbestos above ambient levels is a . . . substantial factor, in causing a plaintiff's asbestos-related disease." (Causation MacKenzie Decl. ¶ 3, Ex. 2 ("Brodkin Dep.") at 33.) He rejected that belief, emphasizing "[t]hat statement does not characterize my opinion." (*Id.*; *see also id.* at 34 ("It's not my opinion that [de minimis exposures] would increase risk for mesothelioma.").) Indeed, when faced with a hypothetical where only one out of 100 dryer felts contained asbestos, Dr. Brodkin stated he could not and would not reach a causation conclusion. (*Id.* at 65-66.)

Instead, Dr. Brodkin explained that only an activity that would "disturb the [asbestos-containing] material in such a way to generate significant airborne asbestos fibers" would increase the risk of an asbestos-related disease. (*Id.* at 33-34.) He terms this exposure as a "biologically significant exposure to asbestos" or an "identified exposure." (*Id.* at 43-44.) Thus, "a biologically significant exposure . . . could increase risk . . . in a cumulative fashion with the total asbestos exposure." (*Id.* at 44.)

Dr. Brodkin clarified that he could not express any opinion on the actual quantitative level of asbestos fibers that Mr. Barabin may have been exposed to because there were no real-time measurements of asbestos at the paper mill to allow a quantification. (*Id.* at 25.) Nevertheless, Dr. Brodkin maintains that "[t]he paper-making activities that Mr. Barabin participated in are a component part of his cumulative

exposure, among others, that resulted in mesothelioma." (*Id.* at 44.) The activities that Mr. Barabin participated in represented both a "substantial part of his occupational history" and a high "intensity of exposure." (*Id.* at 44-45.)

    2. <u>Dr. Allan Smith</u>

    Dr. Smith is a consultant in occupational and environmental epidemiology. (Causation MacKenzie Decl. ¶ 4, Ex. 3 ("Smith Rep.") at 2.) For his report, Dr. Smith reviewed literature regarding asbestos exposure and its link to mesothelioma and studies of asbestos diseases in the pulp and paper mill industry. (*See generally id.*) Dr. Smith states that the scientific evidence establishes that "inhalation of asbestos dust is the main cause of pleural mesothelioma" and that "[a]ll major commercial fiber types of asbestos . . . cause mesothelioma." (*Id.* at 4.) In particular, Dr. Smith points to studies of the paper mill industry that documented malignant mesothelioma among workers. (*Id.* at 5.) In his opinion, "all asbestos fibers contribute to the causal dose." (*Id.* at 4.)

    Based on the scientific evidence and Mr. Barabin's occupational history, Dr. Smith concludes that Mr. Barabin's mesothelioma was caused by the inhalation of asbestos dust. (*Id.* at 6.) Dr. Smith posits that "[w]hen someone gets mesothelioma from asbestos dust inhalation, all the inhalation of asbestos containing dust up to about 15 years prior to diagnosis [of mesothelioma] contributed to the dose that increased the risk and caused the cancer." (*Id.*) "The dose consists of all inhalations, and all of it is therefore . . . significant." (*Id.*) Dr. Smith affirmed in his deposition that there is no minimum threshold level of exposure below which asbestos does not cause mesothelioma. (Causation MacKenzie Decl. ¶ 5, Ex. 4 ("Smith Dep.") at 23.)

3.  <u>Dr. David Tarin</u>

Dr. Tarin is a professor of pathology and a distinguished member of the University of California, San Diego Cancer Center. (Causation MacKenzie Decl. ¶ 6, Ex. 5 ("Tarin Rep.") at 11.)  He reviewed Mr. Barabin's medical records, numerous pathology specimens, and autopsy report, as well as Mr. Barabin's occupational history. (*Id.* at 2, 4.)  Additionally, he reviewed various expert reports and answers to standard asbestos case interrogatories. (*Id.* at 5.)  Dr. Tarin summarizes Mr. Barabin's "long occupational history of exposure to asbestos products as a paper machine worker and laborer from 1968-2001." (*Id.* at 6.)  He describes how Mr. Barabin engaged in "regular manipulation of wet and dry felts," including dry felt change-outs, fitting procedures, and maintenance and replacement of brakes. (*Id.*)

Dr. Tarin received 83 microscope slides containing tissue samples collected from Mr. Barabin. (*Id.* at 8.)  In some samples, he observed features characteristic of the effect a carcinogenic agent has on a target cell population. (*Id.*)  The immunohistochemical stains on the specimens "showed results typical of a mesothelioma." (*Id.*)  Dr. Tarin also detected six asbestos bodies among the tissue samples, which confirmed that Mr. Barabin "had at some time been exposed to airborne asbestos fibers." (*Id.*)  The microscopic identification of the asbestos bodies in the lung tissue supports Dr. Brodkin's conclusions that Mr. Barabin had experienced substantial occupational exposure to asbestos fibers. (*Id.*)  Dr. Tarin diagnoses Mr. Barabin with malignant pleural mesothelioma of the epithelioid cell type and dense fibrous tissue consistent with pleural plaque. (*Id.*)  This

//

conclusion is consistent with those reached by several other pathologists who have examined Mr. Barabin. (*Id.*)

Based on his review of these materials, Dr. Tarin concludes that "asbestos intake is the main cause of pleural mesothelioma and that the cumulative exposure to all forms of this carcinogenic agent contributes to the induction and propagation of the tumor." (*Id.* at 9.) In Mr. Barabin's case, there "is no record of alternative rarer potential causes of this disease, such as extensive thoracic radiation." (*Id.*) Accordingly, due to Mr. Barabin's "substantial, repeated, and sustained" exposure to asbestos fibers, Dr. Tarin concludes, to a high degree of medical probability, that "Mr[.] Barabin's malignant pleural mesothelioma was caused by repeated occupational exposure to, and inhalation of, asbestos dust." (*Id.*)

In his deposition testimony, Dr. Tarin emphasized that "the cumulative load . . . is responsible for causation of the disease." (Causation MacKenzie Decl. ¶ 7, Ex. 6 ("Tarin Dep.") at 85-86.) The following exchange occurred over causation associated with the individual exposures:

> Q: [Y]ou don't apportion causation between . . . the various types of asbestos-containing materials that Mr. Barabin might have encountered during his lifetime?
>
> A: Could you be more specific, please?
>
> Q: Sure . . . [Y]ou're not going to come to court and apportion causation for Mr. Barabin's alleged exposures and saying that 20 percent of it came from thermal insulation materials and 50 percent of it came from insulation on equipment, are you?
>
> A: I'm not going to be itemizing it like that. I will continue with my explanation that it is the cumulative exposure which is responsible.

