1

2

3

4

5

6

7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

8

9

10   GERALDINE BARABIN,                     CASE NO. C07-1454JLR

11                          Plaintiff,      ORDER DENYING POST-TRIAL
                                            MOTIONS
           v.
12

13   SCAPA DRYER FABRICS, INC.,

                            Defendant.
14

15                    I.      INTRODUCTION

16        Before the court are two post-trial motions:  (1) Plaintiff Geraldine Barabin's

17   motion for a partial new trial on the issue of non-economic damages (Rule 59 Mot. (Dkt.

18   # 757)); and (2) Defendant Scapa Dryer Fabrics, Inc.'s ("Scapa") original and renewed

19   motion for judgment as a matter of law (JMOL Mot. (Dkt. # 758)).  The parties each

20   oppose the other's motion.  (*See* Rule 59 Resp. (Dkt. # 767); JMOL Resp. (Dkt. # 768).)

21   The court has reviewed the parties' submissions in support of and in opposition to the

22   //

motions, the relevant portions of the record, and the applicable law. Being fully advised,[1] the court DENIES both motions for the reasons discussed below.

## II. BACKGROUND

The court has detailed the long and complex background of this case on numerous occasions. (*See, e.g.*, 12/12/07 Order (Dkt. # 63); 8/18/09 Order (Dkt. # 200); 12/10/10 1st Order (Dkt. # 550); 12/10/10 2d Order (Dkt. # 551); 2/12/18 Order (Dkt. # 698); 2/22/18 Order (Dkt. # 700).) The court recounts here only the relevant facts, including the procedural history, the evidence presented at trial, Scapa's references during trial to other entities sued by Ms. Barabin, and the jury verdict.

### A. Procedural History

This action stems from Mr. Barabin's work around and with asbestos-containing dryer felts during his employment as a paper worker at the Crown-Zellerbach paper mill in Camas, Washington ("the Camas paper mill"). (*See* Pretrial Order (Dkt. # 725) at 5:7-9, 8:3-10; Ex. 600 (Dkt. # 737) ¶¶ 4-5.) Mr. Barabin worked at the Camas paper mill from 1968 to 2001. (Ex. 600 ¶ 4; 3/26/18 Trial Tr. (Dkt. # 759) at 171:18-22.) His duties at the Camas paper mill included changing the dryer felts on the paper machines as well as using high pressured hoses to blow the dust and paper out of the dryers. (*See, e.g.*, 3/26/18 Trial Tr. at 187:14-188:4.)

//

//

---

[1] Both Ms. Barabin and Scapa request oral argument (*see* Rule 59 Mot. at 1; JMOL Mot. at 1), but the court finds that oral argument is unnecessary to its disposition of the motions, *see* Local Rules W.D. Wash. LCR 7(b)(4).

1    Ms. Barabin alleged that Scapa and AstenJohnson Inc. ("AstenJohnson"), both of

2    whom manufactured asbestos-containing dryer felts for use at the Camas paper mill, are

3    liable under Washington state law for Mr. Barabin's mesothelioma and subsequent death.

4    (*See* Pl. Trial Br. (Dkt. # 304).)  Specifically, Ms. Barabin brought a product liability

5    design defect claim, a products liability failure to warn claim, and a negligence claim

6    related to Scapa and AstenJohnson's manufacturing and sale of the dryer felts.  (*See id.* at

7    10-11.)  The case originally went to trial in 2009.  (*See, e.g.*, 10/26/09 Trial Tr. (Dkt.

8    # 429).)  A jury returned a verdict in favor of the Barabins, awarding $700,000.00 in

9    economic damages and $9,500,000.00 in non-economic damages.  (*See* 11/19/09

10   Judgment (Dkt. # 355); 11/19/09 Verdict Form (Dkt. # 354) at 3.)  On appeal, the Ninth

11   Circuit held that the district court failed to make the appropriate determinations under

12   *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), and remanded for a new trial.

13   *See Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 464, 467 (9th Cir. 2014) (en banc).  Ms.

14   Barabin settled with AstenJohnson on remand.  (*See* Not. of Settlement (Dkt. # 694).)

15       In preparation for the new trial, Scapa moved to exclude several of Ms. Barabin's

16   expert witnesses, including, the testimonies of Dr. Carl Brodkin, Dr. Steven Compton,

17   and Mr. Christopher DePasquale.  (*See* Causation MTE (Dkt. # 683); Exposure MTE

18   (Dkt. # 681).)  Scapa argued that Dr. Brodkin, an expert opining on causation, based his

19   conclusion on the unreliable "every exposure" and "cumulative exposure" theories.[2]

20   

21       [2] The "every exposure" theory posits that "any exposure to asbestos fibers whatsoever,
     regardless of the amount of fibers or length of exposure constitutes an underlying cause of
22   injury." *Krik v. Exxon Mobil Corp.*, 870 F.3d 669, 672 (7th Cir. 2017).  An outgrowth of the
     "every exposure" theory is the "cumulative exposure" theory.  Under such a theory, the

1  (Causation MTE at 1.)  Although the court agreed that neither theory passes muster under

2  *Daubert* (2/12/18 Order at 25-31), the court concluded that Dr. Brodkin's causation

3  opinion was not based on either theory (*id.* at 31-33).  Instead, Dr. Brodkin required an

4  exposure to meet certain requirements, including the ability to generate significant

5  concentrations of airborne asbestos fibers and the ability to overcome the body's natural

6  asbestos defenses.  (*Id.* at 31.)  Thus, the court allowed Dr. Brodkin's testimony.

7      Scapa also moved to exclude the exposure testimonies of Dr. Compton and Mr.

8  DePasquale.  (*See generally* Exposure MTE.)  First, Scapa took issue with the studies

9  both experts relied on, including the Millette studies.[3]  (*Id.* at 7-18.)  The court rejected

10  that argument, concluding that the Millette studies were sufficiently reliable.  (2/12/18

11  Order at 17-21.)  Scapa next impugned the two experts for failing to account for the exact

12  conditions at the Camas paper mill.  (Exposure MTE at 5.)  The court again rejected this

13  argument, finding that the two experts' methodologies were reliable and thus admissible.[4]

14  (2/12/18 Order at 22-25.)

15  //

16  //

17  //

---

18  cumulative exposure to asbestos causes the disease, but because each exposure, no matter how
    small, adds to that cumulative exposure, each exposure is a substantial contributing factor.  *See*
19  *id.* at 672-73.

20      [3] Dr. James R. Millette analyzed the release of asbestos fibers from dryer felts when
    blown with compressed air.  (*See* 2/12/18 Order at 17-18.)  Based on his testing, Dr. Millette
21  authored two studies.  (*See id.*)

22      [4] For reasons not relevant here, the court partially granted Scapa's motion as it pertained
    to Mr. DePasquale.  (2/12/18 Order at 23-24.)

1    From March 26, 2018, to April 6, 2018, the court held a second jury trial on Ms.

2    Barabin's claims against Scapa. (*See* Trial Min. Entries (Dkt. ## 721, 728, 733, 736, 739,

3    742, 743, 747); *see also* 3/26/18 Trial Tr.; 3/27/18 Trial Tr. (Dkt. # 760); 3/28/18

4    Trial Tr. (Dkt. # 761); 4/2/18 Trial Tr. (Dkt. # 762); 4/3/18 Trial Tr. (Dkt. # 763); 4/4/18

5    Trial Tr. (Dkt. # 764); 4/5/18 Trial Tr. (Dkt. # 765); 4/6/18 Trial Tr. (Dkt. # 766).) Scapa

6    moved for judgment as a matter of law after Ms. Barabin rested her case. (*See* Org.

7    JMOL Mot. (Dkt. # 738)); Fed. R. Civ. P. 50(a). Scapa renewed its motion after the jury

8    rendered its verdict. (*See* JMOL Mot.); Fed. R. Civ. P. 50(b).

9    **B.    Evidence Presented at Trial**

10    The evidence that parties presented can be divided into two categories: (1)

11    testimony regarding Mr. Barabin's employment at the Camas paper mill, his personal

12    life, and the impact that his mesothelioma had on him and his family; and (2) expert

13    testimony regarding asbestos, mesothelioma, and Mr. Barabin's diagnosis. The court

14    summarizes each category of evidence below.