1  (*Id.* at 85-86.)  Indeed, Dr. Tarin admits that "it is impossible to say which individual

2  exposure caused this disease" or to "pinpoint any individual exposure as being sufficient

3  in of itself."  (*Id.* at 99.)  Dr. Tarin reiterates that his conclusion, as articulated in his

4  report, is that "it is the cumulative exposure during Mr. Barabin's life which resulted in

5  the causation of this malignancy."  (*Id.*)

6        4.  Dr. Richard Cohen[4]

7        Dr. Cohen is a licensed physician and a Clinical Professor in Occupational and

8  Environmental Medicine at the University of California, San Francisco School of

9  Medicine.  (MacKenzie Decl. ¶ 8, Ex. 7 ("Cohen Rep.") at 2.)  After reviewing the

10  relevant literature and Mr. Barabin's records, Dr. Cohen concludes that "the exposures

11  attributable to each defendant were a substantial factor in the causation of [Mr. Barabin's]

12  mesothelioma."  (*Id.* at 5.)  Because "there is no reliable scientific method for

13  determination of which asbestos exposures that a person suffered were a substantial

14  factor," Dr. Cohen believes that "it is impossible to exclude any exposures as being a

15  substantial factor in causing the illness."  (*Id.* at 6.)

16        In Dr. Cohen's opinion, "any exposures that an individual suffered that were in

17  addition to ambient air levels, such as those alleged in this case as to each defendant,

18  would, on a more likely than not basis, have been a substantial factor in causing the

19  alleged disease."  (*Id.*; *see also id.* at 14 ("[I]n individuals who develop these diseases, all

20

21        _____

          [4] Dr. Richard Cohen is not the same individual as Dr. Kenneth Cohen, who was the
       expert-at-issue during the previous trial and the subsequent appeal.  (*Compare* Cohen Rep. at
22     37-42 (curriculum vitae of Dr. Richard Cohen), *with Estate of Barabin*, 740 F.3d at 461
       (describing the Barabins' expert Kenneth Cohen); *see also* Exposure MTE Resp. at 1 n.1.)

1  exposures to asbestos contribute to the causation of the asbestos-related diseases.").) Dr.

2  Cohen expounds:

> It is further my opinion that when a person with a reliable history of asbestos exposure contracts an asbestos-related disease, after exposures to multiple asbestos-containing products, given sufficient minimum latency, each and every exposure contributes to the person's total dose that caused the asbestos-related disease. Thus, all the asbestos, such as that attributable to each defendant in this case, to which a person is exposed (given sufficient minimum latency) contributed to cause the asbestos-related disease. My opinion is that, given sufficient minimum latency, there is no scientific basis upon which one can look back and exclude some exposures and include other exposures as being causally related to the asbestos-related disease which then caused an individual's asbestos-related disease.

9  (*Id.* at 6.) Dr. Cohen believes that "[t]his is true even if the exposure was within the

10 standard permissible exposure limits at the time of the exposure." (*Id.*) Accordingly, Dr.

11 Cohen maintains that "[a]ll exposures to asbestos . . . given a sufficient minimum latency

12 prior to diagnosis, contribute to the cumulative asbestos fiber dose that, in turn, caused

13 the mesothelioma . . . No exposure to asbestos can be excluded." (*Id.* at 15.)

### III.   ANALYSIS

15      Rule 702 of the Federal Rules of Evidence governs the admission of expert

16 testimony in federal court:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and

22 //

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Rule 702 requires that the expert be qualified and that the "'[e]xpert testimony . . . be both relevant and reliable.'" *Estate of Barabin*, 740 F.3d at 463 (quoting *United States v. Vallejo*, 237 F.3d 1008, 1019 (9th Cir. 2001)); Fed. R. Evid. 702. Relevancy "simply requires that '[t]he evidence . . . logically advance a material aspect of the party's case.'" *Estate of Barabin*, 740 F.3d at 463 (quoting *Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007)).

Reliability requires the court to assess "whether an expert's testimony has a 'reliable basis in the knowledge and experience of the relevant discipline.'" *Id.* (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999)) (internal citations and alterations omitted). The Supreme Court has suggested several factors that courts can use in determining reliability: (1) whether a theory or technique can be tested; (2) whether it has been subjected to peer review and publication; (3) the known or potential error rate of the theory or technique; and (4) whether the theory or technique enjoys general acceptance within the relevant scientific community. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592-94 (1993). The reliability inquiry is flexible, however, and trial judges have broad latitude to focus on the considerations relevant to a particular case. *Kumho Tire*, 526 U.S. at 150.

In determining reliability, the court must rule not on the correctness of the expert's conclusions but on the soundness of the methodology, *Estate of Barabin*, 740 F.3d at 463 (citing *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010)), and the analytical

connection between the data, the methodology, and the expert's conclusions, *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *see also Cooper*, 510 F.3d at 942 ("Rule 702 demands that expert testimony relate to scientific, technical or other specialized knowledge, which does not include unsubstantiated speculation and subjective beliefs."); Fed. R. Evid. 702 Advisory Committee's Notes to 2000 Amendments ("[T]he testimony must be the product of reliable principles and methods that are reliably applied to the facts of the case."). Moreover, "the proponent of the expert . . . has the burden of proving admissibility." *Cooper*, 510 F.3d at 942 (citing *Lust v. Merrell Dow Pharms., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996)).

Here, Scapa does not challenge the relevancy of Ms. Barabin's expert testimonies. (*See* Exposure Mot.; Causation Mot.) Nor would such a challenge succeed, as the expert opinions on Mr. Barabin's exposure to asbestos fibers from Scapa dryer felts and the causal connection this exposure may have had to his mesothelioma "logically advance a material aspect" of Ms. Barabin's case. *See Estate of Barabin*, 740 F.3d at 463. Instead, Scapa focuses its challenges on the reliability of these opinions. The court addresses first the expert testimonies on exposure and then the ones on causation.