15        1.   Mr. Barabin's Experience

16    Mr. Barabin began working at the Camas paper mill in the technical department,

17    where he tested the pulp and paper that came off of the paper machines.[5] (3/26/18 Trial

18    Tr. at 180:2-6.) As a pulp tester, Mr. Barabin recalled observing paper machine

19    shutdowns—when dryer felts were replaced on the paper machines—two to three times a

20    month from about 10 or 15 feet away. (*Id.* at 189:2-6, 189:24-190:3.) After these

21    _____

22    [5] Mr. Barabin's testimony from the first trial was read into the record. (*See* 3/26/18 Trial
Tr. at 164:16-18.)

shutdowns, he would cut and take pieces of the old felts home to use in his gardens. (*Id.* at 185:15-186:15.) He observed a significant amount of dust during the shutdowns and when he cut the dryer felts, both at the Camas paper mill and at home. (*Id.* at 187:1-11; 190:19-21.) Mr. Barabin spent about six years in that position. (*Id.* at 180:7-9.)

Around 1974, Mr. Barabin became a spare hand, a position that required him to "work[] on whatever [paper] machine that need[ed]" him. (*Id.* at 191:1-10.) Part of his duties included standing in the paper machines between the dryer felts and the machine and using high pressured hoses to blow the dust and paper out of the dryers when the paper sheets were caught in the dryer. (*Id.* at 191:20-192:14, 192:21-25.) As a spare hand, Mr. Barabin observed but did not participate in paper machine shutdowns. (3/27/18 Trial Tr. at 364:12-16.)

That same year, Mr. Barabin transitioned to the position of a fifth hand on paper machines 7 and 8. (3/26/18 Trial Tr. at 195:2-3, 195:18-22.) He also worked on machines 4, 5, and 6. (*Id.* at 196:4-10.) As a fifth hand, he would participate in paper machine shutdowns every two weeks, during which he would blow out the paper machine. (3/27/18 Trial Tr. at 364:2-9.) He would also participate in changing out the dryer felts, about once or twice a month, by cutting old dryer felts out of the machine and fastening new felts in their place. (*Id.* at 364:2-9, 368:21-369:1, 370:12-14, 377:20-378:1.) Furthermore, he would use compressed air to clean the area around the paper machines once or twice a day. (*Id.* at 367:10-19.) During this time, Mr. Barabin briefly worked as a fourth hand, where about once a month he would participate in changing out dryer felts. (*Id.* at 373:6-7, 375:17-21.)

1    Mr. Barabin became a winderman on paper machines 7 and 8 around 1976. (*Id.* at

2    376:13-19, 380:25-381:2.) As a winderman, Mr. Barabin experienced a felt break, where

3    a dryer felt broke into pieces in the paper machine. (*Id.* at 378:7-10.) Mr. Barabin used a

4    hook to pull the broken pieces of dryer felt out of the machine and disposed of the rest of

5    the felt. (*Id.* at 378:11-17.) He continued to participate in changing the dryer felts and

6    cleaning the dryers. (*Id.* at 379:23-380:20.)

7        Afterwards, Mr. Barabin became a filterman and was responsible for the paper

8    machines' filters during a shutdown. (*Id.* at 382:8-14, 383:10-13.) He would also

9    observe shutdowns. (*Id.* at 383:17-20.) In 1984, Mr. Barabin moved to work on paper

10   machine 20, which was located in another building. (*Id.* at 385:20-22.) He stayed there

11   until his retirement in 2001. (*Id.* at 386:11-13.)

12       Mr. Barabin did not recall ever wearing a respirator or mask while performing his

13   duties. (3/26/18 Trial Tr. at 194:12-24.) At no time during his career did he receive any

14   warnings from Scapa about the asbestos-containing dryer felts with which he worked.

15   (3/27/18 Trial Tr. at 390:7-12.) Mr. Barabin remembers the name "Scapa" and knows

16   that there were Scapa felts at the Camas paper mill, but he has "no particular knowledge

17   of what particular felt [was used on a] particular machine." (*Id.* at 391:3-10.) From 1964

18   to 1982, Scapa supplied 505 dryer felts to the Camas paper mill, 229 of which contained

19   asbestos. (Ex. 600 ¶ 16.) These felts were used on various paper machines that Mr.

20   Barabin worked on.[6] (*Id.* ¶ 17.)

21   _____

22       [6] Thirteen asbestos-containing dryer felts were utilized on paper machine 1 from 1968 to
     1982; 37 were utilized on paper machine 2 from 1966 to 1982; 1 was utilized on paper machine 3

1    After retirement, Mr. Barabin and his wife moved to Arizona.  (3/27/18 Trial Tr. at

2    392:20-21.)  Mr. Barabin handled a number of chores around the house, including

3    laundry, mopping, dishes, and yardwork.  (*Id.* at 393:22-394:5.)  Mr. Barabin and his

4    wife traveled together, attended church, watched movies, visited their grandchildren, and

5    took walks.  (*Id.* at 354:13-15, 355:3-7, 392:25-393:1.)  In 2006, Mr. Barabin began

6    experiencing trouble breathing.  (*Id.* at 355:13-17.)  The doctors withdrew several liters

7    of fluid from Mr. Barabin's lungs to aid his breathing.  (*Id.* at 261:8-11, 395:13-396:2.)

8    A biopsy of the fluid returned a diagnosis of mesothelioma.  (*Id.* at 261:24-262:2,

9    396:21-25.)  When the Barabins learned of this terminal diagnosis, they were "pretty

10   devastated."  (*Id.* at 397:7-13.)

11         After his diagnosis of mesothelioma, Mr. Barabin underwent several rounds of

12   chemotherapy, which sapped his energy and appetite.  (*Id.* at 357:6-11.)  All in all, Mr.

13   Barabin completed three full rounds of chemotherapy over three years.  (*Id.* at 263:1-3.)

14   The treatment left Mr. Barabin tired and nauseated.  (*Id.* at 265:1-3, 399:10-13.)  As the

15   disease progressed, Mr. Barabin became unable to do his usual activities with his wife.

16   (*Id.* at 357:15-22.)  He could not help with household chores, and they stopped going to

17   church or traveling.  (*Id.* at 358:12-19, 400:21-401:4.)  Instead, he was "pretty listless,"

18   //

19   //

20   _____

     in 1973; 3 were used on paper machine 4 from 1973 to 1974; 73 were used on paper machine 5
21   from 1967 to 1977; 41 were used on paper machine 6 from 1965 to 1982; 5 were used on paper
     machine 7 from 1974 to 1981; 19 were used on paper machine 8 from 1965 to 1982; 2 were used
22   on paper machine 9 from 1973 to 1975; 16 were used on paper machine 15 from 1967 to 1978;
     and 19 were utilized on paper machine 16 from 1964 to 1972.  (Ex. 600 ¶ 17.)

spending the majority of his day sitting or napping. (*See id.* at 348:7-12, 359:23-360:3, 405:18-25.)

Due to the disease's invasion of the chest wall, Mr. Barabin's pain grew increasingly worse as treatment progressed, with the most serious pain in his chest and back area. (*Id.* at 264:13-19, 358:25, 402:15-17, 403:4-5.) Mr. Barabin's mesothelioma eventually metastasized to his brain. (*Id.* at 265:6-8.) In 2012, a CT scan revealed a right cerebral brain hemorrhage that was likely due to the mesothelioma. (*Id.* at 265:9-11.) Shortly afterwards, on March 30, 2012, Mr. Barabin passed away. (*Id.* at 265:16-17.)

Ms. Barabin testified that it "hurt [her] so bad" to see her husband in pain after the chemotherapy began. (*Id.* at 359:13-16.) Mr. Barabin's son, Bryan Barabin, recalled that Ms. Barabin "became really stressed, very nervous all the time" due to the pressure of having to care for Mr. Barabin. (*Id.* at 349:22-350:11.) Mr. Barabin's death was "devastating" to Ms. Barabin. (*Id.* at 350:14-15.) After he passed away, Ms. Barabin recalled, "[S]ome days I sit and I just talk to his picture, or wish he was still there . . . I've lost my best friend." (*Id.* at 362:2-5.)