## A.    Exposure Expert Testimonies

Scapa makes three main arguments to exclude the exposure testimonies of Mr. DePasquale and Dr. Compton. First, Scapa urges the court to reject the studies underlying the experts' opinions—namely Dr. Millette's and the MAS studies. (Exposure Mot. at 7-18.) Second, Scapa challenges the methodology used by Mr. DePasquale, arguing that he cannot estimate the exposure to asbestos fiber without

accounting for certain variables that would have been present at the Camas paper mill. (*Id.* at 4-6.) Third, and lastly, Scapa contends that Dr. Compton's studies are unreliable because they were not conducted in circumstances similar to those at the Camas paper mill. (*Id.* at 6-7.) The court takes each argument in turn.

### 1. Underlying Millette and MAS Studies

In reaching their exposure conclusions, Mr. DePasquale and Dr. Compton both rely on the Millette studies; Mr. DePasquale further relies on the MAS study. (DePasquale Rep. at 21; *see generally* Exposure Good Decl. (Dkt. # 690-1) ¶ 6, Ex. 4 ("Compton Decl.").) Scapa argues for various reasons that these underlying studies are unreliable. The court disagrees and addresses the Millette studies before turning to the MAS study.[5]

#### a. Millette Studies

Scapa takes issue with two studies conducted by Dr. Millette, one from 1999 and another from 2003. (Exposure Mot. at 7-14.) In both these studies, Dr. Millette blew compressed air at various angles on dryer felts and then collected air samples to analyze the asbestos fibers released. (*See generally* Exposure MacKenzie Decl. ¶ 10, Ex. 9 ("1999 Millette Rep."); *id.* ¶ 9, Ex. 8 ("2003 Millette Rep.").) In his studies, Dr. Millette

---

[5] Moreover, Scapa conceded at the hearing that both Mr. DePasquale and Dr. Compton rely on more than just these challenged studies. For instance, Mr. DePasquale relied on the Wendlick study and the RJ Lee study that Scapa also proffers. (*See* DePasquale Rep. at 14-15, 21-22.) Dr. Compton conducted his own microscopic examinations and fiber release testing on dryer felts manufactured by Scapa. (Compton Rep. at 2.) Thus, the court notes that even if the Millette and MAS studies were excluded, that does not preclude Mr. DePasquale or Dr. Compton from testifying. Instead, as Scapa admits, the two experts would simply be precluded from testifying about those underlying studies and any conclusion based upon those studies.

utilized a glove-box method, where both the compressed air blower and the felt are contained in a glove box. (*See* 1999 Millette Rep. at 3-4; 2003 Millette Rep. at 4-5.)

As clarified at the hearing, Scapa does not challenge the reliability of glove-box testing generally.[6] This technique can be—and subsequently was—tested by others who also utilized glove-box techniques to analyze asbestos-fiber release. (*See* Exposure MacKenzie Decl. ¶ 6, Ex. 5 ("RJ Lee Rep.") at 15.) Moreover, the 1999 study was subject to peer review and published in the *Microscope* journal.[7] (*See generally* 1999 Millette Rep.) And lastly, this glove-box method is commonly utilized in various other experiments, even those relied upon by Scapa, and the technique enjoys general acceptance within the scientific community. (*See* Compton Rep. at 2-3 (describing glove-box testing as "published and generally accepted in the scientific community"); RJ Lee Rep. at 15 (utilizing glove-box testing); *see generally* Exposure Good Decl. ¶ 17, Ex. 15 ("EPA Rep.") (report by the EPA approving of the glove-box testing technique)).

//

//

---

[6] Scapa briefly challenges two additional tests conducted by Dr. Millette: one where a Post-It note was used to collect residue, and another where a finger was used to collect residue. (Exposure Mot. at 9.) Scapa offers no citation for its assertion that these techniques "are not generally accepted scientific methodologies." (*See id.*) To the contrary, Dr. Millette had previously published an article in the National Asbestos Council Journal on the utility of Post-It notes for collecting dust particles. (Exposure Good Decl. ¶ 6, Ex. 4-G at 175-78.) Others have also published on the usage of Post-It notes in particle sorting. (*Id.* at 178.) Moreover, both of these techniques were utilized for ascertaining whether the dryer felt contained asbestos at all, not as an estimate of exposure count. (*See* 1999 Millette Rep. at 3.) Thus, even if the techniques were unreliable, they were not the basis of Dr. Millette's exposure conclusions.

[7] Thus, Scapa's assertion that Dr. Millette's protocol "has not been published or subjected to peer review" is inaccurate. (*See* Exposure Mot. at 10.) Indeed, Dr. Millette's published study was later cited by the RJ Lee study that Scapa relies upon. (*See* RJ Lee Rep. at 15.)

1   Thus, the court finds that Dr. Millette's methodology—the glove-box testing procedure

2   that he utilized in both the 1999 and 2003 studies—is reliable.[8]

3       Scapa primarily criticizes how Dr. Millette's tests were not conducted in

4   circumstances that reflect the conditions at the Camas paper mill. (*See* Exposure Mot. at

5   8-9, 11-13.) For instance, Dr. Millette did not account for the ventilation system or the

6   humidity levels at the Camas paper mill. (*Id.* at 12.) Nor did he perform testing with an

7   operating machine, using the exact distances and angles that a worker would have

8   encountered at the Camas paper mill. (*Id.* at 11.) Scapa touts the fact that Dr. Millette

9   "has never been to Camas, or seen photographs, blueprints or diagrams of it, has no

10  information regarding the number of windows, doors or ventilation systems in any of the

11  machine rooms, and never worked on a paper machine himself." (*Id.*)

12      The court finds that Scapa's concerns go to the weight rather than the admissibility

13  of the Millette studies. Generally, tests must be conducted "under conditions

14  substantially similar to the actual conditions." *Lipson v. ON Marine Servs. Co., LLC*, No.

15

16      [8] Scapa criticizes Dr. Millette for not following the EPA protocol, which allegedly
    requires—in addition to a glove-box experiment—the development of a mathematical model, full
17  room tests that simulate field conditions, and field experiments. (Exposure Mot. at 9-10.) But
    there is confusion over whether the EPA actually mandates these three additional steps. Scapa's
18  description of the EPA protocol does not include any citation or supporting material for the court
    to refer to. (*See id.* at 10); *see United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)
19  ("Judges are not like pigs, hunting for truffles buried in briefs."). The RJ Lee study, which
    Scapa relies upon, describes this protocol and cites a 1985 EPA study as the source. (*See* RJ Lee
20  Rep. at 16, n.11.) But Ms. Barabin provides the court with the project summary of that 1985
    EPA report, and that summary only speaks of the glove-box experiment procedure—a procedure
21  that Dr. Millette seems to have followed. (*See generally* EPA Rep.) Moreover, Scapa concedes
    that "it is questionable whether this protocol applies to dryer felts." (Exposure MTE at 10.)
22  Given the confusion surrounding this protocol, the court finds it does not undermine the Millette
    studies' reliability.