2. Expert Testimony

Ms. Barabin called several expert witnesses, three of whom are discussed in the post-trial motions. The court reviews the relevant testimony of each.

a. Dr. Carl Brodkin

Dr. Brodkin is a physician in occupational and environmental medicine and specifically studies factors in the workplace that may cause exposure-related illnesses. (*Id.* at 210:15-21, 216:16-17.) He explained that asbestos is a naturally-occurring mineral

that breaks off into fibers, which can be inhaled and become lodged in the lower

respiratory tract. (*Id.* at 224:9-10, 225:2-3, 225:17-20.) Although the body has natural

defenses against inhaled fibers, exposure to a high enough concentration can overcome

these defenses. (*Id.* at 226:2-227:3.) Because asbestos fibers are difficult to break down,

they remain in the lungs and cause scarring, which in turn leads to respiratory problems,

known as asbestosis. (*Id.* at 228:24-229:13.)

Dr. Brodkin also explained that asbestos can lead to cancer. (*Id.* at 230:11-15.)

Asbestos fibers cause mutations in a person's DNA by disrupting normal cell division,

such that the chromosomes do not divide evenly. (*Id.* at 230:16-231:1.) Moreover, the

fibers promote the development of tumors because the body's immune system reacts to

the presence of fibers in the cells and attempts to fight those foreign bodies, causing

further damage to the cells. (*Id.* at 231:2-8.) The cells eventually become so abnormal

that they lose control, continuing to divide when they should not. (*Id.* at 231:9-13.) This

uncontrolled cell growth eventually results in cancer and the growth of tumor masses.

(*Id.* at 231:13-16, 231:24-232:2.) When this uncontrolled cell growth occurs in the

pleura—the thin lining of the lung—the resulting cancer is called mesothelioma. (*Id.* at

232:3-4.)

Dr. Brodkin recognized that the presence of asbestos in a material alone is not

sufficient to cause mesothelioma. (*See id.* at 240:24-25.) Instead, there must be what Dr.

Brodkin calls "an identified exposure": some activity that disrupts the material and

"generate[s] airborne fibers of significant concentration, that overcome the body's

defenses." (*Id.* at 241:1-9.) In other words, not every exposure alone increases the risk

for disease; a minor release of fibers would not generate the significant levels of fibers necessary for such an increase. (*See id.* at 241:10-21.) Thus, in examining any asbestos-exposed worker, Dr. Brodkin searches for identified exposures in the worker's employment history to ascertain what activities were significant in the development of disease. (*See id.* at 240:19-241:9.)

Dr. Brodkin reviewed Mr. Barabin's medical records, various stipulations and interrogatories related to Mr. Barabin's exposure to asbestos, and personally interviewed Mr. Barabin regarding his employment history. (*Id.* at 235:25-237:8, 238:12-23.) Based on this information, Dr. Brodkin concludes that Mr. Barabin's work manipulating dryer felts qualified as identified exposures, or activities that generated significant airborne fibers to overcome the body's defenses. (*Id.* at 244:5-21.) Specifically, Mr. Barabin "worked directly with an asbestos-containing material, dryer felts . . . [which] contained between 20 and 75 percent asbestos" and was a bystander to asbestos exposure when he was "in proximity to other workers performing work on dryer felts." (*Id.* at 239:17-240:1, 245:8-18.)

Dr. Brodkin additionally concluded that Mr. Barabin was likely exposed to between 0.05 and 41 fibers per cc ("F/CC")[7] when working with asbestos-containing dryer felts. (*Id.* at 249:17-19.) Because even an exposure of 0.07 F/CC can increase risk of asbestos-related disease by 300% (*id.* at 253:6-8), Dr. Brodkin qualifies Mr. Barabin's level of exposure for 12 years as a "significant dose of asbestos" (*id.* at 251:18-21,

---

[7] Fibers per cc measures the number of asbestos fibers in a cubic centimeter of air. (*Id.* at 249:20-23, 250:14-15.)

252:2-7). And because mesothelioma is a "dose response disease"—meaning the greater the dose, the greater the risk for developing disease—Mr. Barabin's exposure to those significant doses of asbestos would substantially increase the risk for developing mesothelioma. (*See id.* at 252:9-22.) In reaching this exposure conclusion, Dr. Brodkin relied on several studies, including a survey done by the International Agency for Research on Cancer; the 1999 Millette study; the 2001 R.J. Lee study; and two studies done on the national registries of mesothelioma in France and Germany. (*See id.* at 248:8-20, 253:15-254:5.)

Dr. Brodkin recognized that Mr. Barabin was exposed to asbestos in other ways, such as through the asbestos-containing insulation, gaskets, and packing material used at the Camas paper mill. (*Id.* at 255:6-256:6.) But, in sum, Dr. Brodkin concludes that Mr. Barabin's exposure to dryer felts—and specifically, Scapa dryer felts—was a substantial factor in causing his mesothelioma. (*Id.* at 281:1-12, 281:25-282:2, 283:18-20.)

### b. Dr. Steven Compton

Dr. Compton is a physicist and microscopist who specializes in condensed matter physics, which studies the properties of solid materials. (3/28/18 Trial Tr. at 444:8-18.) He works at a company called MVA Scientific Consultants ("MVA") that provides consulting on matters requiring microscopic analysis. (*Id.* at 445:22-446:19.) MVA has tested asbestos-containing dryer felts since the late 1990s, analyzing both the asbestos content of a material and how those asbestos fibers are released after the material is manipulated. (*Id.* at 471:10-25.) At MVA, Dr. Compton has studied asbestos under the
//

1  microscope since 2009 and has tested asbestos-containing materials ranging from

2  flooring tiles to protective clothing. (*Id.* at 446:24-447:1, 449:2-13.)

3      Dr. Compton reviewed various dryer-felt studies and performed testing on Scapa

4  dryer felts. (*See id.* at 472:4-483:1.) The dryer-felt studies he reviewed analyzed a

5  number of different asbestos-containing dryer felts and concluded that all of them

6  released asbestos when handled. (*Id.* at 472:23-473:11, 475:15-20.) His own testing of

7  Scapa dryer felts revealed that the felts released between 35 and 75 F/CC of asbestos

8  fibers when they were cut or blown with compressed air. (*Id.* at 479:4-17; 481:14-19;

9  482:23-483:1.) His tests of the dryer felts did not attempt to replicate the everyday

10  environmental conditions at the Camas paper mill. (*Id.* at 498:1-14, 498:19-21.)

11      Dr. Compton also reviewed materials specific to this case, including Mr. Barabin's

12  testimony, work history, and the admitted facts. (*See id.* at 484:2-14.) Based on those

13  materials, the relevant studies, and his own testing, Dr. Compton concluded that the kind

14  of activities Mr. Barabin performed at the Camas paper mill would have released asbestos

15  fibers into the air. (*Id.* at 485:22-486:1.)

16          *c. Christopher DePasquale*

17      Mr. DePasquale is an industrial hygienist with the consulting firm Compass

18  Environmental. (*Id.* at 527:25-528:1, 530:10-12.) He focuses on recognizing and

19  controlling workplace hazards, including asbestos, that may pose a threat to workers'

20  safety. (*Id.* at 528:9-11, 530:21-531:1.) For this case, Mr. DePasquale reviewed trial

21  testimony from other experts, Mr. Barabin's work history, and the admitted facts. (*Id.* at

22  543:23-544:7.) Mr. DePasquale also relied on various studies analyzing asbestos-release

in dryer felts, including the 1973 Wendlick study, the MVA studies, the Materials

Analytic Services ("MAS") studies, and the 2001 R.J. Lee Study. (*Id.* at 545:1-549:22.)

Applying those studies to Mr. Barabin's work history, Mr. DePasquale concluded that

during the course of his work, Mr. Barabin had "significant exposures to asbestos" that

were "significantly above background" and "would have increased Mr. Barabin's risk of

developing disease." (*Id.* at 550:20-24, 551:3-5.)

C.    **Scapa's References to Other Entities**

Scapa, at certain points in the trial, alluded to other entities that Ms. Barabin had

sued. For instance, in its opening statement, Scapa's counsel stated, "[Y]ou heard that 34

people were sued" and listed the other companies that produced other asbestos-containing

products that Mr. Barabin was allegedly exposed to. (3/26/18 Trial Tr. at 146:6-7,

151:12-25.) On cross examination of Mr. Barabin, he recalled that during his deposition,

there were "a number of attorneys and a number of defendants" and that to the best of his

knowledge, the case had been "resolved [as] to all those other defendants." (3/27/18

Trial Tr. at 407:14-22.) On direct examination of one of Scapa's expert witnesses, Paul

Carlson, Scapa asked him to estimate the number of products that Mr. Barabin had made

claims against. (4/4/18 Trial Tr. at 1287:20-1288:3.) Mr. Carlson testified that "there

were at least 40 different products." (*Id.* at 1288:3.) And finally, in closing, Scapa's

counsel stated that the Barabins have "resolved their differences with a number of the

companies." (4/5/18 Trial Tr. at 1419:24-25.)