1  C13-1747TSZ, 2013 WL 6536923, at *2 (W.D. Wash. Dec. 13, 2013) (quoting

2  *Champeau v. Fruehauf Corp.*, 814 F.2d 1271, 1278 (8th Cir. 1987)) (internal quotation

3  marks omitted).  However, "dissimilarities between testing conditions and actual

4  conditions 'affect the weight of the evidence, not its admissibility.'"  *Id.* (quoting

5  *Champeau*, 814 F.2d at 1278).  Dr. Millette does not purport to know the actual

6  conditions at the Camas paper mill (*see* Exposure Mot. at 11), and indeed, it would not

7  have been possible for him to have tested the release of asbestos in Mr. Barabin's actual

8  working conditions.  This distinction may certainly affect the weight a jury would assign

9  Dr. Millette's results, but nothing suggests that the glove-box technique employed by Dr.

10  Millette in either 1999 or 2003 is unreliable in and of itself.

11         Nor are the Millette studies so dissimilar that exclusion is warranted.  For

12  comparison, in *Espinoza v. Dunn*, Nos. 91-56353, 91-56389, 92-56018, 1995 WL 21601

13  (9th Cir. Jan. 18, 1995)—a case Scapa relies on (Exposure Mot. at 6)—the Ninth Circuit

14  rejected a demonstration on dissimilarity grounds in an excessive force case.  In that case,

15  there was a factual dispute as to whether the plaintiff had hit his head against the window

16  of a car.  *Espinoza*, 1995 WL 21601 at *1.  During trial, the jury saw a demonstration

17  where the law clerk—in place of the plaintiff—sat in the car and was unable to hit her

18  head against the rear window.  *Id.* at *2.  However, the law clerk was told not to move,

19  whereas the plaintiff was allegedly kicking and thrashing.  *Id.* at *4.  The Ninth Circuit

20  concluded that this dissimilarity "was of such a nature as to create a discernible risk that

21  the demonstration was seriously misleading."  *Id.*  Indeed, "[t]he very physical

22  //

1  possibilities the court wished to test may have depended upon the element excluded from

2  the demonstrations." *Id.*

3      The dissimilarity here does not rise to that level. Critically, unlike the

4  demonstration in *Espinoza*, the Millette studies do not exclude any element that would

5  have affected the "very physical possibilities" that the studies sought to test. *See id.* That

6  is, Dr. Millette's studies do not purport to create the exact scenario that Mr. Barabin faced

7  at the paper mill; instead, his research on the quantity of asbestos fiber release is one

8  piece of foundational information that can then be applied to Mr. Barabin's situation.

9  The conditions that were not factored into the Millette studies do not render the studies

10  unreliable and thus do not mandate exclusion.

11      In sum, Dr. Millette's two studies regarding the release of asbestos fibers from

12  dryer felts are sufficiently reliable to satisfy Rule 702 and *Daubert*. Although neither

13  study was conducted in circumstances identical to those at the Camas paper mill, that

14  issue goes to weight rather than admissibility. Accordingly, the court denies Scapa's

15  motion to exclude Dr. Millette's studies and the experts' reliance on them.

16      *b. MAS Study*

17      The MAS study was another glove-box test where experimenters blew compressed

18  air at a dryer felt to measure asbestos fibers release. (*See* DePasquale Rep. at 21.)

19  Scapa's arguments targeting the MAS study again boil down to the fact that these were

20  not conducted in conditions similar to those at the Camas paper mill. (*See* Exposure

21  MTE at 14-18 (listing differences between the MAS study and the dryer felt work at the

22  Camas paper mill).) For instance, the testers did not have knowledge of the paper mill

1 and did not perform the experiment with a ventilation hood that would have been present

2 at the paper mill. (*Id.* at 15-16.)

3      These differences go to weight rather than admissibility. MAS utilized the same

4 technique as Dr. Millette's studies did, a technique that is widely-accepted in the

5 scientific community and utilized by numerous experts seeking to study asbestos-fiber

6 release. *See supra* § III.A.1.a. The MAS study also provides only a quantification of

7 asbestos-fiber release when dryer felts are cut or manipulated, without purporting to

8 represent what Mr. Barabin was exposed to. Nor was the study so dissimilar that

9 exclusion is warranted. Accordingly, the court denies Scapa's motion to exclude the

10 MAS study.[9]

11     2. Mr. Christopher DePasquale

12      Scapa also challenges Mr. DePasquale's methodology aside from his reliance on

13 the Millette and MAS studies. (*See* Exposure Mot. at 4-6.) Scapa points out that Mr.

14 DePasquale fails to take into account the conditions at the Camas paper mill that may

15 have impacted Mr. Barabin's exposure to asbestos, such as the ventilation system, the

16 wetting of the dryer felts, and the fact that not every dryer felt at the mill contained

17 asbestos. (*Id.* at 5.) Without considering these factors, Scapa characterizes Mr.

18 //

19 //

20

21     [9] Scapa also seeks to exclude all of the MAS video demonstrations that use Tyndall lighting, a technique that "show[s] a dramatic release of dust and particles, most of which was not asbestos." (Exposure Mot. at 17-18.) However, at the hearing, Ms. Barabin clarified that she will not be introducing any of the filmed experiments at trial. Thus, the court need not decide the admissibility of these videos.

22

DePasquale's conclusion regarding the range of Mr. Barabin's exposure as "the embodiment of guesswork." (*Id.*)

The court finds that Mr. DePasquale's conclusion that Mr. Barabin was exposed to asbestos-fibers while working at the Camas paper mill is reliable and thus admissible. Mr. DePasquale has 19 years of experience in industrial hygiene, including with asbestos sampling, monitoring, and evaluation of historical exposures to asbestos. (DePasquale Rep. at 14.) For this report, Mr. DePasquale reviewed and weighed many varying studies on the exposure level that may result from manipulation of dryer felts—including studies that Scapa relies upon. (*See id.* at 20-22.) For instance, he notes that the Wendlick study only measured exposure levels for one task and may have underestimated the actual exposures because of the exclusion of certain fibers. (*Id.* at 20.) Mr. DePasquale also reviewed information specific to Mr. Barabin's career as a worker at the Camas paper mill, including data pertaining to the number of Scapa dryer felts at the mill. (*See id.* at 15; DePasquale Dep. at 102-03.) Relying on his experience, Mr. DePasquale applied the results of the dryer felt studies to the specifics of Mr. Barabin's career. The court is satisfied that Mr. DePasquale's exposure conclusion is rooted in sufficiently rigorous methodology and therefore admissible.