//

//

## D.    The Jury's Verdict

After the presentation of evidence, the court instructed the jury on the applicable law.  The court gave the following instruction on non-economic damages:

> [Y]ou should consider the following non-economic damages elements:
> (1) The nature and extent of the injuries;
> (2) The disability and loss of enjoyment of life experienced by Mr. Barabin;
> (3) The pain, suffering, anxiety, emotional distress, humiliation, and fear experienced by Mr. Barabin prior to his death as a result of mesothelioma; and
> (4) Loss to Ms. Barabin of the consortium of her husband.

(Final JIs (Dkt. # 744) at 27:11-16.)  The court further defined "consortium" as:

> [T]he fellowship of husband and wife and the right of one spouse to the company, cooperation, and aid of the other in the matrimonial relationship. It includes emotional support, love, affection, care, services, companionship, including sexual companionship, as well as assistance from one spouse to the other.

(*Id.* at 27:17-21.)  Lastly, the court explained to the jury that "[t]he law has not furnished us with any fixed standards by which to measure non-economic damages.  With reference to these matters, you must be governed by your own judgment, by the evidence in the case, and by these instructions."  (*Id.* at 28:1-3.)

After deliberation, the jury found that Scapa did not violate its duty to design reasonably safe products or its duty to warn of any condition that renders a product not reasonably safe for a foreseeable use.  (Verdict Form (Dkt. # 748) at 1:18-2:4; *see* Final JIs at 17, 20.)  However, the jury found Scapa was negligent and failed to exercise ordinary care.  (Verdict Form at 2:6-9; *see* Final JIs at 22.)  The jury awarded economic damages of $750,000.00 and non-economic damages of $306,000.00.  (Verdict Form at 2:15-16.)  After the jury's verdict, the parties filed the instant motions.

# III.   ANALYSIS

The parties both seek post-trial relief.  Ms. Barabin argues for a partial new trial solely on the issue of non-economic damages.  (*See* Rule 59 Mot. at 1-2.)  Scapa seeks judgment as a matter of law in its favor.  (*See* JMOL Mot. at 1.)  The court takes each motion in turn.

## A.     Ms. Barabin's Motion for a Partial New Trial

Ms. Barabin argues that the jury "assessed grossly inadequate non-economic damages" as measured against the award in the first trial, which Ms. Barabin emphasizes was "more than thirty-one times the amount of non-economic damages" awarded here. (Rule 59 Mot. at 1-2 (emphasis omitted).)  She contends that "the only significant difference" between the two trials "was the improper, irrelevant, and prejudicial argument and statements from [Scapa] alluding to [her] settlements with other parties." (*Id.*)  Because the jury's low award of non-economic damages "can only be because of the improper statements from [Scapa's] counsel," Ms. Barabin urges the court to order a new trial solely on the issue of non-economic damages.  (*Id.* at 10.)  For the reasons discussed below, the court declines to do so.

Pursuant to Federal Rule of Civil Procedure 59(a), a new trial may be granted on all or some of the issues "for any reason for which a new trial has heretofore been granted in an action at law in federal court."  Fed. R. Civ. P. 59(a).  Although Rule 59(a) does not specify the grounds on which a new trial may be granted, courts have granted new trials when the verdict is contrary to the clear weight of the evidence, based upon false or perjurious evidence, or tainted by passion or prejudice.  *See Bear ex rel. Bloom v. Ford*

*Motor Co.*, No. C05-0253EFS, 2008 WL 2230743, at *8 (E.D. Wash. May 28, 2008). A court may not, however, "grant a new trial simply because it would have arrived at a different verdict." *Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814, 819 (9th Cir. 2001); *see also Landes Constr. Co. v. Royal Bank of Canada*, 833 F.2d 1365, 1372 (9th Cir. 1987) ("Doubts about the correctness of the verdict are not sufficient grounds for a new trial."). Thus, to grant a new trial, the trial court must have "a firm conviction that the jury has made a mistake." *Landes Constr.*, 833 F.2d at 1365.

The same standard applies when a party seeks a new trial on the ground that the jury awarded inadequate damages. *See DePinto v. Provident Sec. Life Ins. Co.*, 323 F.2d 826, 838 (9th Cir. 1963). Generally, "a jury's damages award is entitled to great deference." *Rivas v. Knight Transp. Inc.*, No. CV 15-05793-DTB, 2017 WL 3453365, at *2 (C.D. Cal. Mar. 24, 2017). Courts defer to the jury's determination of damages "unless the award is . . . 'clearly not supported by the evidence, or based only on speculation or guesswork.'" *McCollough v. Johnson, Rodenburg & Lauinger, LLC*, 637 F.3d 939, 957 (9th Cir. 2011) (quoting *Del Monte Dunes at Monterey, Ltd. v. City of Monterey*, 95 F.3d 1422, 1435 (9th Cir. 1996)). This deference stems from the recognition that "[t]ranslating legal damage into money damages is a matter peculiarly within a jury's ken, especially in cases involving intangible, non-economic losses." *Bear*, 2008 WL 2230743, at *9. Thus, "[a] plaintiff's path towards a new trial based on inadequate damages is feasible, but formidable." *Id.*

*Holzhauer v. Golden Gate Bridge Highway & Transportation District* illustrates how formidable the path is. *See* No. 13-cv-02862-JST, 2017 WL 3382316, at *1-2 (N.D.

Cal. Aug. 7, 2017). In that case, a ferry operated by the defendant collided with a speedboat and killed the speedboat's driver. *Id.* at *1. The driver's widow and sons filed suit, seeking non-economic damages arising from their loss of love, companionship, and support. *Id.* Plaintiffs presented undisputed testimony regarding the sons' close relationship with their father, highlighting his importance to the sons' personal and professional lives. *Id.* The jury awarded $1,000,000.00 in non-economic damages to the widow but none to the sons. *Id.* Plaintiffs moved for a new trial as to the singular issue of the non-economic damages suffered by the sons, pointing to the fact that the defendant did not dispute the sons' testimony. *Id.* at *2.

The court was unconvinced. *Id.* It observed that "[t]he intangible nature of 'love, companionship[,] . . . [and] training and guidance' makes it difficult for any court to reach a 'firm conviction' that a jury made a mistake evaluating such questions." *Id.* (quoting *Landes Constr.*, 833 F.2d at 1372). Moreover, the court found "no reason to believe there were flaws in the jury's deliberation process." *Id.* Plaintiffs agreed that the jury instructions were correct and provided no evidence that the jury "failed to perform a reasoned analysis." *Id.* Indeed, Plaintiffs pointed only to the discrepancy between the widow's $1,000,000.00 award and the sons' $0.00 award. *Id.* The court rejected this argument, explaining that "[t]he mere existence of a discrepancy . . . does not necessarily mean the analysis was unreasonable." *Id.* In fact, the court reasoned, such a mixed verdict may "signal the opposite," as mixed verdicts generally suggest that the jury "rationally evaluated the evidence during deliberations." *Id.* (internal quotation marks omitted) (quoting *Bear*, 2008 WL 2230743, at *9). Thus, the court concluded that there

1 || was "no indication the jury failed to perform a reasoned analysis." *Id.*

2 || The court is similarly unconvinced by Ms. Barabin's arguments. Like in

3 || *Holzhauer*, calculating the non-economic damages here involved measuring concepts

4 || such as the "enjoyment of life," "love," "affection," and "companionship," the very

5 || nature of which are intangible. (*See* Final JIs at 27:12-21); *see* 2017 WL 3382316, at *2.

6 || Indeed, the court instructed the jury that there is no "fixed standard[]" by which to

7 || calculate non-economic damages. (Final JIs at 28:1-2.) Thus, although Scapa introduced

8 || no contradictory evidence regarding non-economic damages, the court cannot reach a

9 || "firm conviction" that the jury erred in valuing those amorphous concepts at

10 || $306,000.00. *See Landes Constr.*, 833 F.2d at 1372.

11 || Moreover, the court finds no reason to doubt the jury's deliberation process. As in

12 || *Holzhauer*, Ms. Barabin agrees that the jury instructions were correct. (4/4/18 Trial Tr. at

13 || 1340:21-25 (taking no exceptions to the instructions)); *see* 2017 WL 3382316, at *2.