However, the court finds Mr. DePasquale's arrival at a numerical range of exposure troubling. Although the studies that he considers contain vastly different exposure ranges—anywhere from 0.02 f/cc to 51.4 f/cc (DePasquale Rep. at 20-22)—Mr. DePasquale concludes that Mr. Barabin's exposure was likely in the range of 0.1 to 5 f/cc (*id.* at 22). Mr. DePasquale gives no explanation for this numerical range, nor does he

elaborate on the methodology he employed to arrive at this range. (*See id.* at 21-22; DePasquale Dep. at 105-06 (offering no explanation beyond calling the range "a best estimate").) When pressed, Ms. Barabin conceded at the hearing that the record does not contain a more detailed explanation; indeed, she acknowledged that there is no metric or formula for how an industrial hygienist arrives at a quantitative range of exposure. Without knowing the methodology Mr. DePasquale utilized to arrive at the specific range of Mr. Barabin's exposure, the court is left with an "opinion evidence that is connected to existing data only by the *ipse dixit*" of Mr. DePasquale. *See General Elec. Co.*, 522 U.S. at 146. The court concludes "there is simply too great an analytical gap" between the numerical ranges in the various underlying studies and the range proffered by Mr. DePasquale.[10] *See id.*

In sum, the court finds Mr. DePasquale's qualitative conclusion regarding exposure to be both relevant and reliable, and accordingly, the court denies Scapa's motion as it pertains to Mr. DePasquale's qualitative testimony. However, the court grants Scapa's motion as it relates to Mr. DePasquale's quantitative conclusions and precludes Mr. DePasquale from testifying to any numerical range of exposure.

### 3. Dr. Compton

Scapa impugns Dr. Compton's own glove-box testing for the same reason it doubts the Millette and MAS studies: it does not adequately mimic the actual conditions at the Camas paper mill. (*See* Exposure Mot. at 6-7.) As the court discussed previously,

_____

[10] Ms. Barabin appears to agree; at the hearing, she offered to exclude any testimony from Mr. DePasquale regarding the quantitative amount of exposure.

1 Dr. Compton utilized a methodology that is generally accepted by the scientific

2 community. *See supra* § III.A.1.a; (*see* Compton Rep. at 2 (describing methodologies as

3 "published and generally accepted in the scientific community").) His own testing

4 utilized methodologies, such as the NIOSH 7400 and NIOSH 7402 methods, which are

5 widely-accepted and frequently used. (*See* Compton Rep. at 3); *see also Lipson*, 2013

6 WL 6536923, at *2 (describing these methodologies as reliable). Accordingly, the court

7 finds that Dr. Compton's methodologies are reliable and denies Scapa's motion to

8 exclude or limit his testimony.

9 **B. Causation Expert Testimonies**

10 Scapa asserts that Ms. Barabin's four causation experts base their conclusions on

11 the unreliable "every exposure" theory of causation.[11] This objection boils down to two

12 questions: (1) whether the "every exposure" theory satisfies scrutiny under Rule 702 and

13 *Daubert*; and (2) if not, whether the experts at issue are in fact basing their opinions on an

14 "every exposure" theory. The court addresses each issue in turn.

15 1. <u>Legal Standard</u>

16 At the outset, the court defines the terminology surrounding the theories at issue.

17 First, the "every exposure" theory posits that "any exposure to asbestos fibers

18 whatsoever, regardless of the amount of fibers or length of exposure constitutes an

19 underlying cause of injury." *Krik v. Exxon Mobil Corp.*, 870 F.3d 669, 672 (7th Cir.

20 //

---

21 [11] The "every exposure" theory goes by many names, including but not limited to the

22 "any exposure" theory, the "single fiber" theory, and the "each and every exposure" theory. *See, e.g., Yates v. Ford Motor Co.*, 113 F. Supp. 3d 841, 846 (E.D.N.C. 2015).

2017). A slight variation of the "every exposure" theory states that "every exposure to

asbestos above a threshold level is necessarily a substantial factor in the contraction of

asbestos-related diseases." *McIndoe v. Huntington Ingalls Inc.*, 817 F.3d 1170, 1177 (9th

Cir. 2016). Second, an outgrowth of the "every exposure" theory is the "cumulative

exposure" theory. Under such a theory, the cumulative exposure to asbestos is the cause

of the disease, but because each exposure, no matter how small, adds to that cumulative

exposure, each exposure becomes a substantial contributing factor. *See Krik*, 870 F.3d at

672-73. For the reasons discussed below, the court finds that both theories lack sufficient

support in facts and data and thus are not the product of reliable principles and methods,

as required by Rule 702.

       *a.  "Every Exposure" Theory*

      Recently, numerous courts across the country have had to determine the reliability

of the "every exposure" theory. In *McIndoe v. Huntington Ingalls Inc.*, the Ninth Circuit

considered the "every exposure" theory in the maritime law context.[12] 817 F.3d at

1177-78. There, an expert concluded that the defendants' asbestos-containing products

were a substantial factor in causing the plaintiff's asbestos-related disease because every

exposure to asbestos above a threshold level must be a substantial factor. *Id.* at 1177.