14 || And as in *Holzhauer*, there is no evidence that the jury's deliberation was flawed. Quite

15 || the opposite. The mixed verdict returned by the jury—with findings of both liability and

16 || non-liability as well as high and low damages amounts—"suggest[s] that the jury

17 || rationally evaluated the evidence during deliberations." *See Bear*, 2008 WL 2230743, at

18 || *9; (*see also* Verdict Form at 1-2). The court finds no indication otherwise.

19 || Ms. Barabin's reliance on the non-economic damages award in the first trial is

20 || misguided. As a general matter, the mere fact that a discrepancy exists does not render

21 || the jury deliberation suspect. *Holzhauer*, 2017 WL 3382316, at *2. But here, even more

22 || so than in *Holzhauer*, the discrepancy sheds no light on the deliberation process because

1  Ms. Barabin points to damages awarded in completely different trials. At the risk of

2  stating the obvious, the two juries were different. Thus, they could have varied in how

3  they weighed the evidence and exercised their judgment in measuring non-economic

4  damages. (*See* Final JIs at 28:1-3 (emphasizing that the jury should be "governed by [its]

5  own judgment" in measuring non-economic damages).) Moreover, Mr. Barabin testified

6  live in the first trial, whereas counsel here read Mr. Barabin's testimony into the record

7  over the course of several days. (*Compare* 10/28/09 Trial Tr. (Dkt. # 431) at

8  50:15-190:15, *with* 3/26/18 Trial Tr. at 165:13-197:20; 3/27/18 Trial Tr. at

9  363:14-411:22; 3/28/18 Trial Tr. at 575:23-618:4); *see Raynes v. Davis*, No. 90-15509,

10  2007 WL 4145102, at *4 (C.D. Cal. Nov. 19, 2007) (describing live testimony as

11  "preferable" over deposition testimony). Indeed, even the parties themselves differed:

12  Two defendants, Scapa and AstenJohnson, litigated the first trial, whereas only Scapa

13  remained for the second. (*Compare* 11/19/09 Verdict Form, *with* Verdict Form.) Thus, it

14  is of no consequence that the jury in the first trial awarded greater non-economic

15  damages.[8]

16  //

17  //

_____

18  [8] Scapa, in its response, argues that the larger award in the first trial was due to conduct
by Ms. Barabin's counsel that "no doubt inflamed the jury's passions." (Rule 59 Resp. at 3.)

19  Because Scapa had raised, and the court had previously excluded, some of this conduct in its
motions in limine (*see* Def. MILs (Dkt. # 697) at 6-7; 3/12/18 Min. Entry (Dkt. # 709) (granting

20  in part Scapa's motions in limine)), Scapa believes that "the second jury was able to deliberate
free from the incendiary and provocative remarks and arguments that infected and tainted the

21  first verdict" (Rule 59 Resp. at 3). The court has no occasion to, and thus will not, pass
judgment on whether inappropriate conduct prejudiced the first verdict. The court simply

22  recognizes this assertion as illustrating another difference between the first and second trials that
renders comparison of the two verdicts inappropriate.

1    Ms. Barabin's contention regarding Scapa's "inappropriate" references to Ms.

2    Barabin's "settlements with other parties" is likewise unavailing. (*See* Rule 59 Mot. at

3    5-8.) As a preliminary matter, Ms. Barabin—not Scapa—was the first to mention other

4    entities that were no longer involved in the suit. In opening statements, Ms. Barabin

5    stated that Mr. Barabin was "exposed to asbestos from various entities, not just Scapa"

6    and that the Barabins "filed suit against many different entities. Scapa is the one that

7    remains."[9] (3/26/18 Trial Tr. at 103:11-14.) In fact, Scapa's comments regarding other

8    entities in its opening refer back to what Ms. Barabin had already told the jury. (*See id.*

9    at 151:12-25 ("[I]t makes sense that you've heard how many companies were actually

10   sued in this case, because they all made these products that we just heard about, that [Ms.

11   Barabin's counsel] told you about.").)

12        But putting aside the fact that Ms. Barabin introduced the comments she now

13   asserts are prejudicial, the statements identified by Ms. Barabin do not warrant a new

14   trial. Misconduct by trial counsel may justify a new trial if the "flavor of misconduct

15   sufficiently permeate[s] an entire proceeding to provide conviction that the jury was

16   influenced by passion and prejudice in reaching its verdict." *Hemmings v. Tidyman's*

17   *Inc.*, 285 F.3d 1174, 1192 (9th Cir. 2002) (internal quotation marks omitted) (quoting

18   *Kehr v. Smith Barney*, 736 F.2d 1283, 1286 (9th Cir. 1984)). The trial court is in "a

19   superior position to evaluate the likely effect of the alleged misconduct." *Id.* at 1193.

20   //

---

21   [9] Ms. Barabin mistakenly attributes this statement to Scapa. (*See* Rule 59 Mot. at 6.) In

22   fact, Ms. Barabin was the one who introduced this information to the jury. (*See* 3/26/18 Trial Tr. at 103:11-14.)

The moving party must demonstrate that the opposing counsel's misconduct

"substantially interfered" with the moving party's interest. *Cayne v. Wash. Tr. Bank*,

No. 2:12-cv-000584-REB, 2017 WL 277403, at \*14 (D. Idaho Jan. 20, 2017).

Ms. Barabin fails to make that showing here. First, Ms. Barabin failed to object

contemporaneously to the comments that she now insists are prejudicial. (*See* 3/26/18

Trial Tr. at 146:6-7, 151:12-25; 3/27/18 Trial Tr. at 407:14-22; 4/4/18 Trial Tr. at

1287:20-1288:3; 4/5/18 Trial Tr. at 1419:24-25; *see also* Rule 59 Mot. at 6 (explaining

why Ms. Barabin did not object).) The court erects a "high threshold" to claims of

improper conduct raised for the first time after trial. *Hemmings*, 285 F.3d at 1193; *see*

*also id.* ("[A]llowing a party to wait to raise the error until after negative verdict

encourages that party to sit silent in the face of claimed error."). Second, the comments

she identifies were isolated in comparison to the length of the trial. *See Kehr*, 736 F.2d at

1286 (finding improper but isolated remarks to not warrant a new trial). For instance, she

points out a two-question exchange (*see* 3/27/18 Trial Tr. at 407:14-22) that constitutes a

mere fraction of Mr. Barabin's entire cross-examination (*see* 3/27/18 Trial Tr. at 407:9-

411:15; 3/28/18 Trial Tr. at 576:5-618:4).

Moreover, the court instructed that statements and arguments made by lawyers do

not qualify as evidence. (Final JIs at 7:5-9.) Thus, the jury could have determined that

Scapa's statements regarding other entities were just that: arguments, not evidence. *See*

*Cayne*, 2017 WL 277403, at \*15 (relying on jury instructions to conclude that the

misconduct did not warrant a new trial). And lastly, the verdict itself suggests that the

jury was not improperly prejudiced. Although Ms. Barabin complains about the amount

of non-economic damages, the jury found liability in her favor and actually awarded her

non-zero economic and non-economic damages. (*See* Verdict Form at 1-2.) Thus, even

if Scapa's references to other entities were improper, the court finds that the misconduct

did not "sufficiently permeate the entire proceeding" such that passion and prejudice

influenced the jury's non-economic damages award.[10] *See Hemmings*, 285 F.3d at 1192.

In sum, the court has no indication, let alone a firm conviction, that the jury made

a mistake in awarding non-economic damages. *See Landes Constr.*, 833 F.2d at 1365.

Because the verdict here was neither against the clear weight of the evidence nor tainted

by passion or prejudice, the court denies Ms. Barabin's motion for a partial new trial on

the issue of non-economic damages.