The Ninth Circuit held that the "district court properly rejected this argument." *Id.* The

---

[12] Ms. Barabin takes issue with the fact that *McIndoe* involved maritime law. (Causation Mot. Resp. at 10.) However, asbestos claims under maritime law similarly utilize a substantial-factor test, and the Ninth Circuit has cited to maritime cases in general asbestos actions. *See McIndoe*, 817 F.3d at 1176 n.6 (noting that the maritime law analysis "comports with the general approach taken by other federal courts in asbestos cases"); *Curtis v. ABB Inc.*, 622 F. App'x 661, 662 (9th Cir. 2015) (mem.) (applying maritime law case to asbestos claim).

expert could not speak to "the severity of [the plaintiff's] own asbestos exposure" and "did not make distinctions between the overall dose of asbestos . . . and that portion of such exposure which could be attributed to the shipbuilders' materials." *Id.* Moreover, accepting "such a sweeping opinion" would render the substantial factor test meaningless and allow "unbounded liability"; it would impose liability on any asbestos-containing product no matter how fleeting the exposure. *Id.*

Several other circuits have also rejected the "every exposure" theory. The Seventh Circuit in *Krik v. Exxon Mobil Corp.* agreed that to allow the "every exposure" theory would render the substantial-factor test "essentially meaningless" because liability could be imposed even when a worker had the briefest of encounters. 870 F.3d at 672. The Sixth Circuit in *Lindstrom v. A-C Product Liability Trust*, rejected an expert opinion that states "in a conclusory fashion that every exposure to asbestos was a substantial factor." 424 F.3d 488, 493 (6th Cir. 2005). Indeed, a growing number of courts have recognized that the "every exposure" theory lacks sufficient support and have accordingly rejected such testimony. *See, e.g., Rockman v. Union Carbide Corp.*, 266 F. Supp. 3d 839, 849 (D. Md. 2017); *Haskins v. 3M Co.*, No 2:15-cv-02086-DCN, 3:15-cv-02123-DCN, 2017 WL 3118017, at *7 (D.S.C. July 21, 2017) (excluding "every exposure" testimony under Rule 403 because its probative value is outweighed by its tendency to confuse and mislead the jury).

The court agrees with this overwhelming precedent that the "every exposure" theory is unreliable. Such a theory is not tied to the severity of exposure and instead is based on a view that every exposure is a substantial contributing factor to any resulting

mesothelioma. In other words, as long as the plaintiff later contracts mesothelioma, any exposure he or she may have had automatically becomes a substantial factor in the contraction of that disease. The imposition of a de minimis threshold does not save this theory. *See, e.g., Yates*, 113 F. Supp. 3d at 847. Neither variant of the theory is based on sufficient supporting facts and data, nor can either variant be tested or have a known error rate. *See, e.g., Comardelle v. Pa. Gen. Ins. Co.*, 76 F. Supp. 3d 628, 632-33 (E.D. La. 2015). As the Ninth Circuit articulated, allowing such a theory would "undermine the substantial factor standard" and allow "unbounded liability." *See* 817 F.3d at 1177.

Ms. Barabin correctly points out that there have been some state and district courts that have approved of the "every exposure" theory. (*See* Causation Mot. Resp. at 12-15.) But the majority of those cases predate *McIndoe* and *Krik*. *See, e.g., Davis v. Honeywell Int'l, Inc.*, 245 Cal. App. 4th 477, 487 (2016). Indeed, when asked at the hearing whether there is any post-*McIndoe* precedent that allowed testimony based upon an "every exposure" theory, Ms. Barabin could not provide such a case.[13] Thus, Ms. Barabin cannot dispute that, notwithstanding any previous split among the courts, the law is now headed toward a consensus that the "every exposure" theory is unreliable and inadmissible. *See Krik*, 870 F.3d at 677 (recognizing that more than 30 other federal and state courts have rejected the "every exposure" theory).

//

---

[13] At the hearing, Ms. Barabin refers to *Lipson* as a case allowing Dr. Brodkin's testimony, but *Lipson* was not post-*McIndoe*. *See generally* 2013 WL 6536923. Moreover, *Lipson* did not admit Dr. Brodkin's testimony because the court approved of the "every exposure" theory. *See id.* at *3-5. Instead, *Lipson* allows Dr. Brodkin's causation testimony because it was not based on an "every exposure" theory at all. *Id.* at *4.

1  Ms. Barabin's remaining responses are meritless and somewhat confounding.

2  First, she points out that "the phrase 'any/cumulative exposure' never actually appears in

3  [*McIndoe*], anywhere." (Causation Mot. Resp. at 10.) The court fails to see the

4  relevance of this omission when the case plainly addresses a theory that is identical in

5  substance. *See Rockman*, 266 F. Supp. 3d at 849 (rejecting semantics argument when

6  "the theories are one and the same"). No matter what *McIndoe* calls the theory—"every

7  exposure," "any exposure," or any of its other many names—that arbitrary label leaves

8  unaffected the analysis of the theory's lack of reliability and the reasoning behind why it

9  should be excluded. Ms. Barabin offers no substantive argument to the contrary. (*See*

10  Causation Mot. Resp.)

11  Second, Ms. Barabin accuses Scapa of omitting *McIndoe*'s citations to the

12  Restatement (Third) of Torts. (*Id.* at 10-11.) Ms. Barabin then quotes a lengthy portion

13  of the Restatement that recites a hypothetical where the plaintiff's exposure to a product

14  was "minuscule" compared to his exposure to other products. (*Id.* at 11.) Relying on this

15  hypothetical, Ms. Barabin argues that *McIndoe* is inapposite because Mr. Barabin's

16  exposure was far from miniscule. (*Id.*) But this portion of the Restatement was not

17  directly discussed by *McIndoe*. *See* 817 F.3d at 1177-78. Nor does *McIndoe* limit its

18  holding only to situations featuring minimal exposure. *See id.* at 1177. Thus, the fact

19  that Mr. Barabin was allegedly exposed to more than de minimis levels of asbestos does

20  not render *McIndoe* inapplicable. Nor did Scapa improperly cite *McIndoe* by omitting a

21  portion of the Restatement that never directly appeared in the case.

22  //

The court concludes that the "every exposure" theory is unreliable and must be excluded under Rule 702 and the *Daubert* standard.

### b. *"Cumulative Exposure" Theory*

The court reaches the same conclusion regarding the "cumulative exposure" theory. The Seventh Circuit in *Krik* recently confronted the same theory and held that the "cumulative exposure theory was no different from the 'each and every exposure' theory in all relevant ways." 870 F.3d at 675. The principle behind the two theories are identical: because it is impossible to determine which particular exposure caused the illness, all exposures that contributed to the total exposure become substantial, regardless of the specific quantum or severity of exposure attributable to each defendant. *Id.* at 677. Accordingly, the Seventh Circuit held that testimony based on the "cumulative exposure" theory is similarly unreliable. *Id.* at 678. District courts across the country have concluded the same. *See Haskins*, 2017 WL 3118017, at *7 (reasoning that the "cumulative exposure" theory "quickly devolves into the sort of 'every exposure' liability that was specifically rejected").