**B. Scapa's Motion for Judgment as a Matter of Law**

Scapa moves for judgment as a matter of law for three reasons: Ms. Barabin failed

to present substantial evidence (1) to support the jury's negligence finding (JMOL Mot.

at 1-3); (2) that a Scapa dryer felt caused Mr. Barabin's mesothelioma (*id.* at 4-7); and (3)

that Mr. Barabin was exposed to asbestos fibers from Scapa dryer felts (*id.* at 7-12). The

//

---

[10] To "guide" the court in assessing non-economic damages, Ms. Barabin includes a
unit-of-time argument—which she made in her closing—asking the court to assess damages in
relation to how much Scapa pays its expert witnesses. (*See* Rule 59 Mot. at 10.) The court fails
to see the relevance of such an argument. There is no indication that Ms. Barabin's proposed
assessment method is the correct way to calculate non-economic damages; it is one proposal out
of many and one that the jury rejected—a decision well within its purview. Indeed, as Scapa
points out, at least one circuit court views unit-of-time arguments as "inflammatory" because
they "bear[] no rational relation to plaintiffs' injuries." *In re DePuy Orthopaedics, Inc.*, 888 F.3d
753, 787 n.71 (5th Cir. 2018); (*see* Rule 59 Resp. at 5 (describing Ms. Barabin's guidance as
"perhaps the worst possible advice").) Thus, the court gives no credence to Ms. Barabin's
unit-of-time argument.

1    court reviews the legal standard governing judgments as a matter of law and applies it to

2    each of Scapa's arguments.

3        1.  Legal Standard

4        The court may grant Scapa's renewed motion for judgment as a matter of law if it

5    "finds that a reasonable jury would not have a legally sufficient evidentiary basis" to find

6    for Ms. Barabin.  Fed. R. Civ. P. 50(a)-(b).  To prevail, Scapa must show that Ms.

7    Barabin failed to support her claims with "substantial evidence." *Weaving v. City of*

8    *Hillsboro*, 763 F.3d 1106, 1111 (9th Cir. 2014).  "Substantial evidence is such relevant

9    evidence as reasonable minds might accept as adequate to support a conclusion even if it

10   is possible to draw two inconsistent conclusions from the evidence." *Landes Constr.*, 833

11   F.2d at 1371; *see also Wallace v. City of San Diego*, 479 F.3d 616, 624 (9th Cir. 2007)

12   ("Substantial evidence is evidence adequate to support the jury's conclusion, even if it is

13   also possible to draw a contrary conclusion from the same evidence.").

14       The court must view the evidence and draw all reasonable inferences in Ms.

15   Barabin's favor.  *See Ostad v. Or. Health Sci. Univ.*, 327 F.3d 876, 881 (9th Cir. 2003).

16   The court may not weigh the evidence or assess the credibility of witnesses in

17   determining whether substantial evidence exists. *Landes Constr.*, 833 F.2d at 1371.

18   Moreover, the court "must disregard all evidence favorable to the moving party that the

19   jury is not required to believe." *Reeves v. Sanderson Plumbing Prods, Inc.*, 530 U.S.

20   133, 151 (2000); *see also Escriba v. Foster Poultry Farms, Inc.*, 743 F.3d 1236, 1242-43

21   (9th Cir. 2014).  Thus, granting Scapa's motion is proper if the evidence "permits only

22   one reasonable conclusion, and that conclusion is contrary to the jury's verdict." *Escriba*,

743 F.3d at 1242; *see also Lakeside-Scott v. Multnomah Cty.*, 556 F.3d 797, 802-03 (9th Cir. 2009) (granting judgment as a matter of law "is appropriate when the jury could have relied only on speculation to reach its verdict").

Because a Rule 50(b) motion is a renewed motion, a proper post-verdict motion for judgment as a matter of law is limited to the grounds asserted in the movant's pre-deliberation Rule 50(a) motion. *EEOC v. GoDaddy Software, Inc.*, 581 F.3d 951, 961-62 (9th Cir. 2009) (citing *Freund v. Nycomed Amersham*, 347 F.3d 752, 761 (9th Cir. 2003)). Consequently, a party cannot properly "raise arguments in its post-trial motion or judgment as a matter of law under Rule 50(b) that it did not raise in its preverdict Rule 50(a) motion." *Freund*, 347 F.3d at 761. But preservation of an issue "may be satisfied by an ambiguous or inartfully made motion" under Rule 50(a). *Reeves v. Teuscher*, 881 F.2d 1495, 1498 (9th Cir. 1989). Otherwise, the rule is an overly harsh one. *See GoDaddy Software*, 581 F.3d at 961 (internal quotation marks omitted) (quoting *Nat'l Indus., Inc. v. Sharon Steel Corp.*, 781 F.2d 1545, 1549 (11th Cir. 1986)).

2. Substantial Evidence Supporting the Negligence Finding

At the outset, Ms. Barabin maintains that Scapa did not raise its argument regarding the negligence finding in its Rule 50(a) motion and thus cannot raise it now. (JMOL Resp. at 1-2.) The court agrees that Scapa did not raise this particular argument regarding the jury's specific findings in its Rule 50(a) motion. (*See* Orig. JMOL Mot.) Indeed, it would not have been possible for Scapa to raise this exact argument because the argument relies on the particularities of the jury's verdict, which were unavailable at the time of the original motion. (*See* JMOL Mot. at 1-3.) But the court finds no need to

1 decide whether the argument was properly preserved, because even assuming that Scapa

2 made the argument in its Rule 50(a) motion, it fails on the merits.

3       Scapa relies on a string of inferences stemming from the jury's mixed verdict—

4 namely, the jury's finding of no liability on the two product liability claims (design defect

5 and failure to warn) and liability on the negligence claim. (*See* JMOL Mot. at 1-3;

6 Verdict Form at 1-2.) Scapa contends that because the jury "refused to find that Scapa

7 dryer felts were defectively designed or that Ms. Barabin proved her . . . failure to warn

8 claim," the jury's negligence finding "cannot be based on a failure [to] warn about a

9 defect associated with the intended use of dryer felts." (JMOL Mot. at 1-2.) From this

10 premise, Scapa concludes that "the only legal potential basis for the jury's negligence

11 finding is Scapa's failure to warn of alleged dangers associated with the *unintended* use

12 Mr. Barabin made of its dryer felts [at home]." (*Id.* at 2.) Scapa then proceeds to argue

13 that, as a matter of law, it was not required to warn of any alleged dangers associated

14 with dryer felt use at home.[11] (*Id.* at 3.)

15 //

16

---

17     [11] Scapa also argues that causation is lacking in the negligence finding. (JMOL Mot. at 4-5.) To the extent that this argument overlaps with Scapa's more general argument regarding causation, the court will address the issue in the following section. *See infra* § III.B.3; (*see*

18 JMOL Mot. at 3.) However, Scapa additionally suggests that, in order to have found no liability for the product liability claims, "the jury had to conclude that dryer felts as used in the mill were

19 incapable of causing mesothelioma." (JMOL Mot. at 2.) Not so. Causation is but one of three necessary elements in each of the two products liability claims. (*See* Final JIs at 18:4-8, 21:4-8.)

20 Thus, the jury could have concluded that Ms. Barabin proved causation but failed to prove the other elements of those two claims. (*See id.* at 18:11-12 ("[I]f you find that Ms. Barabin has

21 failed to prove *any* of these propositions, your verdict should be for Scapa as to this claim." (emphasis added)), 21:11-12 (same).) Thus, Scapa is incorrect that the jury reached an "illogical

22 conclusion" regarding the causation findings for the products liability versus negligence claims. (*See* JMOL Mot. at 2.)

1    But Scapa errs in one of its inferential leaps: The failure to warn of dangers

2    associated with Mr. Barabin's unintended use is not the only evidence that could have

3    supported the jury's finding of negligence here. As the court instructed, negligence is

4    "the failure to exercise ordinary care." (Final JIs at 22:2-3.) "Ordinary care," in the

5    negligence context, encompasses more than the duty to design reasonably safe products

6    at the time the products left the manufacturer's control—as is required in the design

7    defect context (*id.* at 17:2-4)—or the duty to warn of any condition that renders a product

8    not reasonably safe for a foreseeable use—as is required in the failure to warn context (*id.*

9    at 20:2-3). As such, a reasonable jury could have found negligence without considering

10   Mr. Barabin's use of dryer felts outside of the Camas paper mill.

11       For instance, to avoid negligence, a manufacturer must use ordinary care to "test,

12   analyze, and inspect the products it manufactures" and must "use reasonable care to keep

13   abreast of scientific knowledge, discoveries, advances, and research in the field." (*Id.* at

14   24:2-5.) The record supports a jury finding that although Scapa should have known in

15   the 1950s or 1960s that asbestos fibers caused cancer and mesothelioma (4/2/18 Trial Tr.