The court agrees with the reasoning in *Krik*. The "cumulative exposure" theory posits that every exposure, no matter how small, becomes a substantial factor whenever the total cumulative dose results in mesothelioma, because every exposure is necessarily a part of that total dose. Thus, the "cumulative exposure" theory contains the same reliability problems that the "every exposure" theory does. It is not based on sufficient supporting facts and data. Indeed, every exposure becomes a substantial factor based on one fact alone: that it was part of the total dose. Nor can such a theory be tested.

1    Moreover, as the *Haskins* court aptly stated, "[r]egardless of whether this is sound

2    science, it is inconsistent with the law" that the exposure be a substantial factor in causing

3    the injury. *See* 2017 WL 3118017, at *6. Accordingly, the court finds the "cumulative

4    exposure" theory unreliable under Rule 702 and the *Daubert* standard.

5             2. <u>Application to Ms. Barabin's Causation Experts</u>

6             Having found that neither the "every exposure" theory nor the "cumulative

7    exposure" theory is reliable, the court now must ascertain whether Ms. Barabin's

8    proffered expert testimonies rely on either theory. The court address each expert

9    testimony in turn.

10            *a. Dr. Carl Brodkin*

11            Scapa alleges that Dr. Brodkin bases his causation opinion on the "every

12   exposure" and "cumulative exposure" theories. (*See* Causation Mot. at 1.) The court

13   disagrees. Dr. Brodkin's causation opinion is not based on the theory that every exposure

14   must necessarily be a substantial factor. Indeed, when faced with a hypothetical where

15   only 1 out of 100 dryer felts contained asbestos, Dr. Brodkin stated that he would not be

16   able to conclusively make a determination regarding causation. (Brodkin Dep. at 65-66.)

17   Instead, Dr. Brodkin looks for what he calls an "identified exposure" that must meet five

18   requirements: (1) a well-characterized source of asbestos; (2) an activity disrupting that

19   source; (3) so as to generate "significant concentrations of airborne asbestos fibers" that

20   would; (4) overcome the body's natural asbestos defenses; and (5) add to the body's

21   burden of asbestos. (*Id.* at 52.) These requirements prevent exposures from

22   automatically qualifying as substantial factors. For instance, not every exposure

1　generates significant concentrations of asbestos fibers. Moreover, not every exposure

2　would overcome the body's defenses.

3　　　Utilizing this "identified exposure" theory, Dr. Brodkin's testimony regarding

4　causation is reliable. Dr. Brodkin interviewed Mr. Barabin firsthand, reviewed his

5　occupational history, analyzed exposure data from that occupational history, studied Mr.

6　Barabin's medical and autopsy records, and consulted numerous studies on asbestos

7　exposure. (Brodkin Rep. at 10, 46.) Based upon this review, Dr. Brodkin concluded

8　specifically that the paper-making activities Mr. Barabin performed for three-plus

9　decades—which involved "regular manipulation" of dryer felts—were a substantial part

10　of his occupational history and likely a source of intense exposure. (*See id.* at 31.) Thus,

11　the exposure to dryer felts qualifies as an "identified exposure," not simply because the

12　exposure occurred and necessarily contributed to the total dose, but because the dryer

13　felts "represent an historically important source of respirable asbestos exposure." (*See id.*

14　at 52.) Such testimony is not only distinct from the "every exposure" and "cumulative

15　exposure" theories, but also constitutes reliable and relevant testimony. *See Daubert*, 509

16　U.S. at 592.

17　　　Several courts that have considered Dr. Brodkin's "identified exposure" theory

18　have reached the same conclusion. In *Lipson v. ON Marine Servs. Co., LLC*, for

19　example, the Western District of Washington drew this exact distinction between Dr.

20　Brodkin's causation testimony and the "every exposure" theory. 2013 WL 6536923, at

21　*3-4. The court observed that Dr. Brodkin had rejected the "every exposure" theory and

22　concluded that his five-part "identified exposure" opinions are "not simply unreliable

opinions equivalent to 'every fiber in disguise.'" *Id.* at *4. A California state appellate

court recently expressed the same reasoning. *See Phillips v. Honeywell Int'l Inc.*, 9 Cal.

App. 5th 1061, 1088 (2017) (holding that "the identified-exposure theory is a more

rigorous standard of causation than the every-exposure theory" because it takes

"significant exposures" to increase the risk of disease).

The court finds that Dr. Brodkin's expert testimony on causation is both reliable

and relevant and thus passes muster under Rule 702 and the *Daubert* standard.

Accordingly, the court denies Scapa's motion to exclude Dr. Brodkin's testimony.

*b. Dr. Allan Smith*

Scapa next assails Dr. Smith's causation testimony for relying on a "cumulative

exposure" theory. The court agrees. Dr. Smith posits that all of one's asbestos inhalation

in the 15 years before diagnosis "contributed to the dose that increased the risk and

caused the cancer." (Smith Rep. at 6.) In other words, Dr. Smith believes that the

cumulative exposure creates a total "dose" that causes the injury. And because the

cumulative exposure "consists of all inhalation of asbestos dust . . . all of it is therefore

important and meaningful, and significant." (*Id.*) Unlike Dr. Brodkin, Dr. Smith does

not impose any other requirements; instead, for Dr. Smith, it is sufficient that each

inhalation added to the total dose.

This opinion is no different from the "cumulative exposure" theory discussed and

rejected in *Krik*. *See* 870 F.3d at 677-78. Dr. Smith's logic similarly would impose

liability on any exposure, no matter how small, as long as it occurred within 15 years of

diagnosis. Dr. Smith includes no explanation for why exposures to Scapa's dryer felts

1  specifically are considered substantial causes, besides the fact that they contributed to the

2  total exposure.  (*See* Smith Rep.)  Because Dr. Smith bases his opinion on the unreliable

3  "cumulative exposure" theory, his causation testimony is unreliable as well.  *See In re*

4  *Silicone Gel Breast Implants Prod. Liab. Litig.*, 318 F. Supp. 2d 879, 890 (C.D. Cal.

5  2004) (rejecting a conclusion as unreliable because a step in the analysis was unreliable).