16   at 747:8-748:8), Scapa never researched asbestos hazards (3/28/18 Trial Tr. at 636:15-21)

17   and conducted no tests on its asbestos-containing dryer felts, other than testing prepared

18   in connection with litigation (*id.* at 623:6-8; 4/2/18 Trial Tr. at 11-19). Scapa nonetheless

19   continued to produce asbestos-containing dryer felts until 1978. (3/28/18 Trial Tr. at

20   //

21   //

22   //

1  620:6-7.) Thus, a rational juror could have found negligence based on this record

2  evidence and not on Mr. Barabin's allegedly unintended use.[12]

3      Scapa's reliance on *Lambert v. General Motors*, 67 Cal. App. 4th 1179 (1998), is

4  unavailing. (*See* JMOL Mot. at 2.) Scapa reads *Lambert* to hold that when a jury refuses

5  to find a design defect, "a negligence finding against the defendant cannot be based on a

6  failure-to test or failure-to-warn theory." (*Id.*) But *Lambert* reached that conclusion

7  because the negligence claim in that case was specifically tied to "the adequacy of the

8  design." 67 Cal. 4th at 1183; *see also id.* at 1182 (asking the jury "Was [the

9  defendant] negligent *in the design* of the [product]?" (emphasis added)). Moreover, "the

10 record [there] disclose[d] no evidence of negligence except negligent design . . . [and] all

11 plaintiff's examples of negligence involve[d] the [product's] design." *Id.* at 1185. Here,

12 not only is there ample evidence of negligence outside of the product's design, but the

13 negligence claim also encompasses more than just "the adequacy of the design."

14 (*Compare* Final JIs at 23:2-7; Verdict Form at 2:6-7), *with Lambert*, 67 Cal. App. 4th at

15 1182-83. Thus, *Lambert* is inapplicable here.[13]

16 //

17 //

---

18      [12] Additionally, a manufacturer has "a continuing duty to warn" of any "danger connected
    with the product after it was manufactured" with regard to "issuing warnings or instructions
19  concerning the danger." (Final JIs at 25:2-7.) The record evinces that Scapa never warned about
    the asbestos in its product. (4/2/18 Trial Tr. at 786:20-25.) A lack of warning after the product
20  leaves the manufacturer is yet another ground on which a reasonable juror could have found
    liability for negligence but not for products liability.

21      [13] Moreover, Scapa makes no effort to show that *Lambert*'s analysis of California law on
    negligence and products liability should control the court's analysis of Washington law here.
22  (*See* JMOL Mot. at 1-3.)

1      Scapa bases its argument on a faulty premise—that the jury had to have based its

2 negligence finding on Mr. Barabin's use of dryer felts at home. (*See* JMOL Mot. at 1-3.)

3 But, to the contrary, the record discloses "relevant evidence," other than this allegedly

4 unintended use, which "reasonable minds might accept as adequate to support" the jury's

5 negligence verdict. *See Landes Constr.*, 833 F.2d at 1371. Accordingly, the court denies

6 judgment as a matter of law on this ground.

7      3.  <u>Causation</u>

8      Under Washington law, Ms. Barabin must establish that Scapa's negligence was a

9 proximate cause of Mr. Barabin's injury. (Final JIs at 23:7-8); *see Lockwood v. AC & S,*

10 *Inc.*, 744 P.2d 605, 612 (Wash. 1987). Proximate cause, in turn, means a cause that was a

11 substantial factor in bringing about the injury, even if the result would have occurred

12 without it. (Final JIs at 19:2-4); *see Mavroudis v. Pittsburgh-Corning Corp.*, 935 P.2d

13 684, 689 (Wash. Ct. App. 1997). Scapa does not seem to dispute that Ms. Barabin

14 introduced evidence regarding causation at trial. (*See* JMOL Mot. at 4-7.) Instead, Scapa

15 centers its argument on the fact that Ms. Barabin's causation evidence is inadmissible.

16 (*See id.*) In so arguing, Scapa rehashes several arguments from its previous *Daubert*

17 motion to exclude the testimony of Dr. Brodkin.[14] (*See id.*; Causation MTE (Dkt. #

18 683).) On the whole, the court disagrees with Scapa.

19 //

20 //

21      [14] Indeed, some portions of the instant motion are copied-and-pasted from the *Daubert*

22 motion. (*Compare* Causation MTE at 3-4 (discussing Judge Suzanne Barnett's decision
regarding Dr. Brodkin's testimony), *with* JMOL Mot. at 7 (same).)

1    Primarily, Scapa accuses Dr. Brodkin's causation approach as "merely a disguised

2    version of the cumulative-exposure theory." (JMOL Mot. at 4.) The court disagrees. As

3    the court explained in its *Daubert* order and as evidenced by his testimony, Dr. Brodkin

4    does not purport that every exposure amounts to a substantial factor simply because it

5    necessarily adds to the total exposure. (*See* 2/12/18 Order at 31-32.) Far from it. Dr.

6    Brodkin testified that the presence of asbestos alone is insufficient and that not every

7    exposure constitutes a substantial factor. (*See* 3/27/18 Trial Tr. at 240:24-25.) Instead,

8    Dr. Brodkin searched for an "identified exposure" that would have "generate[d] airborne

9    fibers of significant concentrate [to] overcome the body's defenses."[15] (*Id.* at 241:1-9.)

10   Based on his examination of Mr. Barabin and the relevant records, Dr. Brodkin

11   concluded that Mr. Barabin's time working with asbestos-containing dryer felts qualified

12   as identified exposures. (*Id.* at 244:5-21.) Thus, Dr. Brodkin does not posit, as the

13   cumulative exposure theory dictates, that every exposure—no matter how small—

14   becomes a substantial factor whenever the total cumulative dose results in mesothelioma.

15   Scapa next assails Dr. Brodkin for "giv[ing] short shrift to . . . ascertaining the

16   *dose* [Mr. Barabin] was exposed to." (JMOL Mot. at 4.) Again, the court disagrees with

17   Scapa's reading of the record. Dr. Brodkin, after his review of the materials, proffered a

18   //

19   _____

20   [15] Scapa points out that Dr. Brodkin "has not scientifically defined an exposure he would
     consider significant enough to count as an identified exposure." (JMOL Mot. at 5.) But Scapa
     does not specify what would suffice as a "scientific definition," although Scapa is quick to

21   discount Dr. Brodkin's qualitative criteria. (*See id.*) Given Dr. Brodkin's experience and
     expertise in reviewing occupational histories and identifying significant exposures, the jury was
     free to weigh his testimony as it wished. The court may not reweigh the evidence. *See Landes*

22   *Constr.*, 833 F.2d at 1371.

1 | conclusion on dose: Mr. Barabin was likely exposed to between 0.05 and 41 F/CC of

2 | asbestos when working with the dryer felts. (3/27/18 Trial Tr. at 249:17-19.) Exposure

3 | of this level for 12 years, in Dr. Brodkin's opinion, qualified as a "significant dose of

4 | asbestos," especially compared to the level of asbestos—0.7 F/CC to less than 1 F/CC—

5 | that increases the risk of disease.[16] (*Id.* at 251:18-21, 252:2-7.)

6 |       Recognizing that Dr. Brodkin did, in fact, testify to dose, Scapa falls back on a

7 | one-sentence argument that Dr. Brodkin was not qualified to give such testimony.

8 | (JMOL Mot. at 4.) But Dr. Brodkin reviewed the literature on airborne exposures at

9 | paper mills and applied those findings to Mr. Barabin's work experience. (*See* 3/27/18

10 | Trial Tr. at 247:15-249-3.) Combined with his many years of experience, the court finds

11 | that Dr. Brodkin possesses the necessary "knowledge, skill, [or] experience" to reach a

12 | dosage conclusion. *See* Fed. R. Evid. 702.

13 |       Scapa next seeks to exclude Dr. Brodkin's testimony because it is based on the

14 | notion that identified exposures "increase the risk of mesothelioma." (JMOL Mot. at 6

15 | (emphasis removed).) Increasing the risk of a disease, Scapa contends, is not evidence of

16 | legal causation. (*See id.*) But mesothelioma is a dose response disease, meaning that the

17 | dose is correlated with the risk of developing the disease. (*See* 3/27/18 at 252:9-22.)

18 | Thus, testimony regarding whether a particular dose is sufficient to qualify as a

19 | //

20 |

21 | [16] Scapa additionally challenges the dose estimate because it is "based on unreliable studies, such as the Millette study." (JMOL Mot. at 4.) In its *Daubert* order, the court found the Millette study reliable. (*See* 2/12/18 Order at 17-22.) And Scapa does not point to any reason why the court should reach a different conclusion now. (*See* JMOL Mot. at 4.) Accordingly, the jury was free to consider this evidence.