6         At the hearing, Ms. Barabin maintained that Dr. Smith's testimony is reliable

7  because he expresses a "cumulative exposure" theory only as to Mr. Barabin.  Put

8  differently, Ms. Barabin seeks to draw a distinction between a "cumulative exposure"

9  theory as applied to an individual—each of Mr. Barabin's exposures contributed to his

10  cumulative total dose, which caused his mesothelioma—versus a general "cumulative

11  exposure" theory—each exposure in any hypothetical person contributes to the total dose

12  that will cause mesothelioma.  But it is impossible to distinguish between the two

13  positions.  At the outset, the court notes that Dr. Smith's opinion regarding the

14  "cumulative exposure" theory is not limited only to Mr. Barabin; instead, it is couched in

15  general language.  (*See* Smith Rep. at 6 ("When *someone* gets mesothelioma . . . all the

16  inhalation of asbestos containing dust up to about 15 years prior to diagnosis contributed

17  to the dose that increased the risk and caused the cancer." (emphasis added)).)  Moreover,

18  Ms. Barabin draws a distinction without a difference.  Although Dr. Smith's overall

19  conclusion pertains to Mr. Barabin specifically—as it must—there is no indication that

20  Dr. Smith considered disqualifying any exposure, or if he did, what factors he weighed to

21  prevent each and every exposure from being "significant."  Thus, the court grants Scapa's

22  motion to exclude Dr. Smith from testifying to causation in this case.

1          *c.  Dr. David Tarin*

2          Turning to Dr. Tarin's testimony, the court finds that it does not run afoul of

3    *Daubert.*  Dr. Tarin opines that "the cumulative exposure to all forms of [asbestos]

4    contributes to the induction and propagation of the tumor." (Tarin Rep. at 9.)  Indeed, he

5    emphasizes that "it is the cumulative exposure during Mr. Barabin's life which resulted in

6    the causation of this malignancy." (Tarin Dep. at 99.)  Dr. Tarin bases this conclusion on

7    his review of Mr. Barabin's occupational history, his own examination of Mr. Barabin's

8    tissue samples, and how the "substantial occupational exposure to asbestos" during Mr.

9    Barabin's years at the paper mill is corroborated by "the microscopic identification of

10   asbestos bodies in the lung tissue." (Tarin Rep. at 9.)  The court finds that this

11   methodology is sound and sufficiently reliable.

12         Critically, Dr. Tarin does not take the inferential leap that is troublesome in the

13   "cumulative exposure" theory—that is, he does not opine that because every exposure

14   contributes to the total dose, every exposure must be a substantial factor in the cause of

15   the disease.  When pushed at his deposition, Dr. Tarin explicitly declined to apportion

16   causation between individual exposures, stating that he is "not going to be itemizing it

17   like that" and will instead be "continu[ing] with [his] explanation that it is the cumulative

18   exposure which is responsible." (Tarin Dep. at 86.)  Thus, Dr. Tarin does not rely on the

19   "cumulative exposure" theory in reaching his conclusion that Mr. Barabin's

20   mesothelioma was caused "by repeated occupational exposure to, and inhalation of,

21   asbestos dust." (Tarin Rep. at 9.)

22   //

1      The court is wary, however, of the fact that Dr. Tarin comes close to expressing

2 the "cumulative exposure" theory. Certainly, Dr. Tarin's conclusion touches on the

3 theory: that the total cumulative exposure experienced by Mr. Barabin caused his

4 disease. Thus, the court allows Dr. Tarin's testimony only to the extent that, as he states

5 in his deposition, he expresses no opinion on the individual exposures that make up the

6 cumulative exposure. Accordingly, the court denies Scapa's motion to exclude Dr.

7 Tarin's testimony insofar as Dr. Tarin limits his testimony to the impact of the

8 cumulative exposure.

9      *d. Dr. Richard Cohen*

10      Lastly, Scapa argues that Dr. Cohen relies on the "every exposure" and

11 "cumulative exposure" theories. The court agrees. Dr. Cohen opines that "any exposure

12 that an individual suffered that were in addition to ambient air levels . . . would, on a

13 more likely than not basis, have been a substantial factor in causing the alleged disease."

14 (Cohen Rep. at 6.) This statement is nearly identical to the expert opinion excluded in

15 *McIndoe*: that "every exposure to asbestos above a threshold level is necessarily a

16 substantial factor in the contraction of asbestos-related diseases." *See* 817 F.3d at 1177.

17 As with Dr. Smith, this opinion is not one limited to Mr. Barabin. Instead, Dr. Cohen

18 identifies this statement as his general opinion and relies upon it to reach the conclusion

19 that the exposures attributable to Scapa were a substantial factor in the causation of Mr.

20 Barabin's mesothelioma. (*See* Cohen Rep. at 5-6.) For this reason alone, the court finds

21 that Dr. Cohen relies on the "every exposure" theory and thus must be excluded.

22 //

1    Additionally, Dr. Cohen states that the cumulative exposure, or total dose, causes

2    the disease and argues that "it is impossible to exclude any exposures as being a

3    substantial factor in causing the illness." (*Id.* at 6.) Dr. Cohen posits that "each and

4    every exposure contributes to the person's total dose that caused the asbestos-related

5    disease. *Thus*, all the asbestos . . . to which a person is exposed . . . contributed to cause

6    the asbestos-related disease." (*Id.* at 6 (emphasis added).) The use of the word "thus"

7    reveals Dr. Cohen's belief that each individual exposure is a causal factor simply because

8    it contributed to the total dose. Indeed, he posits that "[t]his is true even if the exposure

9    was within the standard permissible exposure limits at the time of the exposure." (*Id.*)

10   This portion of Dr. Cohen's opinion is almost indistinguishable from the "cumulative

11   exposure" theory, where because no single exposure can be excluded from the total

12   exposure, every exposure must be a substantial factor.

13       Because Dr. Cohen relies on both the "every exposure" and "cumulative

14   exposure" theories, his causation testimony is likewise unreliable. Accordingly, the court

15   grants Scapa's motion to exclude Dr. Cohen's testimony on causation in this matter.

16   //

17   //

18   //

19   //

20   //

21   //

22   //

# IV. CONCLUSION

Based on the foregoing analysis, the court GRANTS in part and DENIES in part

Scapa's motion to exclude Ms. Barabin's exposure witnesses (Dkt. # 681) and GRANTS

in part and DENIES in part Scapa's motion to exclude Ms. Barabin's causation witnesses

(Dkt. # 683).

Dated this 12 day of February, 2018.

JAMES L. ROBART
United States District Judge