22 |

1     substantial factor necessarily involves analysis regarding the risk of disease. The court

2     declines to exclude testimony merely because a risk assessment is mentioned.

3         In sum, Scapa's attempt to exclude Dr. Brodkin's testimony falls short. As was

4     the case before trial, the court concludes that Dr. Brodkin's expert opinions meet the

5     standard laid out in *Daubert* and Federal Rule of Evidence 702. Thus, the jury was free

6     to consider Dr. Brodkin's conclusions as substantial evidence of causation.[17]

7         4. <u>Exposure</u>

8         Scapa asserts that Ms. Barabin's evidence at trial "shows nothing more than a

9     theoretical possibility that Mr. Barabin was exposed to asbestos from a Scapa dryer felt."

10     (JMOL Mot. at 7.) Specifically, Scapa challenges the sufficiency of two categories of

11     exposure evidence: (1) Mr. Barabin's occupational history that served as circumstantial

12     evidence of working with Scapa's asbestos-containing dryer-felts; and (2) expert

13     testimony regarding the release of asbestos fibers when Mr. Barabin worked with the

14     felts. (*See id.* at 7-12.) The court disagrees with Scapa on both fronts.

15         *a. Occupational History*

16         Substantial evidence exists in the record to support the jury's finding that Mr.

17     Barabin worked with asbestos-containing Scapa dryer felts while at the Camas paper

18     //

19

---

20     [17] In response to Scapa's challenge to Dr. Brodkin, Ms. Barabin argues that the court "must have determined that the evidence presented from Dr. Brodkin was sufficient for the jury

21     to decide in plaintiff's favor" because during trial, the court excluded another one of Ms. Barabin's proffered expert witnesses, Dr. Adrian Brody, as cumulative. (JMOL Resp. at 6; *see*

22     3/30/18 Order (Dkt. # 735).) In so arguing, Ms. Barabin misapprehends the meaning of "cumulative." *See* Fed. R. Evid. 403. The exclusion of redundant testimony says nothing about the sufficiency of the remaining evidence in the record.

mill. For instance, the parties stipulated that Mr. Barabin "chang[ed] dryer felts during shut downs and also as part of routine maintenance when felts ripped or broke"; "cut the felts and installed new ones"; and "blew out the paper machines using compressed air." (Ex. 600 ¶¶ 7-8.) Evidence further evinced that in 1974 and 1975, Mr. Barabin performed these functions on paper machine 6. (*See* 3/26/18 Trial Tr. at 191:1-10, 192:21-25, 196:4-10, 364:2-9, 367:10-19.) Scapa provided 41 asbestos-containing dryer felts out of 83 total to be used on that specific machine. (Ex. 600 ¶ 17.) Mr. Barabin additionally worked on paper machine 5 during this time period (3/26/18 Trial Tr. at 196:4-10); Scapa sold 73 asbestos-containing dryer felts out of 75 total for that machine (Ex. 600 ¶ 17). This evidence of Mr. Barabin's close proximity to asbestos-containing dryer felts, combined with Scapa's sale records, adequately supports the jury's conclusion that Mr. Barabin was exposed to asbestos fibers from Scapa dryer felts. *See Wallace*, 479 F.3d at 624; *Lockwood*, 744 P.2d at 612.

Scapa emphasizes that Mr. Barabin's work on paper machines 5 and 6 were "occasional" (*see* JMOL Mot. at 8) and that the lack of direct evidence of Mr. Barabin working with Scapa felts undermines the jury's verdict (*see* JMOL Reply (Dkt. # 769)). The court agrees that a jury certainly could have concluded on this record that Mr. Barabin was not exposed to asbestos fibers from Scapa dryer felts. But the fact that it is "possible to draw two inconsistent conclusions from the evidence" is insufficient to secure a judgment as a matter of law. *Landes Constr.*, 833 F.2d at 1371. Instead, the evidence must permit only "one reasonable conclusion" that is contrary to the jury's verdict. *Escriba*, 743 F.3d at 1242. That is not the case here. Accordingly, the court

1    denies Scapa's motion for judgment as a matter of law on this ground.

2            *b. Exposure Expert Testimony*

3        Lastly, Scapa disputes the admissibility of the exposure evidence proffered by two

4    of Ms. Barabin's experts: Dr. Compton and Mr. DePasquale.[18] Scapa's arguments,

5    however, largely repeat those in its *Daubert* motion and the ones it raised against Dr.

6    Brodkin.[19] (*See* JMOL Mot. at 9-12; Exposure MTE); *supra* § III.B.3. For instance,

7    Scapa once again challenges Dr. Compton and Mr. DePasquale's reliance on the Millette

8    studies. (JMOL Mot. at 9, 12.) As discussed above, the court has already determined in

9    its *Daubert* order that the Millette studies are reliable and thus, the exposure experts

10    could consider them. *See supra* § III.B.3 n.13. Scapa additionally takes issue, once

11    again, with how Mr. DePasquale spoke in terms of the increase in risk of disease. (JMOL

12    Mot. at 11.) As the court concluded for Dr. Brodkin, this argument falls short. *See supra*

13    § III.B.3.

14        Scapa also repeats its argument that neither expert took into account the actual

15    conditions at a paper mill. (JMOL Mot. at 10-12.) As the court concluded in its *Daubert*

16    order, the differences in testing condition do not render the studies unreliable and thus do

17    not mandate exclusion. (*See* 2/12/18 Order at 22-25.) Indeed, Scapa cross-examined on

18

19        [18] Ms. Barabin again argues that Scapa's arguments regarding these experts were not properly preserved in its Rule 50(a) motion. (JMOL Resp. at 2.) As it did above, the court does not decide this question because even assuming the arguments are proper, the court concludes

20    that they are unavailing. *See supra* § III.B.2.

21        [19] As was the case with Dr. Brodkin's testimony, Scapa reuses some portions of its *Daubert* motion in its present challenge to the exposure experts' testimonies. (*Compare*

22    Exposure MTE at 4-5 (discussing Mr. DePasquale's failure to account for ventilation), *with* JMOL Mot. at 11-12 (same).)

1 this exact point. Dr. Compton conceded that he did not "attempt[] to replicate [Mr.

2 Barabin's] everyday environmental conditions." (3/28/18 Trial Tr. at 498:10-21.) Mr.

3 DePasquale admitted that he did not know the exact level of ventilation at the Camas

4 paper mill. (*Id.* at 553:12-23.) With this evidence, the jury was free to weigh the expert

5 testimonies accordingly. The court cannot and declines to reweigh the testimonies now.

6 *See Landes Constr.*, 833 F.2d at 1371.

7         Lastly, Scapa asserts that Dr. Compton's testimony "did not satisfy Rule 702's

8 'fit' requirement" because Dr. Compton's tests were not designed to answer whether the

9 release of asbestos fibers exceeded the current Occupational Safety and Health

10 Administration's ("OSHA") permissible exposure limits. (JMOL Mot. at 10.) While this

11 information may have been relevant, Scapa makes no showing why without it, Dr.

12 Compton's testimony must be excluded. (*See id.*) Indeed, even without a comparison to

13 OSHA permissible levels, Dr. Compton's tests—which detail the amount of

14 asbestos-fibers released from Scapa dryer felts—remain directly connected to the

15 disputed issue of exposure and thus would assist the jury in understanding the evidence

16 and determining a fact in issue. *See Daubert*, 509 U.S. at 591-92.

17         Because the court concludes that the testimonies of Dr. Compton and Mr.

18 DePasquale are admissible, the jury was free to consider their testimonies in determining

19 whether Mr. Barabin was exposed to asbestos fibers from Scapa's dryer felts. The expert

20 testimonies, combined with the evidence regarding Mr. Barabin's work history, constitute

21 substantial evidence to support the jury's verdict. Accordingly, the court denies Scapa's

22 motion for judgment as a matter of law on this ground.

# IV.   CONCLUSION

For the foregoing reasons, the court DENIES Ms. Barabin's motion for a partial new trial (Dkt. # 757) and DENIES Scapa's renewed motion for a judgment as a matter of law (Dkt. # 758).

Dated this 4ᵗʰ day of June, 2018.

JAMES L. ROBART
United States District Judge